IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SALIX PHARMACEUTICALS, LTD; SALIX
PHARMACEUTICALS, INC; BAUSCH
HEALTH IRELAND LTD; ALFASIGMA
S.P.A.,

        Plaintiffs;    Civil Action No. 20-cv-430-RGA

  v.

NORWICH PHARMACEUTICALS, INC.,

        Defendant.

## MEMORANDUM OPINION

Jack B. Blumenfeld, Karen Jacobs, Cameron P. Clark, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Scott K. Reed, Steven C. Kline (argued), Shannon K. Clark (argued), VENABLE LLP, New York, NY,
Attorneys for Plaintiffs.

Karen E. Keller, David M. Fry, Nate Hoeschen, SHAW KELLER LLP, Wilmington, DE; Matthew J. Becker, Chad A. Landmon (argued), Stacie L. Ropka, Matthew S. Murphy (argued), AXINN, VELTROP & HARKRIDER LLP, Hartford, CT,
Attorneys for Defendants.

April 29, 2021

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Before the Court is the issue of claim construction of various terms in U.S. Patent Nos. 7,045,620 ("the '620 Patent"), 7,902,206 ("the '206 Patent"), 7,915,275 ("the '275 Patent"), 8,642,573 ("the '573 Patent"), 9,629,828 ("the '9,828 Patent"), and 10,314,828 ("the '4,828 Patent"). The Court has considered the Parties' Joint Claim Construction Brief. (D.I. 129). I heard oral argument on April 22, 2021.

## I. BACKGROUND

This is a Hatch-Waxman action regarding Plaintiffs' Xifaxan® brand (rifaximin) 550 mg dose product. Plaintiffs' Xifaxan® 550 mg tablets are indicated, in adults, for reduction in risk of overt hepatic encephalopathy (HE) recurrence and treatment of irritable bowel syndrome with diarrhea (IBS-D).

Plaintiffs currently assert eighteen patents against Defendant, but only four terms from six patents are disputed. The patents with terms is dispute are the '620, '206, '275, '573, '9,828, and '4,828 Patents. The '620 Patent is directed to various rifaximin crystalline forms α, β, and γ. The '206 Patent claims processes for making rifaximin α, β, and γ. The '275 Patent is directed to methods of treating bacterial infections with rifaximin α, β, and γ. The '573, '4,828, and the '9,828 Patents claim methods of maintaining remission of HE through the administration of rifaximin.

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate

weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324) (alteration in original). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted).

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19 (internal quotation marks

omitted). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id*. Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id*.

"A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GMBH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (citation and internal quotation marks omitted).

## III. CONSTRUCTION OF AGREED-UPON TERMS

I adopt the following agreed-upon constructions:

| Claim Term | Construction |
| --- | --- |
| "hepatic encephalopathy (HE)" ('573 Patent, Claims 1 and 3; '4,828 Patent, Claims 1 and 6; '195 Patent, Claims 1 and 2; '397 Patent, Claims 1-4, 13; '398 Patent, Claim 1; '252 Patent, Claim 14; '9,828 Patent, Claim 1; '694 Patent, Claim 1, 3-5) | A serious, rare, complex, episodic, neuropsychiatric syndrome associated with advanced liver disease |
| "breakthrough overt HE" / "breakthrough overt HE episode" ('397 Patent, Claims 1-3, 13; '694 Patent, Claims 1, 3, and 4) | An increase of a Conn Score to Grade $\geq 2$ (e.g., 0 or 1 to $\geq 2$) or a Conn and Asterixis score increase of one grade each of those subjects having a baseline Conn Score of 0 |
| "peaks at values of the diffraction angles 2θ" ('620 Patent, Claim 3) | peaks at values of the diffraction angles 2θ ($\pm 0.2$ 2θ) |
| "determining the severity of the subject's HE" ('252 Patent, Claim 14) | measuring the severity of the neuropsychiatric syndrome associated with advanced liver disease |
| "administering between 1000 and 1200 mg of rifaximin daily and cautiously for TD to the subject if the HE is severe" ('252 Patent, Claim 14) | Administering between 1000 and 1200 mg of rifaximin daily to a subject for travelers' diarrhea only with consideration of the degree and severity of the subject's hepatic insufficiency, if the hepatic encephalopathy is severe |

4

## IV. CONSTRUCTION OF DISPUTED TERMS

### 1. "purified" ('620 Patent, Claims 3)

    a.    *Plaintiffs' proposed construction*: "A term that conveys that the solid-state profile of rifaximin, that is, the specific solid-state form or forms thereof is controlled"

    b.    *Defendant's proposed construction*: "Free of other polymorphic forms of rifaximin"

    c.    *Court's construction*: "Free of other polymorphic forms of rifaximin"

At oral argument, I construed "purified" to mean "free of other polymorphic forms of rifaximin."

### 2. "solvent" ('206 Patent, Claims 12 and 16)

    a.    *Plaintiffs' proposed construction*: "A liquid that may be used to dissolve a substance – here rifaximin – to form a solution."

    b.    *Defendant's proposed construction*: "A mixture consisting of ethyl alcohol and water"

    c.    *Court's construction*: "A liquid that may be used to dissolve a substance to form a solution."

Plaintiffs argue that their proposed construction of "solvent" is the plain and ordinary meaning of the term and that the intrinsic evidence supports their construction. (D.I. 82 at 34). Plaintiffs assert that a person of ordinary skill in the art would understand a solvent to be a "liquid that may be used to dissolve a substance (in the claims here, rifaximin) to form a solution." (*Id.*). Plaintiffs also contend that Defendant's construction impermissibly limits the claim to the examples in the '206 Patent. (*Id.* at 34-35).

Defendant argues that the intrinsic record narrows the meaning of "solvent" for three reasons: (1) the abstract states that the "object of the invention" is recrystallizing rifaximin from ethyl alcohol and water; (2) the specification states that the "composition of the solvent mixture" is "critical;" and (3) the patent only discloses ethyl alcohol and water as a solvent mixture for

5

carrying out the claimed invention. (*Id.* at 36). Defendant contends that the specification only discloses ethyl alcohol and water as a solvent, and therefore, "solvent" is limited to a narrower construction than Plaintiffs suggest. (*Id.* at 36-38).

I agree with Plaintiffs. Plaintiffs' proposed construction reflects the plain and ordinary meaning of "solvent" and there is no disavowal that merits departing from the plain and ordinary meaning. *See Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). *Merriam-Webster's Collegiate Dictionary* defines solvent as "(1) a [usually] liquid substance capable of dissolving or dispersing one or more other substances" and "(2) something that provides a solution." (D.I. 84-2, Exh. J at 3 of 4). This definition is reflected in Plaintiffs' proposed construction of "a liquid that may be used to dissolve a substance – here rifaximin – to form a solution."

Defendant's arguments that the inventors disavowed all solvents other than ethyl alcohol and water are unpersuasive. "[T]he standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature." *Poly-Am.*, 839 F.3d at 1136. Defendant has not shown "clear and unequivocal evidence" of disavowal in the '206 Patent.

The Federal Circuit has found disavowal where the patent clearly and consistently described something as the "object of the invention" *See Honeywell Intern., Inc v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (referring to the claimed invention as the "object of the invention" four times throughout the course of the patent); *see also Lydall Thermal/Acoustical, Inc. v. Fed. Mogul Corp.*, 344 F. App'x 607, 613-14 (Fed. Cir. 2009).

The '206 Patent does not clearly and consistently claim a solvent of ethyl alcohol and water as the "object of the invention." Instead, the patentee makes it clear that the objects of the

invention are the polymorphous forms of rifaximin and the improved process for synthesizing those forms. The '206 Patent specification states, "The polymorphous forms of rifaximin object of the present patent application…;" "Form α, form β and form γ of rifaximin have then been synthesized and they are the object of the invention;" "[A] further object of the present invention is an improved process for the industrial manufacturing of the α, β, and γ forms of rifaximin;" and, "As already said, form α, form β and form γ of the antibiotic known as rifaximin (INN), processes for their production and the use thereof in the manufacture of medicinal preparations for oral or topical route are the object of the present invention." ('206 Patent, col. 2:32-33, 2:43-44, 3:7-9, 3:26-29 (D.I. 1-1, Exh. D at 46 of 851)).

Unlike *Honeywell*, the '206 Patent does not clearly and consistently state that the "object of the invention" requires a solvent of ethyl alcohol and water. Instead, the object of the invention are the forms of rifaximin and the improved process for synthesizing them. Therefore, Defendant's argument to limit the solvent mixture to ethyl alcohol and water based on this reason is not persuasive.

Defendant next argues that since the solvent mixture is critical, and ethyl alcohol and water is the only disclosed solvent mixture, "solvent" must be limited to ethyl alcohol and water. Defendant relies on the specification, which states, "the composition of the solvent mixture from which crystallization is carried out, the temperature at which the reaction mixture is kept after crystallization and the period of time at which that temperature is kept, have proven to be critical." ('206 Patent, col. 4:2-6 (D.I. 1-1, Exh. D at 47 of 851)). While the specification states that certain conditions are "critical" for crystallization, including "the composition of the solvent mixture," (*id.*), it does not deem a certain solvent mixture (such as ethyl alcohol and water, as Defendant argues) to be critical. The fact that the '206 Patent specification says that the

7

composition of the solvent mixture is critical, and that it includes embodiments of the invention that use ethyl alcohol and water, does not rise to the level of disclaimer.

Defendant's final argument for a narrow construction of "solvent" is that ethyl alcohol and water is the only disclosed solvent for carrying out the claimed invention. (D.I. 82 at 36). However, the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323. While the specification only describes ethyl alcohol and water in the crystallization process, that does not mean that other embodiments have been excluded from the scope of the claims.

There is no clear and unequivocal evidence that the claimed invention of the '206 Patent does not include solvents other than ethyl alcohol and water. The '206 Patent does not disparage prior art that used other solvents. The '206 Patent does not clearly and consistently state that a solvent mixture of ethyl alcohol and water is the "object of the invention." In other words, the '206 Patent does not "clearly and unequivocally" provide that solvents other than ethyl alcohol and water are excluded from the claims. As solvents other than ethyl alcohol and water have not been disclaimed, the Court adopts Plaintiff's proposed construction which reflects the plain and ordinary meaning of "solvent."

**3.     "therapeutically effective amount" ('275 Patent, Claim 1)**

    a.     *Plaintiffs' proposed construction*: "An amount which is effective, upon single or multiple dose administration to treat a bacterial infection in a patient suffering from a bowel related disorder"

    b.     *Defendant's proposed construction*: "An amount of an agent which is effective, upon single or multiple dose administration to the patient, in inhibiting the virus, or in prolonging the survivability of the patient with such bacterial infection beyond that expected in the absence of such treatment"

  c. *Court's construction*: "An amount of an agent which is effective, upon single or multiple dose administration to the patient, in prolonging the survivability of the patient with such bacterial infection beyond that expected in the absence of such treatment"

In an April 27, 2021 letter, the parties stipulated that "therapeutically effective amount" means "an amount of an agent which is effective, upon single or multiple dose administration to the patient, in prolonging the survivability of the patient with such a bacterial infection beyond that expected in the absence of such treatment." (D.I. 89). The Court adopts this construction.

**4.**   **"remission of HE" / "remission from HE" ('573 Patent, Claims 1 and 3; '9,828 Patent, Claims 1-3; '4,828 Patent, Claim 1)**

  a. *Plaintiffs' proposed construction*: "No overt HE episode (e.g., a Conn score of 0 or 1) in a subject with a history of overt HE"

  b. *Defendant's proposed construction*: "A Conn score of 0 or 1 in a subject not experiencing overt HE, with a history of an overt HE episode"

  c. *Court's construction*: "No overt HE episode in a subject with a history of overt HE"

The parties agree that a subject in "remission of HE" or in "remission from HE" has a history of overt HE and experiences no overt HE episode. (D.I. 82 at 58, 60). The only dispute is whether a Conn score is one of the ways or the only way to evaluate whether a subject is in remission.

Plaintiffs argue that while a Conn score of 0 or 1 is an example of a subject in remission from HE, it is not the only way to determine whether a subject is in remission. (*Id.* at 58-59). In support of this construction, Plaintiff points to portions of the '573, '9,828, and '4,828 patent specifications which describe other methods to diagnose HE including measuring asterixis and administering neurophysiological tests. (*Id.* at 59). Plaintiffs contend that Defendant's construction is "inconsistent with the intrinsic evidence and impermissibly reads a limitation from dependent claims into independent claims." (*Id.* at 58). Plaintiffs also argue that their

9

construction of this term is proper under claim differentiation as the independent claims of the '573 patent and the '4,828 patent refer to remission of HE not in relation to a Conn score, while dependent claims in the same patents limit remission of HE to a Conn score of 0 or 1. (*Id.* at 59-60).

Defendant asserts that "remission [of/from] HE" should be construed to require the subject to have a Conn score of 0 or 1. (*Id.* at 60). Defendant argues that this construction is supported by the fact that the '573, '9,828, and '4,828 patent specifications only describe a Conn score as a measurement of remission. (*Id.* at 60). Defendant contends that the patentee acted as its own lexicographer by describing, in the '573, '9,828, and '4,828 patent specifications, clinical studies where the definition of remission was a Conn score of 0 or 1. (*Id.* at 60). Therefore, Defendant argues that to be in remission from/of HE, a subject must have a Conn score of 0 or 1. (*Id.* at 60-61). Defendant also contends that Plaintiffs' construction improperly expands the scope of the claims, as the specification mentions other measurements, such as asterixis and certain neurophysiological tests, to diagnose HE, not to determine if a subject is in remission. (*Id.* at 61-62).

"The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Here, the patentee did not act as its own lexicographer. In describing clinical studies that used "a Conn score of 0 or 1" as the definition for remission, the patentee was not expressly defining a term. The patentee was simply restating the criteria for subjects in the clinical trials. (*See, e.g.*, '573 Patent, col. 46:15-18 (D.I. 1-1, Exh. L at 221 of 851); '9,828 Patent, col. 46:50-53 (D.I. 1-1, Exh. U at 654 of 851); '4,828 Patent, col. 47:22-25 (D.I. 1-1,

10

Exh. V at 745 of 851)). In recounting the parameters of the clinical studies, the patentee was not acting as a lexicographer.

Instead, the '573, '9,828, and '4,828 patent specifications do not define "remission [of/from] HE." The patents detail how HE is diagnosed and state that a Conn score is one method of making such a diagnosis. "HE is a clinical diagnosis made by some tools, including the West Haven, or Conn, Score." ('573 Patent, col. 27:37-38 (D.I. 1-1, Exh. L at 211 of 851)). "Measurements of change in mental status may be done, for example, by the Conn score (also known as the West Haven score). The Conn score has been widely used as a measure of mental state in HE studies. . . ." ('9,828 Patent, col. 26:48-51, (D.I. 1-1, Exh. U at 644 of 851)). While the patents make clear that there are multiple ways of diagnosing HE, including use of a Conn score, the patents do not define or describe how remission from HE is determined.

Plaintiffs and Defendant agree that a subject in "remission [from/of] HE" has a history of HE and is not experiencing an overt HE episode. The patents do not specify whether or how a Conn score is used in determining remission from HE. The Court will not read in the limitation that a certain Conn score is required to determine remission from HE. Therefore, the Court will construe "remission [of/from] HE" to mean "No overt HE episode in a subject with a history of overt HE," as the patent specifications do not further limit how remission is measured.