IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SALIX PHARMACEUTICALS, LTD.,<br>SALIX PHARMACEUTICALS, INC.,<br>BAUSCH HEALTH IRELAND LTD., and<br>ALFASIGMA S.P.A., | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 20-430-RGA |
| NORWICH PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) ) | |

**DEFENDANT NORWICH PHARMACEUTICALS, INC.'S<br><u>OPENING POST-TRIAL BRIEF</u>**

OF COUNSEL:
Matthew J. Becker
Stacie L. Ropka
Matthew S. Murphy
Chad A. Landman
Rebecca L. Clegg
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT  06103
(860) 275-8100

Aziz Burgy
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC  20036
(202) 721-5417

Richard S. Camposanto
AXINN, VELTROP & HARKRIDER LLP
560 Mission Street
San Francisco, CA 94105
(415) 490-2000

Dated:  April 28, 2022

Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................... 1

II.   THE ASSERTED HE CLAIMS ARE INVALID .................................................... 2

      A.    Level of Ordinary Skill in the Art.............................................................. 2

      B.    The Asserted HE Claims Are Invalid as Obvious. ..................................... 2

            1.    As of 2008, The Use of Rifaximin to Treat HE Was Known to Be
                  Safe, Effective, and Widespread ..................................................... 3

            2.    Bausch HE Study in view of the Salix Presentation Disclosed All
                  Limitations ....................................................................................... 5

            3.    Leevy 2007 in view of the Common Knowledge Disclosed All
                  Limitations ....................................................................................... 8

            4.    POSAs Would Have Had Motivation to Combine the Prior Art ............... 9

            5.    POSAs Would Have Had a Reasonable Expectation of Success in
                  Arriving at the Claimed Methods. ................................................. 13

      C.    Three of the Four Asserted HE Claims Lack Adequate Written Description....... 16

III.  THE ASSERTED IBS-D CLAIMS ARE INVALID .............................................. 17

      A.    Level of Ordinary Skill in the Art............................................................ 17

      B.    The Asserted IBS-D Claims Are Invalid as Obvious. .............................. 17

            1.    As of 2008, The Use of Rifaximin to Treat IBS-D Was Known ............. 17

            2.    Pimentel 2006 and the RFIB 2001 Protocol Disclosed the Limitations
                  of the IBS-D Claims........................................................................ 19

            3.    Cuoco and the RFIB 2001 Protocol Disclosed the Limitations of Claim
                  2 of the '569 Patent........................................................................ 20

            4.    Barrett and the RFIB 2001 Protocol Disclosed the Limitations of
                  Claim 3 of the '667 Patent. ........................................................... 20

            5.    Motivation to Combine the Prior Art.............................................. 20

                  a.    Motivation to Adjust Rifaximin Dosage..................................... 21

                  b.    Motivation to Treat IBS-D Patients 65 Years of Age and Older .. 24

                  c.    Salix's Cited References Do Not Rebut the Strong Motivation
                        to Use Rifaximin to Treat IBS-D. ................................................ 25

            6.    A POSA Would Have Had a Reasonable Expectation of Success. .......... 27

      C.    Claim 2 of the '569 patent Is Invalid as Indefinite. ............................... 28

      D.    Claim 2 of the '569 Patent Lacks Adequate Written Description. ....................... 30

IV.   THE ASSERTED POLYMORPH CLAIMS ARE INVALID ......................................... 31

      A.    Level of Ordinary Skill in the Art............................................................ 31

B.      As of 2003, Crystalline Rifaximin and How to Synthesize It Were Known ........ 31

C.      Claim 4 of the '199 Patent Is Inherently Anticipated by Cannata ...................... 32

D.      The Asserted Polymorph Claims Are Invalid as Obvious .................................... 34

E.      The Asserted Polymorph Claims Lack of Written Description ............................ 37

V.      CONCLUSION.................................................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*,
    759 F.3d 1285 (Fed. Cir. 2014)......................................................................37

*Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*,
    903 F.3d 1310 (Fed. Cir. 2018)..............................................................15, 27

*Allergan, Inc. v. Sandoz Inc.*,
    726 F.3d 1286 (Fed. Cir. 2013)..............................................................16, 36

*Apotex Inc. v. OSI Pharm. LLC*,
    No. IPR2016–01284, 2018 WL 335096 (P.T.A.B. Jan. 8, 2018) ............................8

*In re Applied Materials, Inc.*,
    692 F.3d 1289 (Fed. Cir. 2012).....................................................4, 10, 21, 23

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010).................................................16, 30, 37, 38

*Asyst Techs., Inc. v. Emtrak, Inc.*,
    544 F.3d 1310 (Fed. Cir. 2008)..............................................................12, 13

*Atlas Powder Co. v. IRECO Inc.*,
    190 F.3d 1342 (Fed. Cir. 1999)......................................................................33

*Auxilium Pharm., Inc. v. Watson Labs., Inc.*,
    No. 12–3084 (JLL), 2014 WL 9859224 (D.N.J. Dec. 16, 2014)............................8

*Aventis Pharma S.A. v. Hospira, Inc.*,
    743 F. Supp. 2d 305 (D. Del. 2010), *aff'd*, 675 F.3d 1324 (Fed. Cir. 2012) ........................10

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018)......................................................................29

*Boston Sci. Corp. v. Johnson & Johnson*,
    647 F.3d 1353 (Fed. Cir. 2011)......................................................................38

*In re Copaxone Consol. Cases*,
    906 F.3d 1013 (Fed. Cir. 2018)......................................................................18

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005)......................................................................28

*Dow Chem. Co. v. Nova Chem. Corp.*,
  803 F.3d 620 (Fed. Cir. 2015) ................................................................................30

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
  8 F.4th 1331 (Fed. Cir. 2021) .........................................................................15, 27

*Flash-Control, LLC v. Intel Corp.*,
  No. 2020-2141, 2021 WL 2944592 (Fed. Cir. July 14, 2021) ................................31

*Galderma Laboratories, L.P. v. Tolmar, Inc.*,
  737 F.3d 731 (Fed. Cir. 2013) .........................................................................22, 24

*Glaxo Grp. Ltd. v. Teva Pharm. USA, Inc.*,
  No. C.A. 02-219, 2004 WL 1875017 (D. Del. Aug. 20, 2004) ..............................34

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
  748 F.3d 1326 (Fed. Cir. 2014) .....................................................................3, 4, 14

*Hospira, Inc. v. Fresenius Kabi USA, LLC*,
  946 F.3d 1322 (Fed. Cir. 2020) ............................................................................32

*Inguran, LLC v. ABS Global, Inc.*,
  C.A. No. 7-CV-446-WMC, 2019 WL 943515 (W.D. Wis. Feb. 26, 2019) ............29

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
  902 F.3d 1372 (Fed. Cir. 2018) ............................................................................28

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014) ............................................................................28

*Iron Grip Barbell Co., Inc. v. USA Sports*,
  Inc., 392 F.3d 1317 (Fed. Cir. 2004) ....................................................................21

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
  10 F.4th 1330 (Fed. Cir. 2021) .............................................................................38

*KSR Int'l v. Teleflex Inc.*,
  550 U.S. 398 (2007) .................................................................................9, 12, 23

*Medichem, S.A. v. Rolabo, S.L.*,
  437 F.3d 1157 (Fed. Cir. 2006) .......................................................................16, 36

*MEHL/Biophile Int'l Corp. v. Milgraum*,
  192 F.3d 1362 (Fed. Cir. 1999) ............................................................................33

*In re Merck & Co.*,
  800 F.2d 1091 (Fed. Cir. 1986) .......................................................................16, 36

iv

*Monsanto Tech. LLC v. E. I. DuPont de Nemours & Co.*,
   878 F.3d 1336 (Fed. Cir. 2018)................................................................32

*In re Montgomery*,
   677 F.3d 1375 (Fed. Cir. 2012)................................................................14

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S.Ct. 2120 (2014)................................................................29

*Netscape Commc'ns Corp. v. Konrad*,
   295 F.3d 1315 (Fed. Cir. 2002)................................................................19

*In re O'Farrell*,
   853 F.2d 894 (Fed. Cir. 1988)................................................................14, 16, 36

*Omeros Corp. v. Par Sterile Prods. LLC*,
   No. 15-773-RGA (D. Del. June 29, 2017)................................................................8

*Ormco Corp. v. Align Tech., Inc.*,
   463 F.3d 1299 (Fed. Cir. 2006)................................................................18, 19

*OSI Pharm., LLC v. Apotex Inc.*,
   939 F.3d 1375 (Fed. Cir. 2019)................................................................15, 27

*Par Pharm. Inc. v. TWI Pharms., Inc.*,
   773 F.3d 1186 (Fed. Cir. 2014)................................................................22

*Person Pharms. LLC v. Alvogen Malta Operations Ltd.*,
   945 F.3d 1184 (Fed. Cir. 2019)................................................................7

*In re Peterson*,
   315 F.3d 1325 (Fed. Cir. 2003)................................................................4, 21, 22

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007)................................................................ *passim*

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
   491 F.3d 1342 (Fed. Cir. 2007)................................................................5, 27

*Prometheus Labs. Inc. v. Roxane Labs., Inc.*,
   2014 WL 12607728 (D.N.J. May 21, 2014)................................................................15

*Schering Corp. v. Geneva Pharm., Inc.*,
   339 F.3d 1373 (Fed. Cir. 2003)................................................................33

*SmithKline Beecham Corp. v. Apotex Corp.*,
   403 F.3d 1331 (Fed. Cir. 2005)................................................................33

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015)........................................................................................30

*UCB, Inc. v. Watson Labs. Inc.*,
   927 F.3d 1272 (Fed. Cir. 2019)........................................................................................18

*Unigene Labs., Inc. v. Apotex, Inc.*,
   655 F.3d 1352 (Fed. Cir. 2011)..........................................................................................9

*Vas-Cath Inc. v. Mahurkar*,
   935 F.2d 1555 (Fed. Cir. 1991)...................................................................................16, 31

*Yeda Research v. Mylan Pharm. Inc.*,
   906 F.3d 1031 (Fed. Cir. 2018)........................................................................................18

**Statutes**

35 U.S.C. §112 ......................................................................................................................30

**Other Authorities**

MPEP § 2107.03 ...................................................................................................................15

## TABLE OF ABBREVIATIONS

| Abbreviation | Exhibit No. | Description |
|---|---|---|
| Norwich | | Norwich Pharmaceuticals, Inc. |
| Plaintiffs | | Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc., Bausch Health Ireland Ltd., Alfasigma S.p.A. |
| NDA | | New Drug Application |
| ANDA | | Abbreviated New Drug Application |
| PTO | | U.S. Patent and Trademark Office |
| FDA | | U.S. Food and Drug Administration |
| SEC | | U.S. Securities and Exchange Commission |
| TD | | Travelers' diarrhea |
| HE | | Hepatic encephalopathy |
| IBS | | Irritable bowel syndrome |
| IBS-D | | Irritable bowel syndrome with diarrhea |
| '199 patent | JTX2 | United States Patent No. 7,612,199 |
| '206 patent | JTX3 | United States Patent No. 7,902,206 |
| Polymorph Patents | | The '199 patent and '206 patent |
| Asserted Polymorph Claims | | Claim 4 of the '199 patent and claim 36 of the '206 patent |
| β | | Beta |
| α | | Alpha |
| γ | | Gamma |
| δ | | Delta |
| ε | | Epsilon |
| '573 patent | JTX11 | United States Patent No. 8,642,573 |
| '195 patent | JTX19 | United States Patent No. 9,421,195 |
| '397 patent | JTX22 | United States Patent No. 10,335,397 |
| HE Patents | | The '573 patent, '195 patent, and '397 patent |
| Asserted HE Claims | | Claim 8 of the '573 patent, claim 6 of the '195 patent, and claims 11 and 12 of the '397 patent |
| '569 patent | JTX9 | United States Patent No. 8,309,569 |
| '667 patent | JTX26 | United States Patent No. 10,765,667 |
| IBS-D Patents | | The '569 patent and '667 patent |
| Asserted IBS-D Claims | | Claim 2 of the '569 patent and claim 3 of the '667 patent |
| Patents-in-Suit | | The '199 patent, '206 patent, '573 patent, '195 patent, '397 patent, '569 patent and '667 patent |
| POSA | | Person of ordinary skill in the art |
| UF | | Uncontested Facts, Joint Pretrial Order, Ex. 1 (D.I. 149) |
| NFOF | | Defendant Norwich Pharmaceuticals, Inc.'s Findings of Fact |
| XRPD | | X-ray powder diffraction |

| Abbreviation | Exhibit No. | Description |
|---|---|---|
| Leevy 2007 | DTX390 | Leevy, Carroll B. & Phillips, James A., *Hospitalizations During the Use of Rifaximin Versus Lactulose for the Treatment of Hepatic Encephalopathy*, Dig. Dis. Sci., vol. 52, 737-41 (2007) |
| Leevy Abstract | JTX47 | Leevy, Carroll B. & Phillips, James A., *A Crossover Retrospective Chart Review Evaluating Hospitalizations Associated with the Use of Rifaximin vs Lactulose in the Management of Patients with Hepatic Encephalopathy*, Abstract, Am. J. Gastroenterology, vol. 100, suppl. (2005) |
| Festi | JTX42 | Festi, D. et al., *Rifaximin in the Treatment of Chronic Hepatic Encephalopathy; Results of a Multicenter Study of Efficacy and Safety*, Current Therapeutic Res., vol. 54, num. 5, 598-609 (1993) |
| Puxeddu | JTX95 | Puxeddu, A. et al., *Rifaximin in the Treatment of Chronic Hepatic Encephalopathy*, Curr. Med. Res. & Op., vol. 13, num. 5, 274-81 (1995) |
| Williams 2000 | JTX66 | Williams, Roger et al., *Evaluation of the Efficacy and Safety of Rifaximin in the Treatment of Hepatic Encephalopathy: a Double-Blind, Randomized, Dose-Finding Multi-Centre Study*, Eur. J. Gastroenterology & Hepatology, vol. 12, num. 2, 203-08 (2000) |
| Mas 2003 | DTX425 | Mas, A. et al., *Challenges of Designing Hepatic Encephalopathy Treatment Trials*, Hepatology Elsewhere, vol. 38, num. 2, 527-529 (2003) |
| Sama | JTX59 | Sama, Claudia et al., *Clinical Effects of Rifaximin in Patients with Hepatic Encephalopathy Intolerant or Nonresponsive to Previous Lactulose Treatment: An Open-Label, Pilot Study*, Current Therapeutic Res., vol. 65, num. 5, 413-22 (2004) |
| Gerard | JTX90 | Gerard, Laura, Garey, Kevin W., & DuPont, Herbert L., *Rifaximin: a nonabsorbed rifamycin antibiotic for use in nonsystemic gastrointestinal infections*, 3 Expert Rev. Anti Infect. Ther. (2005) |
| Shah | JTX136 | Shah, Vijay H. & Kamath, Patrick, *Management of Portal Hypertension*, Postgraduate Med., vol. 119, num. 3, 14-18 (2006) |
| Di Stefano | JTX40 | Di Stefano, M. et al., *Rifaximin versus chlortetracycline in the short-term treatment of small intestinal bacterial overgrowth*, Alimentary Pharm. & Therapeutics, vol. 14, num. 5 551-56 (2000) |
| Lin '053 | JTX133 | U.S. Patent No. 6,861,053 |

| Abbreviation | Exhibit No. | Description |
|---|---|---|
| Lin '608 | JTX132 | U.S. Patent No. 7,718,608 |
| Lin 2006 | JTX69 | International Publication No. WO 2006/102536 |
| Pimentel 2006 | JTX53 | Pimentel, Mark et al., The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome, Annals Internal Med., vol. 145, num. 8, 557-63 (2006) |
| Pimentel Book | PTX752 | Pimentel, Mark A., A New IBS Solution: Bacteria – The Missing Link in Treating Irritable Bowel Syndrome, Health Point Press (2006) |
| RFIB2001 Study Protocol | DTX340 | Study to Assess the Efficacy and Safety of Rifaximin Administered BID in the Treatment of Patients With Diarrhea-Associated Irritable Bowel Syndrome, NCT00269412 (Dec. 2005) |
| Cuoco | JTX38 | Cuoco, L. & Salvagnini, M., Small Intestine Bacterial Overgrowth in Irritable Bowel Syndrome: a Retrospective Study With Rifaximin, Minerva Gastroenterologica e Dietologica, vol. 52, num. 1, 89-95 (2006) |
| Barrett | JTX71 | Barrett, G., Benefits of the Antibiotic Rifaximin as Empiric Therapy in Patients with Irritable Bowel Syndrome, Am. J. Gastroenterology, vol. 1, num. 9, suppl. (2006) |
| Yang | DTX892 | Yang, Janet, Rifaximin versus Other Antibiotics in the Primary Treatment and Retreatment of Bacterial Overgrowth in IBS, Dig. Dis. Sci. (2007) |
| Lauritano | DTX384 | Lauritano, E.C. et al., Rifaximin dose-finding study for the treatment of small intestinal bacterial overgrowth, 22 Aliment Pharmacol. Ther. 31-35 (2005) |
| Scarpellini | JTX60 | Scarpellini, E. et al., High dosage rifaximin for the treatment of small intestinal bacterial overgrowth, Alimentary Pharm. & Therapeutics, vol. 25, num. 7, 781–86 (Jan. 2007) |
| Jolley | DTX386 | Jolley J., High-dose rifaximin treatment alleviates global symptoms of irritable bowel syndrome, Clin. Exp. Gastroenterol. Vol. 4, 43-48 (2011) |
| Weinstock | DTX858 | Weinstock, L., Long-Term Outcome of Rifaximin Therapy in Non-constipation Irritable Bowel Syndrome, Dig. Dis. Sci., 56(11) 3389-3390 (2011) |
| Pimentel 2011 | DTX496 | Pimentel, M., et al., Effects of Rifaximin Treatment |
| Viscomi | JTX64 | U.S. Patent Application Publication No. US2005/0272754 |
| Cannata | JTX37 | U.S. Patent No. 4,557,866 |
| Marchi | JTX48 | U.S. Patent No. 4,341,785 |

| Abbreviation | Exhibit No. | Description |
| --- | --- | --- |
| 1987 FDA Guidance | DTX315 | Food and Drug Administration's 1987 Guideline For Submitting Supporting Documentation In Drug Applications For the Manufacture of Drug Substances |
| Normix Label | JTX94 | NDA 21-361, Rifaximin § 8.9 Commercial Marketing Experience – Normix Label (2000) |
| Viscomi 2008 | JTX65 | G. S. Viscomi et al., *Crystal Forms of Rifaximin and Their Effect on Pharmaceutical Properties*, 10 CrystEngComm 1074 (2008). |
| Braga 2012 | JTX105 | Dario Braga et al., *The Structure-Property Relationship of Four Crystal Forms of Rifaximin*, 14 CrystEngComm 6404 (2012) |
| Bacchi 2008 | DTX43 | Alessia Bacchi et al., *Sampling Rifamycin Conformational Variety By Cruising Through Crystal Forms: Implications for Polymorph Screening and For Biological Models*, 32 New J. Chem. 1725 (2008). |
| Viscomi Declaration | JTX80 | Declaration of Giuseppe C. Viscomi under 37 C.F.R. § 1.132 |

## I.    INTRODUCTION

Norwich has proven by clear and convincing evidence that each of the Asserted Claims is invalid.  As shown at trial, the Asserted Claims are simply Salix's attempt to patent what was already known in the prior art and prolong its monopoly on rifaximin.

First invented in the early 1980s, rifaximin was available and approved in multiple foreign countries for numerous indications, including the treatment of hepatic encephalopathy ("HE"), by 1985.  Thus, when rifaximin became available in the U.S. in 2004, its safety, efficacy, and widespread use to treat HE had been known for decades.  That long history of use abroad led doctors in the U.S. to immediately start using rifaximin off-label to treat HE.  Salix, well-aware of that off-label use, even held events where it touted the related increase in rifaximin sales and invited respected physicians to discuss the drug's long-term safety and efficacy.  And yet, it was not until October 2008 – more than four years after that off-label use began – that Salix finally filed the applications underlying the HE Patents.

Similarly, doctors in the U.S. had used rifaximin to treat irritable bowel syndrome with diarrhea ("IBS-D") well before the February 2008 priority date of the IBS-D Patents.  As established at trial, books and papers described the prior use of rifaximin to treat IBS-D as early as 2004.  By 2007, Salix had publicly announced results of a 680-patient clinical study showing rifaximin's efficacy in treating IBS-D.  Its own survey results showed that more than 74 percent of polled gastroenterologists had already prescribed rifaximin off-label to treat IBS.

Each of the Asserted Claims of the HE and IBS-D Patents therefore recite the use of a forty-year-old drug in treatments that had been widely practiced for years before their respective priority dates.  A POSA as of 2008, aware of rifaximin's excellent safety profile and the lack of any reports of clinical antibiotic resistance, would have had ample motivation to develop the claimed methods with a reasonable expectation of success.

The Polymorph Patents also describe what was already known in the art.  Namely, the Asserted Polymorph Claims relate to the beta polymorph of rifaximin, which any POSA could have made – and the named inventors actually did make – by following methods of manufacturing rifaximin that were disclosed in the 1980s.

Several Asserted Claims, to the extent not anticipated or obvious, are also invalid for indefiniteness or inadequate written description:  the HE Patents fail to support that rifaximin without lactulose could achieve the claimed effects; claim 2 of the '569 IBS-D patent recites the terms "durability of response" and "adequate relief of symptoms," which are both subjective and inadequately described in the specification; and the Polymorph Patents fail to show the inventors' possession of a crystalline rifaximin form having just the three claimed XRPD peaks.

Simply put, the Asserted Claims should never have issued.  Salix should not be rewarded for furthering the practice of patent evergreening and undeservedly extending its monopoly.

## II.    THE ASSERTED HE CLAIMS ARE INVALID

### A.  Level of Ordinary Skill in the Art

The parties offered differing POSA definitions, but analysis of the Asserted HE Claims would be the same under either.  Tr. 152:9-11, 337:14-19.  Norwich's proposed definition accurately captures the level of skill required, such as the need for a medical degree.  NFOF ¶ 1.

### B.  The Asserted HE Claims Are Invalid as Obvious.

The Asserted HE Claims are obvious over the Bausch HE Study and the Salix Presentation, and over Leevy 2007 and the common knowledge.  A POSA would have been motivated to combine the prior art to achieve the claimed subject matter with a reasonable expectation of success.  *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007).

**1.  As of 2008, The Use of Rifaximin to Treat HE
Was Known to Be Safe, Effective, and Widespread**

Well before the October 2008 priority date of the Asserted HE Claims, physicians

worldwide knew of and used rifaximin to treat HE.  NFOF ¶¶ 2, 5-8, 11.  Rifaximin first became

available in the 1980s and was indicated for treating HE no later than 2000.  *Id.*; NFOF ¶ 27.

Upon becoming available in the U.S. in 2004, rifaximin was immediately used off-label

for HE.  NFOF ¶¶ 5-8.  Salix encouraged using rifaximin off-label by inviting "key opinion

leaders" (including Dr. Leevy) to discuss their experiences doing so.  NFOF ¶¶ 6, 14, 23;

DTX584-1.  In 2005, Salix attributed increased average prescription size and sales to the

growing use of Xifaxan to treat chronic conditions such as HE.  NFOF ¶¶ 8, 17.  In 2007, Salix

market research suggested that most Xifaxan prescriptions at that time were written for HE.

NFOF ¶¶ 8, 18.  Moreover, drug compendia included HE as an approved off-label use for

rifaximin.  NFOF ¶ 18.  This use and promotion by Salix in the U.S. was in addition to over 20

years of use overseas before 2008.  NFOF ¶¶ 2, 6, 8, 11.

By 2008, numerous studies – from randomized, blinded, and controlled studies to

retrospective chart reviews reflective of the real-world experiences of patients and physicians –

demonstrated rifaximin's efficacy for HE.  NFOF ¶¶ 12-13, 15, 19-20.  Salix's pre-2008 studies

found rifaximin safe and effective for reducing clinical measures of HE (*i.e.*, Conn score).

NFOF ¶ 13; DTX425-7.  Those studies may not have been enough to gain FDA approval, but

FDA approval is not the standard for obviousness.  *Hoffmann-La Roche Inc. v. Apotex Inc.*, 748

F.3d 1326, 1331 (Fed. Cir. 2014); *infra* at II.B.5.

It was known by 2008 that HE exists on a spectrum and that the goal of treating patients

is to optimize their health along that spectrum.  NFOF ¶ 35.  This includes treating patients when

they have overt HE (Conn score ≥ 2) and when they have covert HE (Conn score < 2) by

maintaining that remission or reducing the risk of an overt HE breakthrough episode (*i.e.*, of HE recurrence). *Id.*; *e.g.*, NFOF ¶¶ 12-13, 15, 25; DTX424; JTX94.  In fact, numerous references disclosed treating patients with rifaximin while the patients were already in remission from HE. NFOF ¶¶ 12-13, 15, 23.

By 2008, rifaximin was dosed for HE at 400 mg to 1600 mg per day, most commonly as 400 mg three times daily.  NFOF ¶¶ 16, 19-20.  One study disclosed an average dose of 1055 mg per day, while another confirmed that 1200 mg per day is the lowest therapeutically-effective dose when compared to 600 mg and 2400 mg per day.  NFOF ¶¶ 13, 19-20.  Therefore, it was known that doses up to 2400 mg per day were safe, and it was expected that doses of about 1055 mg to 1200 mg were optimal.  *Id.*; NFOF ¶ 7.  Optimizing a dose within a range disclosed by the prior art is not inventive. *Pfizer*, 480 F.3d at 1368-69; *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012); *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003).

It was known by 2008 that rifaximin does not lead to significant side effects or antibiotic resistance.  NFOF § I.D.1; NFOF ¶¶ 7, 12-14, 16, 19-20, 23.  This was shown repeatedly by studies and expounded by physicians – and even Salix itself – across the 1990s and 2000s. NFOF ¶¶ 12-14, 16, 20-23.  As of 2000, "in all clinical experience to date," there were "no reports of serious adverse events."  NFOF ¶ 13.

It was known by 2008 that rifaximin can be safely administered for extended periods of time, and it was commonplace by 2008 to administer rifaximin for HE for 14 months or longer, with some patients using rifaximin for HE for up to 42 months.  NFOF ¶¶ 15-16, 19-20, 22-23.

It was known by 2008 that lactulose is effective in reducing clinical measures of HE (*i.e.*, Conn score).  NFOF at ¶¶ 12-13; JTX59; DTX425.  Lactulose was considered the "gold standard," "mainstay therapy" for HE, and it was common to administer it concomitantly with an

antibiotic.  NFOF ¶¶ 13, 28; DTX425-2, 6; DTX660-10.  That combination therapy was known to exert a synergistic effect and be effective for reducing HE grade.  NFOF ¶¶ 12-13, 33, 38, 61.

In short, by October 2, 2008, it was well-known – both to a POSA and to Salix itself – that 1100 mg of rifaximin per day for 12 months or longer, alone or in combination with lactulose, is safe and effective in maintaining remission of HE, reducing the risk of HE recurrence, and reducing the risk of a breakthrough overt HE episode.  NFOF § I.B.  Salix's own surveys showed that off-label use of rifaximin for HE in the U.S. was widespread and commonplace.  NFOF ¶ 6; DTX349-125 (90% of gastroenterologists surveyed January 2008 had heard of rifaximin for treating HE), 130 (77% of physicians surveyed January 2007 had personally prescribed rifaximin for HE).  At most, then, "the inventors merely used routine research methods to prove what was already believed to be the case.  Scientific confirmation of what was already believed to be true may be a valuable contribution, but it does not give rise to a patentable invention.  Good science and useful contributions do not necessarily result in patentability."  *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1363-64 (Fed. Cir. 2007) (citations omitted).

### 2. Bausch HE Study in view of the Salix Presentation Disclosed All Limitations

The Asserted HE Claims are obvious over the Bausch HE Study (DTX52) in view of the Salix Presentation (DTX660).  NFOF ¶ 32.  The evidence has shown – and, notably, Salix did not dispute – that the Bausch HE Study disclosed the method, dosage, lactulose, and Conn score limitations of the Asserted HE Claims.  *See* NFOF ¶ 32 n. 1.  Specifically, the Bausch HE Study disclosed a method of "preventing the recurrence of [HE]" by administering 550 mg of rifaximin twice daily and, optionally, lactulose to patients in remission from HE.  NFOF ¶¶ 24-25.  The Salix Presentation disclosed the duration limitation – specifically, administering rifaximin for HE

for 12.5 months continuously – which Salix also did not dispute.  NFOF ¶¶ 21-23.  Accordingly, the Bausch HE Study and the Salix Presentation collectively disclosed each and every limitation of the Asserted HE Claims.

Although Salix argued that the prior art disclosed merely treating overt HE, it's clear that at least the Bausch HE Study, the Salix Presentation, and Leevy 2007 specifically disclosed administering rifaximin to maintain remission or reduce the risk of HE recurrence or a breakthrough overt HE episode.  Tr. 354:4-10; 388:14-20; 982:10-19.  For example, the Bausch HE Study disclosed that its purpose is "to determine if rifaximin is safe and effective in preventing recurrence of [HE] in people with liver disease."  DTX52-4; NFOF ¶ 24.  Moreover, Dr. Leevy disclosed in the Salix Presentation that "I personally have treated over 450 patients with Xifaxan in my practice.  We use 1200 milligrams a day, keep the patient on a continuous 1200 milligrams a day.  We've had patients on up to 12.5 months of continuous therapy.  We see no resistance and we have seen no side effects."  DTX660-11; NFOF ¶ 23.  A POSA would have known that at least some patients Dr. Leevy treated with rifaximin for 12.5 months were in remission and had Conn scores of 0 or 1.  NFOF ¶ 26.  Dr. Leevy also stated in the Salix Presentation that his study of 150 HE patients given lactulose for 6 months and then rifaximin for 6 months demonstrated a decrease in the "rate of hospitalization and the cost of hospitalization to one-third of the previous level with Lactulose," DTX660-11, further demonstrating that in at least some patients remission had been maintained or risk of an overt HE episode, which would have required hospitalization, had been reduced, NFOF ¶ 23.

Moreover, the 150 patients in Leevy 2007 likely were a subset of the 450 patients described in the Salix Presentation.  NFOF ¶ 26.  Leevy 2007 stated that "[h]epatic encephalopathy grade at the end of each treatment period reflected less severe illness with

rifaximin than with lactulose." DTX390-3; NFOF ¶ 30. At the end of lactulose treatment, 6% of patients had stage 1 HE and 94% had stage 2 or higher; after switching to rifaximin, 37% of patients had stage 1 HE, 57% of patients had stage 2, 6% had stage 3, and 0 had stage 4. NFOF ¶ 31. By definition, patients whose scores decreased to 1 during rifaximin treatment went into remission; after that, rifaximin was maintaining remission or reducing risk of HE recurrence. Thus, both the Salix Presentation and Leevy 2007 disclosed maintaining remission and reducing risk of a breakthrough episode or HE recurrence.

Salix also ignores that treating HE encompasses maintaining remission and reducing the risk of an HE occurrence. Tr. 155:24-156:4. In fact, Dr. Brown agreed that "the best way to treat [HE] is to prevent" and that he maintained remission with rifaximin before 2008. Tr. 403:11-12; *see also* NFOF ¶ 8. Further, maintaining remission and reducing the risk of HE recurrence are the inherent result of the prior art administration of rifaximin. *Persion Pharms. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184, 1191 (finding obviousness over prior art that "taught the combination of elements that inherently result in the claimed pharmacokinetic parameters").

Although Salix argued that a POSA would not rely on the Bausch HE Study because the final results were not yet published, Tr. 239:16-21, 397:1-398:2, a POSA would have used all available information to guide decisions about how to use rifaximin, NFOF ¶ 47, and Phase III clinical trials were known to have an average rate of success of 50-60%, NFOF ¶ 63. Dr. Brown agreed that a POSA does not need results from a Phase III clinical trial to reasonably expect that the drug would work for its intended purpose, and he prescribed rifaximin without such results. Tr. 341:4-9; 426:15-23. Therefore, even though it lacked final results, a POSA would have considered and relied on the disclosures in the Bausch HE Study.

7

Salix also argued that a POSA would not have relied on the Salix Presentation because it was somehow not publicly available despite Salix publishing it on the SEC website, Tr. 381:13-19, but the record shows that the Salix Presentation was publicly available, NFOF ¶ 21.  This Court has found that SEC filings are prior art printed publications, as have other courts and the PTAB.  *E.g.*, *Omeros Corp. v. Par Sterile Prods. LLC*, No. 15-773-RGA, (D. Del. June 29, 2017) ("If a press release can be prior art, why not a SEC filing?"); *Auxilium Pharm., Inc. v. Watson Labs., Inc.*, No. 12–3084 (JLL), 2014 WL 9859224, at *14 n.9, *17 (D.N.J. Dec. 16, 2014) (SEC filing was prior art because contents "would have been significant to the POSA"); *Apotex Inc. v. OSI Pharm. LLC*, No. IPR2016–01284, 2018 WL 335096, at *9 (P.T.A.B. Jan. 8, 2018).  A POSA seeking information about rifaximin would have found the Salix Presentation because Salix was (and still is) the only company selling rifaximin in the U.S.  NFOF ¶ 21.  Salix also has a responsibility to ensure the accuracy of statements made to investors and filed with the SEC.  Tr. 413:7-414:2.

### 3. Leevy 2007 in view of the Common Knowledge Disclosed All Limitations

The Asserted HE Claims are also obvious over Leevy 2007 (DTX390) in view of the common knowledge.  NFOF ¶¶ 9-10, 33.  Leevy 2007 disclosed the method, dosage, and Conn score limitations.  *Id.*  Leevy 2007 compared the frequency and duration of HE-related hospitalizations during lactulose therapy for at least 6 months versus during rifaximin therapy (as 400 mg three times daily) for at least 6 months.  NFOF ¶¶ 15, 29.  Leevy 2007 concluded that HE hospitalizations were significantly less frequent and shorter while on rifaximin than while on lactulose, the standard-of-care for HE.  NFOF ¶¶ 15, 30-31.  In other words, using HE-related hospitalizations as a metric for breakthrough overt HE, Leevy 2007 disclosed that rifaximin is better than lactulose at maintaining remission and reducing the risk of breakthrough overt HE.

*Id.*; *see also* NFOF ¶¶ 27-28; *supra* at II.B.1.  Leevy 2007 also disclosed switching patients who had stage 1 HE (*i.e.*, were in remission) from lactulose to rifaximin.  NFOF ¶ 31.  Therefore, a POSA would have understood that Leevy 2007 disclosed the method, dosage, and Conn score limitations of the Asserted HE Claims.

The duration and lactulose limitations were common knowledge.[1]  *E.g.*, NFOF ¶¶ 12, 16, 19-20, 23; JTX95; JTX136; *supra* at II.B.1.  Salix did not dispute that, before 2008, 1000 to 1200 mg daily rifaximin was administered for 12 months or longer to patients in remission or that rifaximin was administered with lactulose.  *See, e.g.*, Tr. 373:1-374:1, 396:6-25 (alleging it had not been proven that the claimed methods were effective but not disputing that they were practiced).  Therefore, Leevy 2007 in view of the common knowledge disclosed each and every limitation of the Asserted HE Claims.  NFOF ¶ 33.

### 4. POSAs Would Have Had Motivation to Combine the Prior Art

A POSA would have been motivated to combine the Bausch HE Study with the Salix Presentation, and Leevy 2007 with common knowledge, based on a teaching, suggestion, or motivation found in the prior art.  NFOF ¶ 34; *see KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 418-20 (2007).  For example, a POSA would have been motivated to combine the Bausch HE Study method with the Salix Presentation's administration of rifaximin for 12 months or longer because the prior art taught continuing HE patients on an effective dose of rifaximin for as long as it remained beneficial.  NFOF ¶ 35; JTX90 at 203 (administration "for as long as needed"); *see also*, *e.g.*, DTX660-11 (up to 12.5 months); JTX109 at 1-2 (385 days (~12.7 months)); JTX111

---

[1] A POSA may and indeed must rely on common knowledge of the art at the time of the alleged invention.  When flexibly viewed and applied, "motivations from the store of common knowledge of one of ordinary skill in the art field . . . provide the sources of evidence that an ordinary skilled artisan might have found and combined at the time of the invention."  *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361 (Fed. Cir. 2011).

at 4544 (42 months); JTX137 at 1 (24 months).

A POSA also would have been motivated by the teaching that reducing pill burden increases patient compliance.  NFOF ¶ 36.  Adjusting 1200 mg (as 400 mg three times daily) to the claimed 1100 mg (as 550 mg twice daily) would have been a matter of mere routine optimization.  NFOF ¶ 42.  "Where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or working ranges by routine experimentation." *In re Applied Materials*, 692 F.3d at 1295.  "[D]iscovery of an optimum value of a variable in a known process is usually obvious." *Pfizer,* 480 F.3d at 1368 (citation omitted); *see also Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305, 344 (D. Del. 2010), *aff'd*, 675 F.3d 1324 (Fed. Cir. 2012) (claims obvious where "routine testing and optimization that [POSAs] would undertake would have quickly led them to the ingredient amounts and ratios disclosed in the asserted claims").  A POSA would have sought to increase patient compliance and therefore been motivated to develop a method that involved administering fewer tablets, fewer times per day.  NFOF ¶ 44.  Nothing as of 2008 suggested that 1100 mg per day was less effective than 1200 mg per day.[2]  NFOF ¶ 37; DTX561-4 (Salix representing to FDA that 1100 mg daily is "approximately therapeutically equivalent to" 1200 mg daily).

A POSA also would have been motivated to develop a method involving administering both lactulose and rifaximin because it was known that the two drugs could be – and often were – administered concomitantly for HE and exerted a synergistic effect due to their complimentary mechanisms of action.  NFOF ¶¶ 38, 61.

---

[2] Bill Forbes, one of the listed inventors of the HE Patents, recommended at a 2005 meeting on behalf of Salix that "a discrete strength be developed for HE – which provides a new dosing regimen not easily substitutable in the event of a generic 200 mg product." Tr. 421:5-422:22; DTX29-80.  Of course, the patent laws are not designed to protect such gamesmanship.

Similarly, the prior art would have motivated a POSA to combine Leevy 2007 with common knowledge to arrive at the claimed methods.  NFOF ¶ 34.  Leevy 2007 disclosed using rifaximin for 6 months or longer as effective in treating HE, and that patients demonstrate lower grades of HE and maintenance of remission (stage 1) after at least 6 months of rifaximin treatment.  NFOF ¶¶ 30, 35, 41.  It was common knowledge that rifaximin is effective to treat HE, that administering rifaximin for 12 months or longer is safe and effective, and that HE is a chronic disease requiring long-term therapy.  NFOF ¶¶ 12, 16, 33, 35-36, 42-43.  POSAs would have been motivated to use 550 mg twice daily, rather than use the 400 mg three times daily disclosed in Leevy 2007, to improve patient compliance.  NFOF ¶ 36.

Despite those numerous motivations, Salix argued that a POSA would have been dissuaded from developing the claimed methods due to antibiotic resistance concerns.  Tr. 439:11-12.  Bacterial resistance, however, is not an inevitable result of administering antibiotics, and a POSA would not have been dissuaded from combining the prior art just because antibiotic resistance was possible.  NFOF ¶¶ 45-46.  The risk of resistance was low for colonic bacteria, and even if a superinfection that was resistant to rifaximin did arise elsewhere in the body, many other antibiotics were available to treat it.  NFOF ¶¶ 49, 55.  A POSA also would not have been concerned about person-to-person spread of rifaximin-resistant bacteria.  NFOF ¶ 56.

A POSA would have concluded that the benefits of prescribing rifaximin long term to HE patients outweighed any risk of resistance.  NFOF ¶ 47.  Salix's supposed evidence that antibiotic resistance concerns would have dissuaded a POSA from administering rifaximin "long term" is based on drugs significantly different from rifaximin.  NFOF ¶ 59.  In fact, it was known by 2008 that rifaximin does not exhibit clinical resistance, and the record does not reflect any such resistance even today.  NFOF ¶ 53.  By 2008, rifaximin had been approved in 19 countries

and, on the basis of data from 20 clinical studies and experience in medical practice, appeared to have a favorable benefit-risk ratio in the treatment of HE.  NFOF ¶ 27.  In fact, not only were Norwich's experts – Dr. Mahl and Dr. Berg – treating HE patients in the prior art timeframe with rifaximin, but even Salix's expert, Dr. Brown, had been doing so.  NFOF ¶ 8.

Combining the Bausch HE Study with the Salix Presentation, and Leevy 2007 with common knowledge, to arrive at the Asserted HE Claims reflects combining prior art elements according to known methods.  "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 416; NFOF ¶¶ 34, 40.  The Salix Presentation disclosed administration for 12 months or longer, which could be combined with the method disclosed in the Bausch HE Study to arrive at the claimed methods.  NFOF ¶ 40.  Combining the two references simply extends the method of the Bausch HE Study from 6 months of administration to 12 months or longer.  The same is true of incorporating the common knowledge administration for 12 months or longer to extend the method of Leevy 2007.  NFOF ¶ 41.  Using the 550 mg tablet BID, rather than two 200 mg tablets TID as disclosed in Leevy 2007, would have been routine optimization.  NFOF ¶ 42.

Combining the Bausch HE Study with the Salix Presentation, and Leevy 2007 with common knowledge, also reflects the simple substitution of one element for another.  NFOF ¶¶ 34, 41-43; *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1315 (Fed. Cir. 2008).  The Bausch HE Study describes a method of administering 550 mg of rifaximin BID for 6 months or longer to patients in remission of HE, with concomitant lactulose use permissible.  NFOF ¶ 25.  The Salix Presentation describes a method of administering 1200 mg of rifaximin per day for 12 months or longer to patients with HE.  NFOF ¶ 23.  Given that Neff disclosed administration of rifaximin for a range spanning 6 months to more than 12 months, a POSA would have been

motivated to simply substitute the duration of treatment disclosed in the Salix Presentation in place of the duration disclosed in the Bausch HE Study to arrive at the Asserted HE Claims. NFOF ¶¶ 34, 41.  Similarly, Leevy 2007 describes administering 1200 mg of rifaximin per day for 6 months or longer to patients with HE, and a POSA would have been motivated to simply substitute the more than 12 month duration of treatment in the common knowledge in place of the duration disclosed in Leevy 2007 to arrive at the Asserted HE Claims.  NFOF ¶¶ 33, 43.  A POSA would have considered it routine optimization to simply substitute the 550 mg twice daily dose for the 400 mg three times daily dose disclosed in Leevy 2007.  NFOF ¶¶ 42-44.

### 5.   POSAs Would Have Had a Reasonable Expectation of Success in Arriving at the Claimed Methods.

A POSA would have had a reasonable expectation of success in combining the Bausch HE Study with the Salix Presentation, as well as Leevy 2007 with common knowledge, to arrive at the Asserted HE Claims.  NFOF ¶ 60.  For example, a POSA would have had a reasonable expectation of success in developing the claimed methods because they reflect use of a known, effective treatment of HE (*i.e.*, rifaximin) according to a known dosing regimen (*i.e.*, 550 mg twice daily) for a known duration (*i.e.*, 12 months or longer).  NFOF ¶¶ 61-62.  A POSA would have had a reasonable expectation of success in developing a method of maintaining remission of HE because it was known that rifaximin could be administered to patients with a Conn score of 0 or 1.  *Id.*  A POSA also would have had a reasonable expectation of success in reducing the risk of HE recurrence since maintaining remission necessarily reduces the risk of an HE recurrence (although reducing risk does not necessarily mean that remission is maintained).  Tr. 156:5-11.

In addition, a POSA would have had a reasonable expectation of success in administering lactulose with rifaximin given the known synergistic effect of the two drugs.  NFOF ¶ 61.  A POSA would have expected that 1100 mg of rifaximin per day would be at least as safe and

effective as 1200 mg of rifaximin per day for HE.  NFOF ¶ 62.  Indeed, Salix knew well before

2008 that 1200 mg was a standard dose for HE.  *Id.*  A POSA also would have had a reasonable

expectation of success that one 550 mg tablet twice daily (*i.e.*, 1100 mg daily) would be effective

for HE because it was already known that two 200 mg tablets three times daily (*i.e.*, 1200 mg

daily) is an effective regimen for treating HE.  *Id.*

Salix's argument that rifaximin was only used as a last resort in desperate situations, Tr.

1036:24-1037:10, is belied by Salix's own surveys showing that using rifaximin off-label for HE

in the U.S. was widespread and commonplace.  NFOF ¶ 6.  Such off-label use of medicines,

including antibiotics, is a common practice among physicians.  NFOF ¶ 59.  For rifaximin in

particular, the off-label use was common given the known side effects associated with other HE

treatments.  *Id.*

The abundant off-label use and related promotion of rifaximin for HE, discussed above,

provided a POSA with the requisite reasonable expectation of success.  Tr. 219:2-15.  POSAs in

the U.S. were aware of these safe and effective uses of rifaximin to treat HE.  NFOF ¶¶ 2, 6.

Given that widespread prior use, Salix cannot credibly maintain its position that there was no

reasonable expectation of success.  *In re O'Farrell*, 853 F.2d 894, 903-04 (Fed. Cir. 1988).

Salix asserts that there was no reasonable expectation of success in 2008 because no

randomized, controlled clinical trials on rifaximin for HE had led to FDA approval.  Tr. 360:17-

361:1.  But "[i]t is well established that a patent may be secured, and typically is secured, before

the conclusion of clinical trials."  *In re Montgomery*, 677 F.3d 1375, 1382-83 (Fed. Cir. 2012)

(affirming invalidity in view of drug study protocol).  Proof sufficient to obtain regulatory

approval for a drug is not necessary to establish obviousness.  *Hoffmann-La Roche Inc. v. Apotex

Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. 2014).

"[N]either law nor logic require that a full blown clinical trial be conducted to show that a method of treatment using a drug would be obvious." *Prometheus Labs. Inc. v. Roxane Labs., Inc.*, 2014 WL 12607728, at *15 n.16 (D.N.J. May 21, 2014).  In fact, late stage clinical trials can convey a reasonable expectation of success to a POSA.  Tr. 200:22-202:1.  A POSA "can draw reasonable inferences about the likelihood of success even without a perfectly designed clinical trial." *Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1334 (Fed. Cir. 2018); *see also* MPEP § 2107.03 (clinical trial initiation creates presumption "that the subject matter of that trial is reasonably predictive of having the asserted therapeutic utility").  "[A] showing of a reasonable expectation of success in a method of treatment claim need not rely on clinical data (which might, in fact, lead to a finding of anticipation), nor must it include a demonstration of certainty that the treatment would be successful in every instance." *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1346 (Fed. Cir. 2021).  The Federal Circuit has expressly rejected the idea that "efficacy data is always required for a reasonable expectation of success." *OSI Pharm., LLC v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019).

Despite widespread use and study of rifaximin to treat HE, Salix at trial suggested that POSAs had at best only a "hope," rather than a reasonable expectation of success.  The knowledge in the art as of 2008, however, was more than enough for a reasonable expectation of success.  NFOF ¶ 64.  Phase III clinical trials like the Bausch HE Study are successful more often than not.  Tr. 201:20-25.  But *cf. OSI Pharm.*, 939 F.3d at 1382-85 (finding unpredictability and no reasonable expectation of success where failure rate for drugs entering Phase II clinical studies was over 99.5%).  "[O]bviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer*, 480 F.3d at 1364.  Salix's position is akin to the "absolute predictability" of success that

the Federal Circuit has repeatedly deemed unnecessary to demonstrate obviousness. *In re O'Farrell*, 853 F.2d. at 903-04; *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013); *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986); *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006).  Thus, the Asserted HE Claims are invalid as obvious.

### C.  Three of the Four Asserted HE Claims Lack Adequate Written Description

Claim 8 of the '573 patent, claim 6 of the '195 patent, and claim 11 of the '397 patent are invalid for lack of written description because the specifications of the patents fail to show that the administration of rifaximin alone (*i.e.*, in the absence of concomitant administration of lactulose) achieves the claimed effects.  *See Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1353 (Fed. Cir. 2010) (every limitation must have written support in specification).  As Dr. Berg explained, 91% of patients in the study described in the shared specification of the '573 and '195 patents were administered lactulose concomitantly, and the '397 patent disclosed the optional use of lactulose in patients as well.  NFOF ¶ 69.  The difference in treatment effect could not even be assessed in the population of patients who did not use lactulose concomitantly because the sample size was too small.  NFOF ¶¶ 70-71.  Unable to assess differences in treatment effect, a POSA reading the specifications would be unable to determine whether the study showed the efficacy of rifaximin alone or whether any patient administered rifaximin alone actually achieved the claimed results (*i.e.*, "maintaining remission," having a reduction in "risk of experiencing a breakthrough overt [HE] episode," or having a reduction in "risk of [HE] recurrence").  Accordingly, the specifications fail to prove that the inventors had possession of the full scope of the Asserted HE Claims.  *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561 (Fed. Cir. 1991).

III.     **THE ASSERTED IBS-D CLAIMS ARE INVALID**

    **A.  Level of Ordinary Skill in the Art**

Each of the Asserted IBS-D Claims is directed to a method of treating a subject having

IBS-D with rifaximin.  Physicians are responsible for diagnosing IBS-D, proposing treatment

options, and prescribing medications.  NFOF ¶ 75.  The state of the art, as discussed below,

shows that physicians had prescribed rifaximin to treat IBS-D by February 2008.  Thus, a POSA

would have possessed a medical degree with training in gastroenterology, or, alternatively, have

been a practicing physician (i.e., an internist) with experience in treating IBS.  NFOF ¶ 76.

    **B.  The Asserted IBS-D Claims Are Invalid as Obvious.**

        **1.  As of 2008, The Use of Rifaximin to Treat IBS-D Was Known**

By February 26, 2008, rifaximin had been known and used for more than 20 years.

NFOF ¶ 168.  Dr. Mark Pimentel had patented the use of rifaximin to treat IBS and licensed

those patents to Salix.  NFOF ¶¶ 81-84, 87.  In 2002, he approached Salix to develop rifaximin

for an IBS indication.  NFOF ¶ 86.  In November 2005, Salix promoted Dr. Pimentel's research

and his group's use of rifaximin to treat IBS patients.  NFOF ¶¶ 96-98.  In 2006, Dr. Pimentel

published a book that taught a protocol for using rifaximin for IBS-D.  NFOF ¶¶ 99-100.

Dr. Pimentel was not alone.  Xifaxan 200 mg tablets had been prescribed off-label by

physicians in the United States to treat IBS, including IBS-D, beginning in 2004.  NFOF ¶¶ 89,

96-97, 104, 110-11.  Indeed, Salix's expert, Dr. Philip Schoenfeld, admitted that he had

prescribed rifaximin, 400 mg TID for 10 days, to treat IBS-D patients in 2007.  NFOF ¶ 93.

Salix's market research verified that, by January 2008, 74% of polled gastroenterologists had

personally prescribed rifaximin for IBS.  NFOF ¶ 91.  Prescription audit data showed that 27%

of Xifaxan 200 mg tablet uses in November 2007 had been for IBS.  NFOF ¶ 90.

Retrospective studies by Yang, Cuoco, and Barrett showed that rifaximin had

successfully treated IBS patients, including IBS-D patients.  NFOF ¶¶ 103, 133, 137.  Yang

disclosed, for example, that rifaximin was superior to other antibiotics in treating IBS, suggested

a link between SIBO and IBS, and reported that retreatment of symptom recurrence did not result

in clinically relevant antibiotic resistance.  NFOF ¶¶ 103-105.

Publications by Weinstock, Jolley, and Pimentel in 2011 disclosed pre-priority date uses

of rifaximin, 800 mg to 2,400 mg per day for 10-14 days, to treat IBS-D.  NFOF ¶¶ 107, 111,

114.  While not statutory prior art, each shows the level of skill, knowledge, and motivation of a

POSA as of February 2008.  *See In re Copaxone Consol. Cases*, 906 F.3d 1013, 1020 (Fed. Cir.

2018) (non-statutory prior art used show the state of the art and a POSA's motivation); *Yeda*

*Research v. Mylan Pharm. Inc*., 906 F.3d 1031, 1041 (Fed. Cir. 2018) (same).

Each clinical use of rifaximin by IBS-D patients in the United States before February

2008, as reported in the 2011 Weinstock, Jolley, and Pimentel publications, also qualifies as

prior art.  NFOF ¶¶ 107, 111, 114.  If a claimed invention "was known to or used by others in

[the United States] before the date of the patentee's invention, the later inventor has not

contributed to the store of knowledge, and has no entitlement to a patent."  *UCB, Inc. v. Watson*

*Labs. Inc*., 927 F.3d 1272, 1289 (Fed. Cir. 2019) (affirming invalidity based on a patient's public

use of a patch).  "A patient's use of the [claimed invention] fairly counts as public use under §

102(a)."  *Id*. at 1291; *see also Ormco Corp. v. Align Tech., Inc*., 463 F.3d 1299, 1305 (Fed. Cir.

2006) (affirming obviousness where a dentist's use of devices and discussion of his technique at

dental seminars established knowledge or use by others under §102(a)).  Based on patients'

medical records, these articles establish that IBS-D patients, including those 65 years of age or

older, had used rifaximin before February 2008.  *E.g*., NFOF ¶¶ 109, 113.  Anonymized

databases of medical records provided to Salix by Weinstock and Pimentel also corroborate such

use before February 2008. *Id*.  It is undisputed that (i) a physician was free to discuss anonymized uses of rifaximin to treat IBS-D patients, and (ii) a patient would have had no obligation of confidentiality regarding his or her use of rifaximin.  NFOF ¶¶ 94-95.  *See Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir. 2002) (A public use is "any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.").  For example, Dr. Weinstock described using rifaximin, 1800 mg per day for 14 days, to treat an IBS patient to Salix's Bill Forbes in February 2006 – two years before the filing of the IBS-D patents.  NFOF ¶ 110.

Rifaximin's efficacy in treating IBS and IBS-D was also established in randomized, placebo-controlled clinical studies.  NFOF ¶¶ 121, 126.  On September 5, 2007, Salix announced (the "RFIB 2001 Press Release") the successful completion of its Phase IIb study and disclosed that "a 14-day course of rifaximin at 550 mg twice-a-day, provides a statistically significant improvement in both adequate relief of [IBS-D] symptoms and adequate relief of bloating, compared to placebo."  NFOF ¶¶ 126-128.  In addition, A prospective study, which included IBS-D patients, taught that a higher rifaximin dose (1,600 mg versus 1,200 mg per day) was superior in reducing bacterial overgrowth with no additional side effects.  NFOF ¶¶ 156-158.

### 2. Pimentel 2006 and the RFIB 2001 Protocol Disclosed the Limitations of the IBS-D Claims.

Pimentel 2006 disclosed a placebo-controlled study that had administered rifaximin, 400 mg TID for 10 days, to treat IBS patients (18-65 years of age).  NFOF ¶¶ 119-120.  Pimentel 2006 that rifaximin provided a global improvement of IBS symptoms for at least 10 weeks post-treatment.  NFOF ¶ 121.

The RFIB 2001 Protocol disclosed a study that compared rifaximin, 550 mg to 2200 mg per day for 14 days, to placebo in IBS-D patients.  NFOF ¶ 122.  It disclosed, as its primary end

point, administering rifaximin 550 mg BID for 14 days to achieve "adequate relief" of symptoms.  NFOF ¶ 123.  As a secondary measure, it evaluated "durability of response" for 12 weeks post-treatment.  NFOF ¶ 124.

### 3. Cuoco and the RFIB 2001 Protocol Disclosed the Limitations of Claim 2 of the '569 Patent.

In addition to the disclosures of the RFIB 2001 Protocol discussed above, Cuoco taught administering rifaximin, 1200 mg for 14 days, to treat SIBO in IBS patients.  NFOF ¶¶ 130-131.  A POSA would have understood that the rifaximin in Cuoco had likely been taken two or three times per day.  NFOF ¶ 132.  Moreover, a POSA would have known that TID dosing was a known technique.  NFOF ¶ 159.  Cuoco taught that, four to five months after treatment, rifaximin provided a significant reduction in IBS symptoms and a significant reduction in the number of patients having a positive breath test.  NFOF ¶¶ 133, 135.

### 4. Barrett and the RFIB 2001 Protocol Disclosed the Limitations of Claim 3 of the '667 Patent.

As discussed above, the RFIB 2001 Protocol taught the administration of rifaximin, 550 mg to 2200 mg per day for 14 days, to IBS-D patients, including patients 65 years of age older.  NFOF ¶ 125.  Barrett taught the administration of rifaximin, 400 mg TID for 1-5 months, to nine patients (21-73 years) having a diagnosis of IBS-D or IBS-A.  NFOF ¶ 136.  It taught that patients achieved either complete resolution of symptoms after initial therapy or partial resolution with additional improvement after re-treatment with rifaximin.  NFOF ¶137.  Salix does not argue that the "65 years of age or older" limitation is a point of novelty.  Tr. 997:23-25.

### 5. Motivation to Combine the Prior Art

A POSA would have been motivated to combine Pimentel 2006, Cuoco, or Barrett with the RFIB 2001 Protocol to improve the treatment of IBS-D with a reasonable expectation of success.  NFOF ¶ 138.  Pimentel 2006 disclosed that rifaximin provided a sustained

improvement in IBS symptoms for at least 10 weeks, and a POSA would have recognized that some of the patients had IBS-D.  NFOF ¶ 121; Tr. 650:1-6.  The RFIB 2001 Press Release taught that rifaximin, 550 mg BID for 14 days, had achieved "adequate relief" of symptoms in a randomized, controlled study (RFIB 2001) of 680 IBS-D patients.  NFOF ¶ 126; DTX657-4.  The prior art also taught that rifaximin was a safe and effective antibiotic with no evidence of clinically relevant antibiotic resistance.  *See, e.g.*, NFOF ¶ 139.

The off-label use of Xifaxan 200 mg tablets to treat IBS, including IBS-D, would have motivated a POSA to combine the teachings of Pimentel 2006 and the RFIB 2001 protocol.  NFOF ¶ 168.  In fact, such use shows that physicians, including Salix's expert Dr. Schoenfeld, had been motivated to use rifaximin to treat IBS-D before February 2008.  NFOF ¶¶ 90-93.

### a.      Motivation to Adjust Rifaximin Dosage

A POSA would have been motivated to administer rifaximin 1650 mg per day, or 550 mg TID, for 14 days to treat IBS-D, as required by each Asserted IBS-D Claim.  A POSA would have been motivated to improve the known treatment of IBS-D by adjusting the rifaximin dose within the known range taught by the prior art using known techniques with a reasonable expectation of success.  NFOF ¶¶ 141-142.  "Where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or working ranges by routine experimentation." *In re Applied Materials*, 692 F.3d at 1295 (affirming obviousness rejection).  A POSA would have recognized, for example, that the combination of Pimentel 2006 and the RFIB 2001 Protocol taught administering rifaximin 1100 or 1200 mg per day to 2200 mg per day for 10-14 days.  *In re Peterson*, 315 F.3d at 1329-1330 (When "claimed ranges are completely encompassed by the prior art, the conclusion is even more compelling than in cases of mere overlap.").  Moreover, this range was also well-supported in the prior art.  *Iron Grip Barbell Co., Inc. v. USA Sports*, Inc., 392 F.3d 1317, 1322 (Fed. Cir. 2004) (whether a range is

21

disclosed by either a single or multiple references is a "distinction without difference").

Viscomi 2005 taught a preferred dose range of 100 mg to 1800 mg per day for a bowel-related disorder, including IBS.  NFOF ¶¶ 144-145.  Lin 2006 taught using rifaximin, about 400 mg TID for about 10 days, for the treatment of SIBO, which was a reported cause of IBS symptoms.  NFOF ¶¶ 146-147.  In addition, Lin 2006 taught administering rifaximin, about 400 mg to 600 mg TID for about 10 days, for the treatment of chronic fatigue syndrome, which Lin 2006 reported was highly prevalent in IBS patients.  NFOF ¶¶ 148-149.  Collectively, Lin 2006 taught administering about 1200 mg to about 1800 mg of rifaximin per day for about 10 days.  NFOF ¶¶ 148-149.  Prior uses by Weinstock taught administering rifaximin, 800 mg to 1,800 mg per day for 10-14 days, to treat IBS-D.  NFOF ¶ 111.  Similarly, the prior use by Jolley taught administering rifaximin 1200 mg per day for 10 days to treat IBS-D, and re-treating with 2400 mg per day for 10 days if the lower dose had not achieved the desired result.  NFOF ¶¶ 114-117.

A POSA would have been motivated to routinely adjust the dose of rifaximin in the known range to improve the treatment of IBS-D.  *Galderma Laboratories, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 737-739 (Fed. Cir. 2013) (claim obvious where prior art range encompassed claimed amount).  Merely optimizing a value within a known range is prima facie obvious.  *In re Peterson*, 315 F.3d at 1329.  Obviousness does not require that a selected dose be "the best option, only that it be a suitable option from which the prior art did not teach away."  *Par Pharm. Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197-98 (Fed. Cir. 2014).

Here, Salix has not presented evidence that administering rifaximin 550 mg TID is superior to 400 mg or 600 mg TID.  It is simply the dose that Salix chose to develop.  A 550 mg rifaximin tablet was known.  NFOF ¶ 126.  A POSA would have been motivated to use a tablet that was larger than the available 200 mg Xifaxan tablet because it would be more convenient for

22

patients.  NFOF ¶ 161.  Lorin Johnson, a named inventor, testified that Salix selected a 550 mg

tablet to improve patient compliance by reducing the number of pills to be taken.  NFOF ¶ 162.

This is a common sense rationale.  *KSR*, 550 U.S. at 421.  The other record evidence is that Salix

chose a 550 mg tablet to stymie substitution by a generic 200 mg rifaximin tablet.  DTX-29-80;

Tr. 420:14-16, 422:11-423:7, 548:2-5.  Stated differently, a 550 mg tablet taken BID (1100 mg)

or TID (1650 mg) could not be conveniently achieved by 200 mg tablets.

The prior art further established a dose-response relationship for rifaximin.  NFOF ¶ 117;

Tr. 665:7-10.  "A recognition in the prior art that a property is affected by the variable is

sufficient to find the variable result-effective."  *Applied Materials*, 692 F.3d at 1297.  Lauritano

and Scarpellini demonstrated that higher doses of rifaximin achieved superior efficacy in

reducing bacterial overgrowth, including in IBS-D patients.  NFOF ¶¶ 153-156.  Moreover, prior

uses by Weinstock (*e.g.*, 800-1800 mg per day) and Jolley (1200-2400 mg per day) for IBS-D

taught that increased doses improved the treatment effect in at least some patients.  NFOF ¶¶

111, 117.

A POSA would have been motivated to increase the dose of rifaximin in the known range

to optimize the treatment for IBS-D.  NFOF ¶ 150.  Pimentel 2006 taught that the optimal dose

of rifaximin may be higher than 1200 mg per for 10 days.  NFOF ¶ 151.  Scarpellini, published

after Pimentel 2006, taught that the administration of rifaximin 1600 mg per day achieved

greater efficacy than 1200 mg without any difference in side effects.  NFOF ¶ 156.  It would

have been well within the skill of a POSA to conduct a dose-ranging study, such as those

described in Lauritano, Scarpellini, and the RFIB 2001 Protocol.  NFOF ¶¶ 122, 152, 154.

Indeed, the '569 patent states that "[t]he determination of effective dosage levels . . . can be

accomplished . . . using routine pharmacological methods."  JTX9 at 11:25-28.  Weinstock and

Jolley demonstrated, for example, that a POSA would know how to adjust the dose rifaximin to treat IBS-D as of February 2008.  NFOF ¶¶ 111, 143.

To rebut a finding of obviousness, Salix must show that the prior art taught away from the claimed dosing regimen or that administering rifaximin 1650 mg per day for 14 days achieved an unexpected result.  *Galderma Laboratories*, 737 F.3d at 738.  Salix has not alleged the secondary consideration of teaching away for the IBS-D Patents.  *Id*. at 739 ("A teaching that [one option] may be optimal or standard does not criticize, discredit, or otherwise discourage investigation into other [suitable options].").  Nor has it showed that the claimed dosing regimen achieved a result that was different in kind as opposed to one of degree.  *Id*.

Likewise, administering 1650 mg per day via TID dosing would have been obvious.  A POSA would have recognized that a daily dose of rifaximin would need to be administered to a patient via some finite number of administrations.  NFOF ¶ 132.  Pimentel 2006 taught TID dosing, and the RFIB 2001 Protocol taught BID dosing.  NFOF ¶¶ 120, 123.  TID dosing was a well-known technique.  NFOF ¶ 159.  A POSA would have recognized that the prior art generally taught administering rifaximin TID for treating IBS or SIBO.  *See, e.g*., NFOF 79, 120  Salix's market research demonstrated that, as of January 2008, a majority of gastroenterologists used TID dosing when prescribing rifaximin for IBS.  NFOF ¶ 92.  In addition, a POSA would have been motivated to use TID dosing to maintain a more consistent concentration of rifaximin in the small intestine to treat bacterial overgrowth.  NFOF ¶ 160.  Again, there is no record evidence that TID dosing of rifaximin achieved a surprising or unexpected result.

### b.    Motivation to Treat IBS-D Patients 65 Years of Age and Older

A POSA would have been motivated to combine the teachings of Pimentel 2006 or Barrett with the RFIB 2001 Protocol to treat IBS-D in patients 65 years of age or older.  NFOF ¶¶ 163, 167.  Barrett taught, for example, the clinical use of rifaximin, 400 mg TID for 1-5

months, to treat IBS-D and IBS-A in patients 21-73 years old.  NFOF ¶ 136.  A POSA would

have also recognized that the RFIB 2001 Protocol had enrolled subjects 18 years of age and

older, which a POSA would understand included subjects older than 65 years.  NFOF ¶ 164.

Prior clinical uses by Pimentel and Weinstock show that rifaximin had been used to treat IBS-D

in patients 65 years of age and older.  NFOF ¶¶ 109, 113, 165.  A POSA would not have

expected differences in effectiveness of rifaximin in IBS patients 18-65 years old, as taught by

Pimentel 2006, and patients 65 years of age or older.  NFOF ¶ 166.

### c. Salix's Cited References Do Not Rebut the Strong Motivation to Use Rifaximin to Treat IBS-D.

The references cited by Salix in its closing argument do not refute the motivation to use

rifaximin to treat IBS-D.  Tr. 988:13-23.  Riordan, Parisi, Robson, Jones, and Walters were

published years before Pimentel 2006 and before Xifaxan 200 mg tablets had been available for

use off-label in the U.S. to treat IBS-D.  NFOF ¶¶ 89-91, 121.  Drossman was published before

the publication of Yang and before Salix had announced that rifaximin had achieved "adequate

relief" of IBS-D symptoms in the RFIB 2001 Study.  NFOF ¶¶ 101, 126.  Quigley did not

address either Yang or the RFIB 2001 Study.  Nor did Quigley or Drossman address the

substantial off-label use of rifaximin for IBS-D before 2008.  Vanner recognized that "there has

been a rapidly growing acceptance of the use of the antibiotics, such as rifaximin, to treat IBS in

the USA and elsewhere," PTX-693-930, and that "bloating is the major symptom which is

reduced by antibiotics," PTX-693-934.  It did not address the RFIB 2001 Study or Yang.

Generalized statements that antibiotics may pose a risk of antibiotic resistance are

irrelevant.  A lack of antibiotic resistance is not a limitation of the Asserted IBS-D Claim.  In

addition, the claims require treating "a subject in need thereof," and not retreating an entire

population.  None of Salix's selective quotations are specific to rifaximin.  The prior art reported

that rifaximin had not developed clinically significant antibiotic resistance.  Dr. DuPont admitted

that the short-term use of rifaximin did not lead to antibiotic resistance and that administering

rifaximin for "14 days . . . wouldn't be long term."  Tr. 493:15-494:20.  Dr. Schoenfeld admitted

to "using [rifaximin] in an individual patient who has severe [IBS-D] symptoms" in 2007, and

testified that he "was not concerned about spreading bacterial resistance by prescribing it to 10

people in a year."  Tr. 849:17-850:14.  He stated in 2008 that "[n]o clinically relevant resistance

has emerged during 20 years of use [of rifaximin] for enteric infections."  Tr. 839:17-21; 844:6-

844:19.

Contrary to its trial narrative, Salix promoted the link between IBS and SIBO.  The '569

patent identifies "gastrointestinal bacteria" as a "cause" of IBS and SIBO.  NFOF ¶ 80.  It also

cites Yang, which identified an association between IBS and SIBO.  NFOF ¶ 101.  Salix had Dr.

Pimentel discuss the link between IBS and SIBO.  Tr. 595:11-17, 596:4-15.  It licensed Dr.

Pimentel's '053 patent and listed it on the Xifaxan Label for the IBS-D indication.  NFOF ¶¶ 87-

88.  That patent taught using rifaximin to treat IBS symptoms by partially eradicating SIBO.

NFOF ¶ 82.  Bill Forbes, a named inventor, stated in the RFIB 2001 Press Release that "the

belief that bacteria in the small bowel may play a role in the symptoms of IBS gain additional

evidence and the "results provide a solid rationale and basis for further investigation of

rifaximin" for IBS-D.  NFOF ¶ 127; DTX657-4.

Nor did Dr. Drossman's editorial discourage the use of rifaximin to treat IBS-D.  He

suggested the same protocol set forth in the Pimentel Book:

> First, determine whether the patient fits the clinical profile of bacterial overgrowth
> with postprandial abdominal discomfort, bloating, and possibly loose stools. If the
> clinical features are present, perform a lactulose $H_2$ breath study if it is available
> and, if the result is positive, consider a course of a broad-spectrum antibiotic . . .

PTX457 at 2219; NFOF ¶ 100.  Although he also stated an opinion about perceived

26

shortcomings of the Pimentel study design, he did not state that rifaximin was not effective for

treating IBS-D.  Pimentel 2006 was published in Annals of Internal Medicine, a peer reviewed

journal published by the American College of Physicians.  JTX-53. A POSA would have relied

on Pimentel 2006 for what it disclosed.  Dr. Schoenfeld relied on it in his February 2008

presentation – 15 months after Dr. Drossman's editorial.  Tr. 839:17-841:5.  Moreover, he stated

that the Pimentel study had found that rifaximin provided a statistically significant difference

over placebo in treating diarrhea and abdominal pain.  *Compare* Tr. 767:19-768:7 to Tr. 841:17-

842:5; 844:24-845:11.

### 6.  A POSA Would Have Had a Reasonable Expectation of Success.

By February 2008, a POSA would have known that rifaximin had been safely used in

clinical practice for more than 20 years.  NFOF ¶ 168.  A POSA would have also known that

rifaximin had been effective in treating IBS and IBS-D in randomized controlled clinical trials.

NFOF ¶ 171.  Likewise, a POSA would have been aware of retrospective studies reporting that

rifaximin had treated the symptoms of IBS and IBS-D.  NFOF ¶¶ 170, 172.  A POSA would

have recognized that rifaximin provided a sustained, post-treatment response.  NFOF 173.  A

POSA would have also recognized the substantial off-label use of Xifaxan 200 mg tablets to treat

IBS, including IBS-D, in patients in the United States before February 2008.  NFOF ¶ 174.

Norwich is not required to show "conclusive proof of efficacy."  *Acorda*, 903 F.3d at

1333; *see also OSI Pharm.,* 939 F.3d at 1385.  The prior art taught the use of rifaximin to treat

IBS-D and exemplary dosing regimens for doing so, which encompassed the claimed dosing

regimen.  NFOF ¶¶  141, 144.  As discussed, reasonable inference of success may be drawn

without "a perfectly designed clinical trial" and "scientific confirmation" is not required.

*Acorda*, 903 F.3d at 1334; *PharmaStem Therapeutics,* 491 F.3d at 1363-64; *Eli Lilly,* 8 F.4th

at1346.

Regarding claim 3 of the '667 patent, a POSA would have expected that rifaximin would be effective in treating a symptom of IBS-D in patients 65 years of age and older.  NFOF ¶ 174.  The RFIB 2001 Press Release reported that subjects 18 years of age and older achieved "adequate relief" of IBS-D symptoms, including bloating.  NFOF ¶ 126.  Rifaximin had been clinically used to treat symptoms of IBS-D in patients 65 years of age or older before February 2008.  NFOF ¶¶ 109, 113, 136; JTX71.

Thus, a POSA would have had a reasonable expectation of success in combining Pimentel 2006, Cuoco, or Barrett with the RFIB 2001 Protocol to arrive at the claimed methods of the Asserted IBS-D Claims.  *Pfizer, Inc.*, 480 F.3d at 1367–68.

For the foregoing reasons, the Asserted IBS-D Claims are invalid as obvious.

### C.   Claim 2 of the '569 patent Is Invalid as Indefinite.

A POSA would lack reasonable certainty about the objective scope of a "durability of response compris[ing] about 12 weeks of adequate relief of symptoms" because whether "a subject" achieves "adequate relief of symptoms" is based on "unfettered, subjective opinion."  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1356 (Fed. Cir. 2005) (affirming indefiniteness where "aesthetically pleasing" could not be "objectively verified").

"[A] term of degree that is purely subjective and depends on the vagaries of any one person's opinion is indefinite."  *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) ("QoS requirements" was "user defined" and indefinite).  When read in light of the intrinsic evidence, claims "must provide objective boundaries for those of skill in the art" to satisfy the definiteness requirement.  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) ("unobtrusive manner" was indefinite).

The '569 patent states that "adequate relief" may be "measured" by "for example, a subject's subjective assessment of their symptoms or a healthcare provider's or caretaker's

assessment of a subject's symptoms." NFOF ¶ 175. The assessor may reach a different

conclusion about whether "relief" is "adequate" based on the weight given to one or more IBS-D

symptoms, which include bloating, abdominal pain, diarrhea, urgency and frequency. Dr.

Schoenfeld admitted that "adequate relief" is subjective and that "you know it when you see it."

Tr. 556:15-557:9. A "'you'll know it when you see it approach' . . . is incompatible with the

requirement that a patent claim informs with reasonable certainty those skilled in the art about

the scope of the invention." *Inguran, LLC v. ABS Global, Inc.*, C.A. No. 7-CV-446-WMC, 2019

WL 943515, at *8 (W.D. Wis. Feb. 26, 2019) ("chemically coordinated" held indefinite).

Unlike a term of degree having an objective threshold, a purely subjective assessment has

no such boundary. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363-64 (Fed. Cir. 2018) ("minimal

redundancy" was indefinite for lack of objective boundaries). The '569 patent applies "adequate

relief" differently in different embodiments, and FDA has adopted shifting criteria for clinical

trial end points. Tr. 548:7-549:11. Dr. Schoenfeld admitted that a 30% improvement from

baseline in an IBS-D patient's abdominal pain – a clinical trial end point currently advocated by

FDA – may or may not show that a patient has achieved "adequate relief of symptoms." NFOF

¶ 188. Thus, "adequate relief" does not have an ascribed objective scope. NFOF ¶¶ 186-187.

There is also uncertainty on how to assess whether "adequate relief of symptoms" has

been durable for "about 12 weeks" "after removal from treatment." NFOF ¶¶ 190-191.

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2130 (2014). "Adequate relief" has a

broader temporal scope than "continuous adequate relief." NFOF ¶ 189. Dr. Schoenfeld could

not say how many weeks out of twelve weeks required "adequate relief" in order to have the

claimed "durability of response." He testified that "[p]recisely, that would vary based on the

individual patient," and that "some patients" would not have "adequate relief" "if they didn't

have 12 consecutive weeks of adequate relief of all of their symptoms," but others "might be happy with six out of 12 weeks of adequate relief alternating week by week." Tr. 553:12:-555:1. Thus, a different result would be obtained if the threshold were arbitrarily set, for example, at six versus eight weeks of the "about 12 weeks." NFOF ¶¶ 190, 192. The chosen measure will affect if the claimed "durability of response" is achieved. *Dow Chem. Co. v. Nova Chem. Corp.*, 803 F.3d 620, 630 (Fed. Cir. 2015) (finding term indefinite where methods of measurement affected the result); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015) (same).

Accordingly, claim 2 of the '569 patent is invalid as indefinite. 35 U.S.C. §112

### D. Claim 2 of the '569 Patent Lacks Adequate Written Description.

The '569 patent fails to show possession of the claimed "durability of response compis[ing] about 12 weeks of adequate relief of symptoms," and thus claim 2 of the '569 patent is invalid for lack of adequate written description. 35 U.S.C. §112; *Ariad*, 598 F.3d at 1353.

The '569 patent prophetically describes administering rifaximin 550 mg TID for 14 days to IBS-D patients to obtain a generic "durability of response." NFOF ¶¶ 178-179. It does not describe the specific "durability of response" that is claimed, which was added via amendment during the prosecution of the patent. NFOF ¶¶ 178, 183-185. Example 2 of the '569 patent describes a four-week study. NFOF ¶ 179. Thus, it does not describe "about 12 weeks of adequate relief of symptoms." Tr. 685:15-686:7. Salix's use of Figure 3 fares no better. Figure 3 does not report data or describe a treatment effect. NFOF ¶ 181. It is a flowchart for a generic study design having an undefined post-treatment phase. NFOF ¶ 181. The '569 patent does not sate what treatment effect is assessed in that post-treatment phase, or describe the length of any such treatment effect. NFOF ¶ 181.

As of February 26, 2008, Salix had not yet studied administering rifaximin, 550 mg TID day for 14 days, to any IBS-D patient. NFOF ¶ 182. According to Dr. Schoenfeld, a "POSA

could not know if the study would work before the study is actually conducted." Tr. 829:8-14.

The '569 patent's generic description of a "durability of response" does not cure the void. NFOF ¶¶ 175-177. *Flash-Control, LLC v. Intel Corp.*, No. 2020-2141, 2021 WL 2944592, at *4 (Fed. Cir. July 14, 2021) (picking and choosing disparate disclosures is insufficient). This generic disclosure is not tied to any medical condition or dosing regimen. NFOF ¶ 176. Moreover, the disclosure that a response "may be, for example, 2 days, 7 days, two weeks, 3 weeks, 4 weeks, 12 weeks, between about 1 week and about 24 weeks or longer" is effectively unlimited in time. NFOF ¶ 177. The '569 patent does not describe a "durability of response compris[ing] about 12 weeks of adequate relief of symptoms." Accordingly, claim 2 is invalid for lack of adequate written description. *See Vas-Cath*, 935 F.2d at 1561.

## IV. THE ASSERTED POLYMORPH CLAIMS ARE INVALID

### A. Level of Ordinary Skill in the Art

The parties have offered different POSA definitions, but analysis of the Asserted Polymorph Claims would be the same under either proposal. Tr. 860:9-861:8, 936:17-837:13. Regardless, the Court should adopt Norwich's proposed definition because it accurately reflects the background of persons actively synthesizing crystalline forms of solid compounds, including the inventors Dario Braga and Giuseppe Viscomi. *See* NFOF ¶ 193; Tr. 860:15-861:1.

### B. As of 2003, Crystalline Rifaximin and How to Synthesize It Were Known

By November 7, 2003, crystalline rifaximin had been obtained from a mixture of ethanol and water using conventional crystallization techniques. NFOF ¶¶ 194-199, 201, 205. It was well-known that a hydrate, such as rifaximin, could exhibit more than one crystal structure depending on its water content. NFOF ¶¶ 226, 231. Consequently, regulatory authorities required the characterization of crystalline drugs using known techniques, such as X-ray powder diffraction and water content. NFOF ¶¶ 228-230. In addition, rifaximin had recognized

31

antibacterial properties, and had been formulated as oral pharmaceutical composition since at least 1985.  NFOF ¶¶ 200, 202-204.

### C.  Claim 4 of the '199 Patent Is Inherently Anticipated by Cannata

Cannata inherently anticipates claim 4 of the '199 patent because rifaximin β necessarily results from the processes disclosed by Cannata and, accordingly, possesses the claimed water content and XRPD peaks that are inherent characteristics of rifaximin β.

Rifaximin β is a channel hydrate.  Tr. 875:12-876:4, 897:15-898:3.  An inherent property of rifaximin β is that it converts to rifaximin α, δ, and ε when it loses water (i.e., dehydrated, such as by drying), and that it forms when rifaximin α, δ, and ε gain water (i.e., hydrated, such as by exposure to humidity).  NFOF ¶ 211.  This natural relationship is undisputed.  The uncontroverted record evidence is that rifaximin β is a necessary precursor to rifaximin α, δ, and ε.  NFOF ¶ 215.  Figure 4 of the inventors' own article (Viscomi 2008) depicts this relationship:



**Fig. 4**  The relationship between the various crystal forms of rifaximin.

JTX65 at Fig. 4, 1074, 1076; Tr. 876:5-877:18, 923:17-925:1.  Extrinsic evidence published after the priority date of a patent may be used to prove inherent properties of a prior art composition. *See, e.g.*, *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1329-30 (Fed. Cir. 2020) (post-priority date evidence "helps to elucidate what the prior art consisted of"); *Monsanto Tech.*

32

*LLC v. E. I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1344-45 (Fed. Cir. 2018) (same).

One rifaximin β molecule is sufficient to satisfy claim 4 of the '199 patent.  *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1344-45 (Fed. Cir. 2005) (finding inherent anticipation based on a trace amount of the claimed polymorph).  Giuseppe Viscomi, a named inventor, submitted a Rule 1.132 Declaration to the PTO admitting that Cannata yielded rifaximin β, α, δ, or ε, or mixtures thereof.  NFOF ¶ 213.  Thus, rifaximin β would have necessarily been formed by the processes of Cannata as the lone product, as part of a mixture, or as a precursor to obtaining rifaximin α, δ, and ε via additional drying.  NFOF ¶¶ 206, 209-215.

Plaintiffs' argument that no one had recognized that the crystalline rifaximin produced by Cannata could exist in more than one form is irrelevant.  Tr. 992:13-993:2.  Controlling Federal Circuit precedent "rejects the contention that inherent anticipation requires recognition in the prior art."  *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377-78 (Fed. Cir. 2003).  The "discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer."  *Atlas Powder Co. v. IRECO Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999).  "Inherency is not necessarily coterminous with the knowledge of" POSAs who "may not recognize the inherent characteristics or functioning of the prior art."  *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).  Indeed, "[i]nsufficient prior understanding of the inherent properties of a known composition does not defeat a finding of anticipation."  *Atlas Powder*, 190 F.3d at 1349; *see also SmithKline*, 403 F.3d at 1345 (finding that a polymorph that is a "natural derivative" of practicing the prior art is inherently anticipated, even if the inventors did not recognize it for some time).

Plaintiffs wrongly assert that Cannata cannot anticipate rifaximin β because rifaximin α,

δ, or ε and mixtures thereof may also be obtained.  *See* Tr. 945:21-946:4, 947:17-948:1, 949:8-12, 989:20-991:18.  *See also* 919:6-19, 971:3-13, 972:24-973:7.  "[I]nherent anticipation does not require the element to be present each and every time," but it requires the "result to be a necessary and inevitable consequence of practicing the invention claimed in the prior art under normal conditions."  *Glaxo Grp. Ltd. v. Teva Pharm. USA, Inc.*, No. C.A. 02-219, 2004 WL 1875017, at *19 (D. Del. Aug. 20, 2004).  Here, rifaximin β is necessarily and inevitably obtained when carrying out Examples 1, 6, 7, or 9 of Cannata because, as synthesized, the water content of the resulting crystalline rifaximin would have been greater than 5%.  NFOF ¶¶ 206, 209-211.  Even if the rifaximin had been "aggressively" dried to a water content of less than 5% and resulted in rifaximin α, δ, and ε, rifaximin β would have necessarily formed as an intermediate during the synthesis of those hydrates.  NFOF ¶¶ 211, 215; Tr. 1020:9-1022:1.  Moreover, rifaximin α, δ, and ε would have reverted to rifaximin β under ambient temperature and humidity.  NFOF ¶¶ 211-214.  As Dr. Zaworotko testified, "beta is the winner," and thus there was no need to recreate any of Cannata's examples.  Tr. 877:13-18, 878:17-19, 918:8-11.

The water content and XRPD profile are inherent characteristics of rifaximin β, regardless of how it is synthesized.  Tr. 959:22-24 (Myerson); NFOF ¶¶ 208, 219.  For example, the inventors admitted in Braga 2012 that Bacchi's rifaximin tetrahydrate, which was prepared by slow evaporation from an unspecified water-ethanol solution, exhibited a water content of 8.4% and the claimed XRPD peaks and, accordingly, was rifaximin β.  NFOF ¶¶ 216-218, 221.

Therefore, Cannata's disclosure of crystalline rifaximin necessarily satisfies all limitations of and inherently anticipates claim 4 of the '199 patent.

### D.  The Asserted Polymorph Claims Are Invalid as Obvious

To the extent that Cannata does not inherently anticipate rifaximin β having the claimed characteristics, claim 4 of '199 patent would have been obvious over Cannata in view of

common knowledge.  In addition, claim 36 of '206 patent would have been obvious over Cannata in view of the Normix Label and common knowledge or over Marchi in view of Cannata and common knowledge.

In view of Cannata's disclosure of crystalline rifaximin and its antibacterial utility, NFOF ¶¶ 194-200, a POSA would have been motivated to identify the characteristics of the obtained rifaximin.  NFOF ¶ 228.  A POSA have been particularly motivated to obtain an XRPD profile and water content for the as-synthesized rifaximin because these were routine methods for characterizing a crystalline solid.  NFOF ¶¶ 208, 219, 228-230.  As discussed above, the as-synthesized rifaximin obtained from the processes of Cannata using a mixture of ethanol and water would have been rifaximin β having the claimed water content and XRPD profile.

Furthermore, a POSA would have recognized that the crystallization solvent used by Cannata included water, which could lead to hydrate formation, and thus would have been motivated to analyze the effect of water on the crystalline form using conventional methods. NFOF ¶¶ 226, 231-232.  By 2003, hydrates were well-known, and a POSA would have understood that the amount of water may affect the crystal structure of the rifaximin.  NFOF ¶ 231.  A routine humidity experiment, e.g., DVS, would have screened the crystalline rifaximin for different crystal structures based on water content.  NFOF ¶¶ 231-232.  As shown in Viscomi 2008, a POSA could have conducted such a humidity or drying experiment in one day and detected rifaximin β.  NFOF ¶ 211.  Thus, rifaximin β would have been quickly detected using routine and well-known experiments.

Plaintiffs' reliance on the generalized "unpredictability" of polymorphs, *see, e.g.*, Tr. 938:9-940:5, 956:11-957:25, 991:19-993:2, ignores the facts of this case.  Unlike other cases, Cannata indisputably disclosed crystalline rifaximin and taught how to obtain it from suitable

reactants using conventional crystallization techniques and a well-known crystallization solvent: a mixture of ethanol and water – the same solvent system used in the Polymorph Patents' Examples.  NFOF ¶¶ 194-199, 205, 233; Tr. 971:16-972:22.  As discussed, the inventors admitted that Cannata's processes produce rifaximin β, α, δ, or ε, or mixtures thereof. Conducting a drying experiment, measuring water content, and obtaining an XRPD was routine.

A POSA would have had a reasonable expectation of success in evaluating and characterizing the crystalline rifaximin obtained from Cannata to arrive at the claimed invention. Contrary to Plaintiffs' trial argument, the law does not mandate absolute predictability.  "[A] rule of law equating unpredictability to patentability . . . . cannot be the proper standard since the expectation of success need only be reasonable, not absolute."  *Pfizer*, 480 F.3d at 1364.  *See also Allergan*, 726 F.3d at 1292-93; *Medichem*, 437 F.3d at 1165 ("[O]ur case law makes clear that [reasonable expectation] does not require a *certainty* of success."); *In re O'Farrell*, 853 F.2d at 903-04 ("Obviousness does not require absolute predictability of success. . . . For obviousness under § 103, all that is required is a reasonable expectation of success."); *In re Merck & Co.*, 800 F.2d at 1096-97.  Obviousness may be found despite "some degree of unpredictability in the art so long as there was a reasonable probability of success."  *Pfizer*, 480 F.3d at 1364.  The fact that the prior art had not disclosed that rifaximin exhibits multiple crystalline forms, Tr. 956:11-957:3, 992:24-993:2, does not eliminate a reasonable expectation that Cannata's rifaximin would result in different crystalline forms based on the degree of dryness.  NFOF ¶¶ 231-232, 234.  *See In re O'Farrell*, 853 F.2d at 903-04 ("[F]or many inventions that seem quite obvious, there is no absolute predictability of success until the invention is reduced to practice.").  As discussed, not only were hydrates known to exhibit polymorphism, but so did compounds structurally similar to rifaximin.  NFOF ¶¶ 226-227.

Plaintiffs do not dispute that rifaximin had been formulated as a "pharmaceutical composition" comprising "pharmaceutically acceptable excipients or carriers," as also required by claim 36 of the '206 patent, before 2003.  NFOF ¶¶ 202-204, 238-239, 241.  In addition, the antibacterial properties of rifaximin had been long-known.  NFOF ¶¶ 200, 202-203.  Marchi and the Normix Label expressly taught "pharmaceutical compositions" comprising rifaximin in 1982 and 2001, respectively.  NFOF ¶¶ 202-204.  *See also* Tr. 955:7-11.  Nor do Plaintiffs dispute that a POSA would have been motivated to prepare a pharmaceutical composition comprising rifaximin with a reasonable expectation of success.  NFOF ¶¶ 225, 242-244.

Thus, the Asserted Claims of the Polymorph Patents are invalid as obvious.

### E.  The Asserted Polymorph Claims Lack of Written Description

Each Asserted Polymorph Claim recites that rifaximin β has "x-ray powder diffraction pattern peaks at about 5.4°; 9.0°; and 20.9° 2-θ."  NFOF ¶ 247.  Each Polymorph Patent states, however, that rifaximin β is "characterized . . . by a powder X-ray diffractogram (reported in FIG. 2) which shows peaks at the values of the diffraction angles 2θ of 5.4°; 6.4°; 7.0°; 7.8°; 9.0°; 10.4°; 13.1°; 14.4°; 17.1°; 17.90°; 18.30°; 20.9°."  NFOF ¶ 248.  By claiming only three of these 12 enumerated peaks, the Asserted Polymorph Claims impermissibly expand the specific rifaximin β XRPD profile described in the Polymorph Patents to encompass an undescribed genus of crystalline forms.  *See AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1299-1300 (Fed. Cir. 2014); *Ariad*, 598 F.3d at 1349-50.

A POSA would not understand the Polymorph Patents to show possession of any crystalline form having three XRPD peaks.  NFOF ¶ 252.  The Polymorph Patents do not recite the claimed subset of peaks.  Nor do they use words to broaden the specific 12-peak XRPD profile used to "characterize[ ]" rifaximin β.  Yet, the inventors knew how to use such words.  For example, intervening continuation-in-part applications used various subsets of XRPD peaks

to describe rifaximin β.  NFOF ¶ 250.  None of these related patent applications characterized rifaximin β based on XRPD peaks at "5.4°; 9.0°; and 20.9° 2-θ."  *Id.*  Moreover, the Polymorph Patents expressly deleted all subsets of XRPD peaks in favor of the 12-peak XRPD profile.

Dr. Myerson's post-hoc analysis for identifying the claimed subset of XRPD peaks for rifaximin β, *see* Tr. 963:2-965:1, is not described in the Polymorph Patents.  The inventors had not disclosed a method for identifying "unique" peaks for one form by comparing it to other forms.  Moreover, "a description that merely renders the invention obvious does not satisfy the requirement."  *Ariad*, 598 F.3d at 1352.  Regardless, there is no evidence that this method would necessarily arrive at the claimed XRPD peaks.  For example, as shown by the bolded values in Table 1 of Viscomi 2008, the inventors identified 5.4°, 10.4°, 18.3° and 20.9° 2θ as "unique" peaks for rifaximin β relative to rifaximin α, γ, δ, and ε.  *See* Tr. 885:5-13.  Yet, only two of these four XRPD peaks are common to three XRPD peaks recited in the Asserted Polymorph Claims, which Dr. Myerson alleged a POSA would have identified by comparing rifaximin β to rifaximin α and γ.  The "unique" XRPD peak subset changed based on the crystalline forms used as comparators.  Possession of the claimed rifaximin β having only three XRPD peaks cannot be contingent on what XRPD profiles are or are not chosen for comparison.  Neither of the Asserted Polymorph Claims are so limited in scope, and the three-peak XRPD profile for rifaximin stands to capture forms the inventors never disclosed in the Polymorph Patents.  *Ariad*, 598 F.3d at 1352-54; *see also Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1340-42 (Fed. Cir. 2021); *Boston Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1364-65 (Fed. Cir. 2011).

Thus, the Asserted Polymorph Claims are invalid for lack of adequate written description.

## V.   CONCLUSION

Based on the foregoing, Norwich respectfully requests that this Court find the Asserted Claims of the Patents-In-Suit invalid.

OF COUNSEL:
Matthew J. Becker
Stacie L. Ropka
Matthew S. Murphy
Chad A. Landmon
Rebecca L. Clegg
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT  06103
(860) 275-8100

Aziz Burgy
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC  20036
(202) 721-5417

Richardo S. Camposanto
AXINN, VELTROP & HARKRIDER LLP
560 Mission Street
San Francisco, CA 94105
(415) 490-2000

Dated:  April 28, 2022

/s/ Karen E. Keller
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*