IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 20-430 (RGA) |
| NORWICH PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' ANSWERING POST-TRIAL BRIEF ON VALIDITY**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
kjacobs@morrisnichols.com
cclark@morrisnichols.com
*Attorneys for Plaintiffs*

OF COUNSEL:

Scott K. Reed
Steven C. Kline
Shannon K. Clark
Daniel A. Apgar
Alexis M. McJoynt
Damien N. Dombrowski
VENABLE LLP
1290 Avenue of the Americas
New York, NY  10104
(212) 218-2100

Becky E. Steephenson
VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, NY 10020
(212) 307-5598

# TABLE OF CONTENTS

I.  HE PATENT VALIDITY ................................................................................................ 1

    A.  Priority Date and Level of Skill in the Art ................................................... 1

    B.  Nonobviousness ............................................................................................ 1

        1.  The Claims Recite Methods of Preventing Recurrence of Episodic HE ................................................................................... 1

        2.  Rifaximin's Efficacy to Treat HE Was Doubtful, and Its Efficacy to Prevent Recurrence of HE Was Unknown ............................... 2

        3.  Bausch HE Study and Salix Presentation ................................... 5

        4.  Leevy 2007 with "Common Knowledge" ................................... 6

        5.  No Motivation to Combine the Prior Art ................................... 7

        6.  No Reasonable Expectation of Success ................................... 13

    C.  Adequate Written Description ..................................................................... 16

II.  IBS-D PATENT VALIDITY ...................................................................................... 17

    A.  Priority Date and Level of Ordinary Skill in the Art ................................. 17

    B.  Nonobviousness .......................................................................................... 17

        1.  Antibiotics Were Not Recommended to Treat IBS-D ................. 17

        2.  Norwich's Prior Art Combinations ............................................ 19

        3.  No Motivation to Combine the Prior Art ................................... 21

        4.  No Reasonable Expectation of Success ..................................... 28

    C.  Adequate Written Description ..................................................................... 30

    D.  Definiteness ................................................................................................. 32

III.  POLYMORPH PATENT VALIDITY ....................................................................... 34

    A.  Priority Date and Level of Skill in the Art ................................................. 34

    B.  No Anticipation ........................................................................................... 34

    C.  Nonobviousness .......................................................................................... 38

    D.  Adequate Written Description ..................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Ajinomoto Co. v. Int'l Trade Comm'n*,
  932 F.3d 1342 (Fed. Cir. 2019)..................................................................42

*Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*,
  745 F.3d 1180 (Fed. Cir. 2014)..................................................................41

*Allergan, Inc. v. Sandoz Inc.*,
  796 F.3d 1293 (Fed. Cir. 2015)..............................................................24, 42

*In re Applied Materials, Inc.*,
  692 F.3d 1289 (Fed. Cir. 2012)....................................................................9

*Arctic Cat Inc. v. Polaris Indus., Inc.*,
  795 F. App'x 827 (Fed. Cir. 2019) .............................................................22

*Arendi S.A.R.L. v. Apple Inc.*,
  832 F.3d 1355 (Fed. Cir. 2016).....................................................................6

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010)..............................................................17, 30

*Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*,
  119 F.3d 953 (Fed. Cir. 1997).....................................................................30

*In re Armodafinil Pat. Litig. Inc.*,
  939 F. Supp. 2d 456 (D. Del. 2013).................................................... *passim*

*Aventis Pharma S.A. v. Hospira, Inc.*,
  743 F. Supp. 2d 305 (D. Del. 2010).............................................................10

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
  783 F.3d 1374 (Fed. Cir. 2015).....................................................................32

*Blue Calypso, LLC v. Groupon, Inc.*,
  815 F.3d 1331 (Fed. Cir. 2016).......................................................................6

*Boehringer Ingelheim Vetmedica, Inc., v. Schering-Plough Corp.*,
  320 F.3d 1339 (Fed. Cir. 2003).....................................................................14

*Cephalon, Inc. v. Slayback Pharma LLC*,
  456 F. Supp. 3d 594 (D. Del. 2020)..............................................................26

*Cephalon, Inc. v. Slayback Pharma LLC*,
    856 F. App'x 309 (Fed. Cir. 2021) ...................................................................27

*Coalition for Affordable Drugs v. Univ. of Penn*,
    IPR2015-01835 ..................................................................................................5

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*,
    676 F.3d 1063 (Fed. Cir. 2012).................................................................28, 40

*DePuy Spine v. Medtronic*,
    567 F.3d 1314 (Fed. Cir. 2009).......................................................................21

*In re Deuel*,
    51 F.3d 1552 (Fed. Cir. 1995).........................................................................40

*In re Dow Chem. Co.*,
    837 F.2d 469 (Fed. Cir. 1988).........................................................................3

*E.I. DuPont de Nemours & Co. v. Synvina C.V.*,
    904 F.3d 996 (Fed. Cir. 2018).........................................................................25

*Eibel Process Co. v. Minn. & Ont. Paper Co.*,
    261 U.S. 45 (1923)...........................................................................................37

*Endo Pharms. Sols., Inc. v. Custopharm Inc.*,
    894 F.3d 1374 (Fed. Cir. 2018).......................................................................35

*In re Enhanced Security Res., LLC*,
    739 F.3d 1347 (Fed. Cir. 2014).......................................................................19

*Evonik Degussa GmbH v. Materia, Inc.*,
    274 F. Supp. 3d 241 (D. Del. 2017).................................................................32

*Ferring Pharms. Inc. v. Par Pharm., Inc.*,
    267 F. Supp. 3d 501 (D. Del. 2017).................................................................25

*Ferring Pharms. Inc. v. Par Pharm., Inc.*,
    726 F. App'x 821 (Fed. Cir. 2018) ..................................................................25

*Flash-Control, LLC v. Intel Corp.*,
    No. 2020-2141, 2021 WL 2944592 (Fed. Cir. July 14, 2021)..............................31

*Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*,
    473 F. Supp. 3d 376 (D. Del. 2020)...................................................................9

*Glaxo Grp. Ltd. v. Teva Pharms. USA, Inc.*,
    No. 02-219 GMS, 2004 WL 1875017 (D. Del. 2004) ..........................................36

*Glaxo Inc. v. Novopharm Ltd.*,
    52 F.3d 1043 (Fed. Cir. 1995)...................................................................................35

*Grunenthal GMBH v. Alkem Lab'ys Ltd.*,
    919 F.3d 1333 (Fed. Cir. 2019).................................................................................39

*H. Lundbeck A/S v. Apotex Inc.*,
    No. 18-88-LPS, 2020 WL 777210 (D. Del. Feb. 18, 2020).......................................32

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V.*,
    865 F.3d 1348 (Fed. Cir. 2017).........................................................................15, 27

*Immunex Corp. v. Sandoz Inc.*,
    141 S. Ct. 2623 (2021).............................................................................................22

*Immunex Corp. v. Sandoz Inc.*,
    964 F.3d 1049 (Fed. Cir. 2020).................................................................................22

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*,
    821 F.3d 1359 (Fed. Cir. 2016).................................................................................27

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014).................................................................................33

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
    424 F.3d 1374 (Fed. Cir. 2005).................................................................................21

*Invitrogen Corp. v. Clontech Lab'ys, Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005).................................................................................25

*Jazz Pharm., Inc. v. Amneal Pharm., LLC*,
    895 F.3d 1347 (Fed. Cir. 2018)...................................................................................5

*K/S Himpp v. Hear-Wear Techs., LLC*,
    751 F.3d 1362 (Fed. Cir. 2014)...................................................................................7

*KSR Int'l Co. v. Teleflex, Inc.*,
    550 U.S. 398 (2007)...........................................................................................10, 11

*In re Langer*,
    465 F.2d 896 (C.C.P.A. 1972) ..............................................................................7, 19

*Medichem, S.A. v. Rolabo, S.L.*,
    437 F.3d 1157 (Fed. Cir. 2006).........................................................................7, 21, 38

*Merck & Cie v. Watson Lab'ys, Inc.*,
    125 F. Supp. 3d 503 (D. Del. 2015)................................................................35, 39, 40

*Merck & Cie v. Watson Lab'ys, Inc.*,
    822 F.3d 1347 (Fed. Cir. 2016)................................................................36

*Neptune Generics, LLC v. Eli Lilly & Co.*,
    921 F.3d 1372 (Fed. Cir. 2019)..........................................................15, 28

*Netscape Commc'ns Corp. v. Konrad*,
    295 F.3d 1315 (Fed. Cir. 2002)................................................................19

*Nevro Corp. v. Bos. Sci. Corp.*,
    955 F.3d 35 (Fed. Cir. 2020)....................................................................33

*Novartis Pharms. Corp. v. Accord Healthcare, Inc.*,
    21 F.4th 1362 (Fed. Cir. 2022)................................................................31

*Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd.*,
    923 F.3d 1051 (Fed. Cir. 2019)................................................................29

*Ormco Corp. v. Align Tech., Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006)................................................................19

*Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*,
    520 F.3d 1358 (Fed. Cir. 2008)........................................................9, 22, 40

*OSI Pharms., LLC v. Apotex Inc.*,
    939 F.3d 1375 (Fed. Cir. 2019)................................................................29

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
    678 F.3d 1280 (Fed. Cir. 2012)................................................................23

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
    773 F.3d 1186 (Fed. Cir. 2014)................................................................15

*Pfizer Inc. v. Teva Pharms. U.S.A., Inc.*,
    555 F. App'x 961 (Fed. Cir. 2014) ..........................................................43

*Pfizer Inc. v. Teva Pharms. U.S.A., Inc.*,
    882 F. Supp. 2d 643 (D. Del. 2012)..........................................................43

*Pharmacyclics LLC v. Alvogen Pine Brook LLC*,
    556 F. Supp. 3d 377 (D. Del. 2021)................................................24, 30, 38, 39

*Pittsburgh Iron & Steel Foundries Co. v. Seaman-Sleeth Co.*,
    248 F. 705 (3d Cir. 1917)........................................................................37

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    875 F.3d 1369 (Fed. Cir. 2017)................................................................33

*Res. Found. of SUNY v. Mylan Pharm. Inc*,
    531 F. App'x 1008 (Fed. Cir. 2013) ...................................................................18

*Res. Found. of SUNY v. Mylan Pharm. Inc.*,
    809 F. Supp. 2d 296 (D. Del. 2011) ................................................................18

*Sanofi v. Glenmark Pharms. Inc., USA*,
    204 F. Supp. 3d 665 (D. Del. 2016) ....................................................... *passim*

*Sanofi v. Lupin Atl. Holdings S.A.*,
    282 F. Supp. 3d 818 (D. Del. 2017) ................................................................3

*Sanofi v. Watson Lab'ys Inc.*,
    875 F.3d 636 (Fed. Cir. 2017) ........................................................................8

*In re Schulze*,
    346 F.2d 600 (C.C.P.A. 1965) .....................................................................22

*Snitzer v. Etzel*,
    465 F.2d 899 (C.C.P.A. 1972) .....................................................................31

*Sonix Tech. Co. v. Publications Int'l, Ltd.*,
    844 F.3d 1370 (Fed. Cir. 2017) ....................................................................32

*St. Jude Med., LLC v. Snyders Heart Valve LLC*,
    977 F.3d 1232 (Fed. Cir. 2020) .............................................................11, 19

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
    726 F.2d 724 (Fed. Cir. 1984) ......................................................................35

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
    18 F.4th 1377 (Fed. Cir. 2021) ..............................................................15, 29

*Tilghman v. Proctor*,
    102 U.S. 707 (1880) ......................................................................................37

*UCB, Inc. v. Watson Labs., Inc.*,
    927 F.3d 1272 (Fed. Cir. 2019) ....................................................................19

*Upjohn Co. v. Mova Pharm. Corp.*,
    225 F.3d 1306 (Fed. Cir. 2000) ......................................................................5

*In re Wesslau*,
    353 F.2d 238 (C.C.P.A. 1965) .................................................................20, 27

*In re Wright*,
    866 F.2d 422 (Fed. Cir. 1989) ......................................................................31

*Yeda Rsch. & Dev. Co., Ltd. v. Abbott GMBH & Co. KG*,
    837 F.3d 1341 (Fed. Cir. 2016)........................................................................................42, 43

**Statutes**

35 U.S.C. § 103.......................................................................................................................28

## TABLE OF ASSERTED CLAIMS

| Patent Family | U.S. Patent No. | Asserted Claim |
|---|---|---|
| HE | 8,642,573 | 8 |
| | 9,421,195 | 6 |
| | 10,335,397 | 11, 12 |
| IBS-D | 10,765,667 | 3 |
| | 8,309,569 | 2 |
| Polymorphs | 7,612,199 | 4 |
| | 7,902,206 | 36 |

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '195 patent | U.S. Patent No. 9,421,195 |
| '199 patent | U.S. Patent No. 7,612,199 |
| '206 patent | U.S. Patent No. 7,902,206 |
| '397 patent | U.S. Patent No. 10,335,397 |
| '569 patent | U.S. Patent No. 8,309,569 |
| '573 patent | U.S. Patent No. 8,642,573 |
| '667 patent | U.S. Patent No. 10,765,667 |
| BID | two times a day |
| GI | gastrointestinal |
| FDA | Food and Drug Administration |
| HE | hepatic encephalopathy |
| IBS | irritable bowel syndrome |
| IBS-D | irritable bowel syndrome with diarrhea |
| SIBO | small intestinal bacterial overgrowth |
| TID | three times a day |
| USPTO | United States Patent and Trademark Office |
| XRPD | X-ray powder diffraction |

## I.   HE PATENT VALIDITY

### A.   Priority Date and Level of Ordinary Skill in the Art

The priority date for the HE claims is October 2, 2008. Pls' FoF ¶ 120. The definition of a POSA is not outcome determinative, even though the parties disagree on the definition. Pls' FoF ¶ 121.

### B.   Nonobviousness

#### 1.   The Claims Recite Methods of Preventing Recurrence of Episodic HE

The asserted HE claims are directed to *preventing* recurrence of *episodic* HE. D.I. 90 at 4; Tr. 45:10-12, 51:5-52:8 (Brown). Norwich directed its obviousness defense to *treating* HE of *any* type (or even more vague: *for* HE). Tr. 163:22-164:10, 168:2-6, 186:23-187:3, 195:6-12, 203:10-16, 205:10-19, 206:2-11, 216:2-14, 220:6-14, 221:21-222:6 (Berg).

Treating HE and preventing it are distinct goals. Pls' FoF ¶ 125; s*ee* Tr. 212:18-19 (Berg) ("The goal of treatment of hepatic encephalopathy is to improve quality of life by putting patients into remission."). First, physicians treat an HE episode to bring patients into remission. Tr. 212:18-19 (Berg); Tr. 347:2-11 (Brown). Then, when the episode is resolved, the goal shifts to preventing the next episode from occurring. Tr. 347:12-19 (Brown); *see also* PTX 465 at 719-720 (distinguishing "Episodic HE" group in which goal is "Clinical improvement" from "After recovery from episodic HE" group in which goal is "prevention of … recurrent episodes"). The distinction carries through to managing HE: some drugs are administered to "induce [] remission" and others to "prevent a relapse" (*i.e.*, maintain remission), as Norwich's resistance expert, Dr. Schoolnik, acknowledged. Tr. 328:21-24 (Schoolnik). But a POSA would not assume that a drug that induces remission (*i.e.*, treats) would also prevent a relapse. Pls' FoF ¶ 125. Those indications were studied separately, and Salix's clinical development of rifaximin is an example. Tr. 59:1-6, 378:23-379:18 (Brown). Salix conducted two phase 3 trials—Mas and Bass—to determine if

1

rifaximin could *treat* HE. Both studies failed. Pls' FoF ¶¶ 130, 131. Disappointed, Salix tried again. Tr. 59:1-6; 378:23-379:18 (Brown). But this time, Salix designed a phase 3 study (the Bausch HE Protocol, also called RFHE3001) "to determine *if* rifaximin is safe and effective in *preventing* the recurrence of [HE]" in subjects already in remission of HE—an endpoint that had never been used in any HE trial. DTX 52 at Study Description (emphasis added); Pls' FoF ¶ 132.

HE can be episodic or persistent. Pls' FoF ¶ 124; PTX 465 at 717 ("episodic" and "persistent" HE are subcategories of HE caused by cirrhosis). The difference between episodic and persistent HE (and Norwich's failure to consider it) is important because the Court construed HE to cover the episodic subcategory. D.I. 90 at 4 (HE is "A serious, rare, complex, *episodic*, neuropsychiatric syndrome associated with advanced liver disease"); *see also id.* at 9 ("remission of/from HE" is "*no overt HE episode* in a subject with a history of overt HE") (emphases added).

### 2.     Rifaximin's Efficacy to Treat HE Was Doubtful, and Its Efficacy to Prevent Recurrence of HE Was Unknown

HE is "complex." *Id.* at 4. As of October 2008, its pathogenesis was unknown. Pls' FoF ¶ 122. Norwich's experts testified that rifaximin treats HE by reducing ammonia. Tr. 153:11-21, 218:3-6 (Berg); Tr. 288:5-12, 292:10-19 (Schoolnik). But patients can have high ammonia and no HE, or normal ammonia and severe HE. Tr. 344:6-15 (Brown). A POSA would not have relied on a drug's ability to reduce ammonia as an indicator of its ability to treat or prevent HE. Pls' FoF ¶ 123.

As of October 2008, management of HE was an experimental endeavor. Pls' FoF ¶ 126. There were no adequate therapies for any kind of HE. *Id*. The standard approach to treating HE episodes was to provide supportive care and correct any precipitating factors. PTX 491 at 1970; Tr. 349:10-22 (Brown). The next option was lactulose or lactitol, drugs whose efficacy had never been established. Pls' FoF ¶ 126. Although there were additional options if lactulose failed, like

2

neomycin and metronidazole, the efficacy of these approaches had never been established either. *Id*.

The use of antibiotics (including rifaximin) to treat HE was "not widespread, probably because they [did] not present major advantages" over lactulose. PTX 1108 at 588; Tr. 344:24-345:4; 354:11-17 (Brown); *contra* Def's Br. at 14, 15. There was some short-term antibiotic use, including rifaximin, to *treat* HE episodes, but a POSA would not have been aware of physicians using antibiotics long-term to *prevent* HE recurrence as claimed. Pls' FoF ¶ 127.

### (a)     The Most Reliable Evidence Suggested Rifaximin's Efficacy to Treat HE Was Doubtful

Norwich's expert, Dr. Berg. failed to consider Bass—the *only* multi-center, randomized, double-blind, placebo-controlled rifaximin study for the treatment of HE—when he compared the prior art to the asserted HE claims. *See* DDX 211. Dr. Berg relied on the references provided to him by Norwich's counsel, Tr. 249:19-21 (Berg), but "the full field of the invention must be considered; for the [POSA] is charged with knowledge of the entire body of technological literature, including that which might lead away from the claimed invention." *Sanofi v. Lupin Atl. Holdings S.A.*, 282 F. Supp. 3d 818, 842-43 (D. Del. 2017) (*citing In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988)). A POSA would have had more than passing familiarity with Bass, because it was the most reliable clinical trial and the most important HE rifaximin study conducted prior to October 2008. Tr. 338:11-21, 360:17-361:1, 363:9-364:8 (Brown), Pls' FoF ¶ 130. As of October 2008, the consensus was to include either a placebo or standard of care treatment arm in HE trials (but preferably not lactulose or neomycin, since their efficacy was questionable). PTX 465 at 720; Tr. 348:25-349:9, 364:4-8 (Brown). Bass was the only rifaximin study that fulfilled these criteria. Pls' FoF ¶ 130. A POSA would have considered Bass a failure, as it showed no significant difference between rifaximin and placebo in improving mental state. *Id*. Ultimately,

although less reliable studies suggested rifaximin had potential benefits to treat HE, Bass would have curtailed a POSA's expectations that rifaximin could prevent HE recurrence as claimed. *Id.*

Mas, another randomized, double-blind, controlled trial, also would have tempered any expectation that rifaximin could treat HE episodes. Pls' FoF ¶ 131. Mas rifaximin 1200 mg/day for 5 to 10 days to lactitol (the European version of lactulose) in 103 patients experiencing overt HE episodes. *Id.* The results indicated that rifaximin's and lactitol's effects were similar. *Id.* But by October 2008, a POSA would have known that lactulose (or lactitol)'s efficacy to treat HE had never been established. Pls' FoF ¶ 126 Mas therefore concluded that "the *real efficacy* of non-absorbable disaccharides or poor or *non-absorbable antibiotics in HE remains doubtful.*" DTX 425 at 57 (emphases added); Pls' FoF ¶ 131.

Dr. Berg asserted that less reliable, short-term treatment studies "demonstrated rifaximin's efficacy for HE." Def's Br. at 3. A POSA would have put these studies low in the hierarchy of evidence as less reliable because they were retrospective, uncontrolled, or both. Pls' FoF ¶ 133-146; Tr. 359:23-11 (Brown). At most, these studies would have suggested to a POSA that rifaximin may have potential to treat HE. Tr. 360:4-11, 369:4-13, 396:6-16 (Brown); s*ee* PTX 1101 at 1 ("Not all information that is published is of equal quality."). But a POSA would have given more weight to Bass and Mas, which concluded rifaximin was no better than placebo in improving mental state and its efficacy remained "doubtful." Tr. 359:21-360:3, 363:9-20, 369:4-13 (Brown).

### (b)   Whether Rifaximin Could Prevent Recurrence of HE Was Still a Hypothesis

A "POSA would assume that something that can't even treat HE would not be effective at maintaining remission." Tr. 348:6-7 (Brown). And, by October 2008, no study had established rifaximin's ability to prevent HE episodes. Tr. 386:1-12; 388:13-20 (Brown). The Bausch HE Study *hypothesized* that rifaximin might prevent recurrence of HE but disclosed no results. Pls'

FoF ¶ 132. Due to the disappointing results of the treatment studies, a POSA would not have expected rifaximin to prevent HE episodes, as claimed. Tr. 387:13-388:3, 396:6-16 (Brown).

### 3.   Bausch HE Study and Salix Presentation

The Bausch HE Study was the protocol for Salix's phase 3 RFHE3001 HE prevention trial, but it had no results. Pls' FoF ¶ 132. A POSA would have known that it was Salix's third attempt at a phase 3 trial find a place for rifaximin's in HE. *Id.* It was designed to analyze "if" rifaximin was safe and effective to prevent HE recurrence—an endpoint that had never been used. *Id.*

The Salix Presentation contains Dr. Carrol Leevy's personal experience with rifaximin, which is the least reliable type of medical evidence. Pls' FoF ¶ 137. It discloses that Dr. Leevy had an unspecified number of patients on 1200 mg rifaximin therapy for up to 12.5 months. Pls' FoF ¶ 138. Dr. Leevy did not say whether, while on rifaximin, patients experienced HE episodes, had changes in Conn scores or asterixis, or died. *Id.* He did not say whether he was treating episodic or persistent HE (and a POSA would not be able to discern which). *Id.* And he did not say whether he was administering rifaximin to prevent HE recurrence. *Id.*

Aside from its scientific deficiencies, the Salix Presentation is not prior art. Norwich had to offer clear and convincing evidence that the reference was (1) technically accessible and (2) that a POSA exercising reasonable diligence could locate it. *See Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1355-56 (Fed. Cir. 2018) (although a reference was publicly available on the FDA website, the petitioner still needed to show that it was technically accessible and distributed). Dr. Berg testified that he recently confirmed (after Plaintiffs' motion *in limine*) that a link to the transcript was available in October 2008, but he did not say how he did that or provide evidence to support it. Tr. 256:10-19 (Berg). *See Upjohn Co. v. Mova Pharm. Corp.*, 225 F.3d 1306, 1311 (Fed. Cir. 2000) (on a critical point in an obviousness analysis, "there must be factual support for an expert's conclusory opinion"); *Coalition for Affordable Drugs v. Univ. of Penn*, IPR2015-01835

(Paper No. 56), at 20. The same goes for Dr. Berg's assertion that searching the Internet with the words "'Salix' and 'Xifaxan'" "could lead a POSA" to the document: there is no evidence the Salix Presentation was indexed in a way that allowed a POSA to locate it with an online search. Tr. 176:15-22 (Berg); *see Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1350 (Fed. Cir. 2016).

### 4. Leevy 2007 with "Common Knowledge"

During the Salix Presentation, Dr. Leevy stated that he would be publishing some of his patients' experiences with rifaximin. DTX 660[1] at 11. That experience was published in Leevy 2007, a retrospective chart review, but it excluded two-thirds of the patients Dr. Leevy said he had on rifaximin in his Salix Presentation comments. Pls' FoF ¶ 139. Still, Leevy 2007 does not disclose whether these subjects were experiencing persistent or episodic HE (and actually, most had asterixis, a tell-tale sign of an overt HE episode). Pls' FoF ¶ 135. A POSA would have assumed that Dr. Leevy's patients (in the Salix Presentation and Leevy 2007) were experiencing overt HE when starting rifaximin. *Contra* Norwich Br. at 6; Pls' FoF ¶ 135. Further, because Conn scores were not recorded throughout the study, a POSA would not have been able to determine whether subjects who had a Conn score of 1 at the beginning of the rifaximin phase maintained that Conn score throughout the 6 months. Pls' FoF ¶ 134. Leevy 2007, therefore, fails to disclose administering rifaximin to reduce the risk or maintain remission of episodic HE—claim limitations that go to "the heart of [the] invention." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1363 (Fed. Cir. 2016).

"Common knowledge" seems to be an attempt to expand this prior art combination to be

---

[1] The Salix Presentation was entered into evidence as DTX 748. Norwich's Opening Brief and Proposed Findings of Fact refer to it as DTX 660, which was not entered into evidence. For simplicity, Plaintiffs will cite to it as Norwich has—as DTX 660.

Leevy 2007 in view of over a dozen other references. Regardless of how it is packaged, "common knowledge" cannot supply missing claim elements. *K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1366 (Fed. Cir. 2014) ("[G]eneral conclusions about what is 'basic knowledge'" cannot be "a replacement for documentary evidence for core factual findings in a determination of patentability."). Further, Norwich's "common knowledge" is fundamentally flawed because it omits Mas and Bass. *In re Langer*, 465 F.2d 896, 899 (C.C.P.A. 1972) (invention "as a whole" must be considered in light of the prior art "as a whole").

### 5.     No Motivation to Combine the Prior Art

#### (a)     No "Teaching, Suggestion, or Motivation"

Norwich first asserts that a POSA would have had a "teaching, suggestion, or motivation" to combine the prior art. Def's Br. at 9. Norwich argues a POSA would have combined the Bausch HE Study and Salix Presentation, because HE is a chronic condition and a POSA would keep a patient on rifaximin for as long as it remained beneficial. *Id.* But neither reference contained results. Tr. 200:19-21, 239:16-21, 258:17-19 (Berg); Tr. 383:6-10 (Brown). And a POSA would have doubted rifaximin's short-term efficacy to treat HE episodes, and certainly its long-term ability to prevent HE recurrence. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (POSA must be motivated to do more than "pursue a general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it") (cleaned up).

A POSA would not have been motivated to combine Leevy 2007 with "common knowledge" on the premise that rifaximin was "effective in treating HE, and that patients demonstrate[d] lower grades of HE and maintenance of remission." Def's Br. at 11. Leevy 2007 concluded only that its results were "consistent with the *possibility* that the reductions in frequency, duration, and hospitalization charges are attributed to better efficacy of rifaximin." DTX 390 at

740 (emphasis added); Pls' FoF ¶ 133. And it was not "common knowledge" that rifaximin was effective to treat HE, because the phase 3 studies Dr. Berg did not include in his incomplete collection of "common knowledge" concluded that rifaximin's efficacy to treat HE was doubtful. Pls' FoF ¶¶ 130, 131. *See Sanofi v. Glenmark Pharms. Inc., USA*, 204 F. Supp. 3d 665, 686 (D. Del. 2016) ("A POSA in 2008 would know that post-hoc analyses have inherent limitations in terms of reliability and would therefore critically evaluate conclusions arising out of a post-hoc analysis in light of the known risks and benefits of a particular method of treatment."), *aff'd sub nom. Sanofi v. Watson Lab'ys Inc.*, 875 F.3d 636 (Fed. Cir. 2017).

The other references Norwich cites to support using rifaximin continuously for 12 months—Shen, Mantry, Neff, Festi, and Gerard—do not provide a teaching, suggestion, or motivation towards the claimed methods. Dr. Berg admitted that Shen was a study of rifaximin in patients with pouchitis, not HE (in fact, patients with pouchitis do not even have colons—where the toxins thought to cause HE originate). JTX 137; Tr. 228:10-13, 267:16-18 (Berg). Mantry was published two years *after* the priority date in response to Salix's RFHE3001 clinical trial, and it suffers the same biases as Leevy 2007. Pls' FoF ¶ 146. Dr. Berg admitted that Neff does not disclose whether the use of rifaximin was successful or whether rifaximin prevents overt HE episodes. Pls' FoF ¶ 145. Dr. Berg admitted that the longest of the three sub-studies disclosed in Festi was 21 days, and none were capable of showing whether rifaximin was effective to treat HE. JTX 42; Tr. 268:20-269:18 (Berg). And Gerard offered no new data and reported that the longest continuous use of rifaximin to treat HE was 21 days. JTX 90; Pls' FoF ¶ 149. Gerard disclosed the use of rifaximin to treat HE "for as long as needed (generally weeks to months)," which a POSA would have understood to encompass the 21-day continuous and 6-month cyclical (2 weeks on, 2 weeks off) administrations, *not* 6 months *continuously*. *Id*.

A POSA would not have been motivated to administer rifaximin with lactulose. Def's Br. at 10. Norwich acknowledged that Puxeddu disclosed *treating* HE with rifaximin and lactulose. Def's Br. at 5 (combination "was known" to "be effective for reducing HE grade", whereas preventing recurrence would involve ensure that HE grade, once reduced, does not go back up); Pls' FoF ¶ 143. In any event, Puxeddu looked at ammonia production with the combination, and ammonia is not a reliable indicator of HE symptom improvement. *Id*. Shah disclosed using rifaximin to treat patients with refractory HE *after* lactulose failed. Pls' FoF ¶ 150.

The only motivation that Norwich identifies for arriving at the claimed dosage regimens (550 mg BID or 1000-1200 mg per day for 12 months or longer) was to increase patient compliance. But Dr. Berg never suggested that compliance was an issue. *See Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, 473 F. Supp. 3d 376, 381 (D. Del. 2020) ("[G]eneral understanding that a certain dosage form may improve patient compliance is not enough, by itself, to show that a POSA would have been motivated to develop a specific drug or a drug for a specific illness using that dosage form."). Even if a POSA were motivated to increase the tablet size, Norwich offered no reason why a POSA would replace the 200 mg tablet with a 550 mg tablet (as opposed to any other size larger than 200 mg). *See Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) (defendants' expert "discounted the number and complexity of the alternatives … Of course, this reasoning is always inappropriate for an obviousness test").

A POSA would not have been able to identify the claimed daily dose via "routine experimentation" since there was no evidence that the daily dose had any effect on HE symptoms. *See* Tr. 213:7-13 (Berg). There were no dose-finding studies of rifaximin for the *prevention* of HE episodes. Pls' FoF ¶ 144. The only dose-finding study of rifaximin in HE was a treatment study, and it found no significant difference between the 600, 1200, and 2400 mg doses. *Id*. This case is

different from the "routine experimentation" cases Norwich cited where the difference between the prior art and claims was a result-effective variable; here it was not known if rifaximin would work at all. *See In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) (groove dimension in polishing pad were known and result-effective); *Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305, 344 (D. Del. 2010) (stock solution of 10 to 200 mg/ml of docetaxel and polysorbate 80 was obvious where expert testified that "it's completely in the routine, mundane part of being a formulator to vary the volumes and the ratios of ingredients.") (cleaned up).

### (b) The HE Claims Are Not Combinations of Familiar Elements According to Known Methods That Have a Predictable Result

Next, Norwich asserts that a POSA would have been motivated to combine the prior art because doing so reflects combining prior art elements according to known methods. Def's Br. at 12 (citing *KSR*: "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). The Bausch HE Study does not disclose preventing HE recurrence; it disclosed studying *if* rifaximin could prevent HE recurrence. *Supra* pp. 2, 5. The results were not known, and "the playing field was littered with failures," including two failed phase 3 trials. Tr. 380:20-381:12 (Brown) Pls' FoF ¶¶ 126, 132, 156, 157. Leevy 2007 only suggested the "possibility" rifaximin had a benefit. *Supra* pp. 6-7. No HE drug had been approved in over 30 years, and no drug had ever been approved to prevent HE recurrence. Pls' FoF ¶ 115. Thus, the claimed elements were not "familiar," there was no "known method," and the result were not "predictable." *Cf. KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 416 (2007).

### (c) The HE Claims Are Not Simple Substitutions

Last, Norwich asserts that a POSA would have arrived at the claimed inventions via simple substitution of one element for another, citing *Asyst Tech*'s finding that it was obvious to use an information bus instead of a multiplexer in a system for tracking articles in a manufacturing

facility. Def's Br. at 12. But Norwich "failed to prove that a relevant artisan would have made the particular combination[s]" Norwich proposes (replacing the Bausch HE Study duration with the one in the Salix Presentation, and replacing the Leevy 2007 duration with one from "common knowledge"). *St. Jude Med., LLC v. Snyders Heart Valve LLC*, 977 F.3d 1232, 1243 (Fed. Cir. 2020). And HE is "complex" and unpredictable, *supra* p. 2, which is very different than the car pedals in *KSR* where "a technique ha[d] been used to improve one device, and a [POSA] would recognize that it would improve similar devices in the same way." *KSR*, 550 U.S. at 417.

### (d)   It Would Have Been Risky to Give Rifaximin Every Day for 12 Months to HE Patients

A POSA would have known that the "prolonged use" of antibiotics for prevention "would undoubtedly lead to important levels of general antibacterial resistance." PTX 386 at 103; PTX 1108 at 588 (liver textbook explaining that "[a]n important limitation of antibiotics is the risk for toxicity and the possible selection of multiresistant strains. For these reasons, antibiotics are not usually recommended for prolonged periods."); PTX 734 at 2s; PTX 654 at 428 (warning against using antibiotics prophylactically); Pls' FoF ¶ 151.

A POSA would have been concerned that daily, long-term use of antibiotics would cause deadly superinfections in HE patients. Pls' FoF ¶¶ 152, 153. Dr. Schoolnik downplayed the risk of superinfections, suggesting "many other antibiotics were available to treat" them. Tr. 297:1-6 (Schoolnik). But his approach of using another antibiotic in response to an antibiotic-caused infection would only exacerbate the epidemic of antibiotic resistance. Tr. 472:16-21 (DuPont); PTX 732 at 667. Also, multi-drug resistant infections are a common cause of death in HE patients; in the process of trying to find an effective antibiotic, patients would likely die. Pls' FoF ¶ 153. A POSA would have known it was critical to avoid infections in HE patients. Tr. 471:22-472:21, 490:2-8 (DuPont).

11

A POSA would have been concerned that if an HE patient developed clinical resistance to rifaximin, he would not be able to administer rifaximin the next time the patient experienced an HE episode. Pls' FoF ¶ 152. Thus, even if a POSA perceived a short-term benefit, he would stop rifaximin shortly after the patient's episode resolved to avoid the development of antibiotic resistance. Pls' FoF ¶¶ 153, 159; Tr. 376:3-13; 377:14-20 (Brown). Norwich asserts that "it was known by 2008 that rifaximin does not exhibit clinical resistance," Def's Br. at 11 (citing Def. FoF ¶ 53), but that is not what the evidence showed. Dr. Berg testified only that the Salix Presentation, Shen, and Leevy 2007 did discuss or observe or report resistance. Tr. 299:10-21; DTX 390 (Leevy 2007 does not discuss resistance at all); Pls' FoF ¶ 134; JTX 137 (the patients in Shen do not have colons—where the bacteria a POSA would be concerned would become resistant reside); Tr. 228:10-13, 267:16-18 (Berg). Dr. Leevy stated that he had seen "no resistance", but a POSA would not have given this observation significant weight without data and clarity on what he meant. DTX 660 at 11; Tr. 384:3-15 (Brown); Tr. 474:6-475:19 (DuPont). Thus, none of these references were studies designed to assess resistance and could not have shown that resistance was known not to develop with daily, long-term administration of rifaximin. Tr. 462:8-463:5 (DuPont). The only reliable studies assessing resistance to rifaximin were based on short-term administration. Tr. 462:8-463:5, 466:8-467:12 (DuPont).

Dr. Schoolnik disagreed that daily, long-term rifaximin would cause resistance, but this was based on his incorrect assumption that bacteria in the colon are exposed to high concentrations of rifaximin. Tr. 295:8-20 (Schoolnik).[2] Dr. DuPont, supported by the literature, explained that

---

[2] Dr. DuPont has worked with rifaximin for nearly three decades, conducted multiple rifaximin clinical trials, consulted with the FDA on rifaximin resistance, and published over a hundred papers on rifaximin. Tr. 441:8-443:3, 444:6-17 (DuPont). Dr. Schoolnik has not published on rifaximin or conducted studies with rifaximin. Tr. 311:2-4 (Schoolnik).

despite the high concentration, rifaximin was thought to have low bioavailability in the colon and thus colonic bacteria could be exposed to low concentrations, increasing the likelihood that resistance would develop. Pls' FoF ¶ 152. Until further studies could be conducted, a POSA would have understood that "despite the high intestinal concentrations of rifaximin, of up to 8000 µg/g in faeces, *rifaximin should be used with caution*, because of the possibility of developing rifaximin resistance during treatment, which may result in both therapeutic failure and the spread of stable rifaximin-resistant strains." PTX 950 at 1018 (emphasis added); Tr. 457:19-23, 460:17-20 (DuPont). Without further studies, a POSA would have been reluctant to administer rifaximin every day for 12 months or more to prevent HE recurrence. Tr. 467:10-12 (DuPont).

### 6.   No Reasonable Expectation of Success

Norwich failed to demonstrate that a POSA would have reasonably expected that rifaximin 550 mg BID (or 1000-1200 mg/day) with or without lactulose, for 12 months or longer. would work as claimed.[3] The claims do not reflect a "known effective treatment" with a "known dosing regimen" for a "known duration." *Contra* Def. Br. at 13.

What was "known" about rifaximin's efficacy was that it was "doubtful" and no better than placebo in improving mental state in patients with active HE episodes. *Supra* pp. 2-4. Those results—which Dr. Berg failed to consider in his *prima facie* obviousness case—would have undermined any reasonable expectation that rifaximin would *treat* HE, and a POSA would not have reasonably expected a failed treatment to successfully prevent HE recurrence as claimed. Tr.

---

[3] Plaintiffs do not take a position on what *would* be required for there to be a reasonable expectation of success, but rather that Norwich has not met its burden of proving that a POSA would have had that expectation. *Contra* Def's Br. at 14-15. In fact, Dr. Brown was explicit that a POSA would not have needed phase 3 clinical trial data to have a reasonable expectation of success. Tr. 341:4-10, 399:14-21, 369:4-13, 387:13-388:12 (Brown). Thus, the suggestion that Plaintiffs are holding Norwich to a higher standard – something akin to FDA approval – is incorrect and not supported by the testimony Norwich cites.

348:6-7, 359:21-630:3, 363:9-20, 369:4-13 (Brown). *Boehringer Ingelheim Vetmedica, Inc., v. Schering-Plough Corp.*, 320 F.3d 1339, 1354 (Fed. Cir. 2003) ("[T]here can be little better evidence negating an expectation of success than actual reports of failure."). Even as an investigator on the Bausch HE Study, Dr. Brown had no expectation rifaximin would prevent HE recurrence. Tr. 378:23-380:7, 380:20-381:12 (Brown).

Dr. Berg's testimony undermines, rather than supports, Norwich's suggestion that "Phase III clinical trials like the Bausch HE study are successful more often than not." Def's Br. at 15. He admitted his "50-60%" average success rate was not HE-specific and that he did not consider the success rate for HE clinical trials in his analysis. Tr. 234:23-235:1, 240:22-25 (Berg). A POSA would not have applied that success rate to the Bausch HE Study, Tr. 341:11-23 (Brown), because the literature was "littered with a history of inconsistent clinical trial results" involving both rifaximin and other experimental HE therapies. Tr. 380:8-381:12 (Brown); *see Sanofi*, 204 F. Supp. 3d at 696. A POSA would have known that the Bausch HE Study was Salix's third attempt to find a role for rifaximin in HE, Pls' FoF ¶ 132, and there was no reason that a POSA would expect its outcome to be different than its first two attempts. Tr. 379:11-380:7; 380:20-381:12, 387:13-388:3, 396:6-16 (Brown). Dr. Leevy's "feeling" that rifaximin would eventually be the standard of care ("in the treatment" of HE, not prevention) would not have swayed a POSA in the other direction, because the POSA's expectations would have been based on the evidence, not feelings. Tr. 384:16-385:1 (Brown); Tr. 476:5-18 (DuPont).

The 12-month, 1100 mg daily rifaximin dosage regimen (550 mg BID) was under investigation, but it was not "known" if it worked. DTX 52 at Study Description; Pls' FoF ¶ 132; *see Sanofi*, 204 F. Supp. 3d at 686-92, 696 (investigators' article disclosing rationale and design of phase 3 trial, before results were reported, provided a hypothesis that needed to be tested).

14

Norwich's argument that the 1200 mg dose was "standard" and "an effective regimen for treating HE," Def. Br. at 14, is incorrect because that dose failed to treat HE. Pls' FoF ¶¶ 130, 131. The short-term use of 1200 mg of rifaximin did not work and so it would not have provided a POSA with a reasonable expectation that 1100 mg (or 550 mg BID) would be successful to prevent HE recurrence. *Id.*; *see Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021) (patent challenger must "prove a reasonable expectation of success in achieving the specific invention claimed…."). The inventors' belief that 1200 mg and 1100 mg were similar is irrelevant. *See Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1377 (Fed. Cir. 2019).

Without citing any evidence or testimony, Norwich asserts that "maintaining remission and reducing the risk of HE recurrence are the inherent result of the prior art administration of rifaximin." Def's Br. at 7. Norwich has not asserted anticipation, and to prevail on obviousness based on inherency, Norwich still must prove that a POSA would have had a reasonable expectation of success for the claimed inventions. "[T]he use of inherency in the context of obviousness must be carefully circumscribed because that which may be inherent is not necessarily known and that which is unknown cannot be obvious." *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017) (cleaned up). Even if administering rifaximin to treat HE results in preventing recurrence of HE episodes (it does not), Norwich still has not met its burden because it was not known if rifaximin could prevent HE recurrence. Tr. 369:4-13, 396:6-16 (Brown). *See PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1195-96 (Fed. Cir. 2014) (A party must meet "a high standard in order to rely on inherency to establish the existence of a claim limitation in the prior art in an obviousness analysis—the limitation at issue necessarily must be present, or the natural result of the combination of elements explicitly disclosed by the prior art.").

A POSA would not have reasonably expected lactulose and rifaximin would result in a synergistic effect in preventing HE recurrence. *Contra* Def's Br. at 13. Puxeddu was a treatment study and concluded there was a synergistic effect in reducing ammonia, which a POSA would have understood was not reasonably predictive of an effect on HE symptoms. Pls' FoF ¶ 143. Shah disclosed administering rifaximin in patients with refractory HE episodes after lactulose failed (not with lactulose). Pls' FoF ¶ 150. Norwich identified no data of the combination to prevent HE recurrence.

Off-label use would not have provided a POSA with a reasonable expectation of success, because a POSA would have recognized that physicians were using rifaximin off-label out of desperation, not because they reasonably expected it to work. Tr. 374:2-12 (Brown). Drs. Berg and Brown used rifaximin only when lactulose failed. Tr. 156:12-16 (Berg); Tr. 374:13-21, 398:14-399:10 (Brown). Norwich's evidence that off-label use was "abundant," "common," or "widespread" is based on Salix's physician survey data (which is not prior art)[4] and three physicians' personal experiences (relayed in a conference call transcript). *See* Def. Br. at 14 (citing Def. FoF ¶¶ 6, 59). As of October 2008, antibiotic use to treat HE was "not widespread," and rifaximin's share in the HE market was "very, very low." PTX 1108 at 588; DTX 535 at 6; Tr. 344:24-345:4; 354:11-17 (Brown). There is no record evidence that physicians were using long-term, daily rifaximin to prevent HE episodes. *See* Tr. 396:17-25, 388:13-20, 354:4-10 (Brown).

## C.   Adequate Written Description

Norwich failed to prove inadequate written description of methods of administering

---

[4] Salix's data suggested 77% of surveyed physicians had prescribed Xifaxan "for HE" at least once. Tr. 418:22-419:9 (Brown). But it is not clear how many physicians were surveyed, making the percentage unhelpful to determine whether use was "abundant," "common," or "widespread." Tr. 130:11-131:4 (Johnson) ("we don't know how many physicians are in this survey or who makes up the survey" and "I can't tell from this how this was done").

rifaximin alone in claim 8 of the '573 patent, claim 6 of the '195 patent, and claim 11 of the '397 patent. The specifications disclose administering rifaximin with or without another agent. JTX 19 at 17:26-29 ("A GI specific antibiotic can be administered alone, or in conjunction with [another agent]"); JTX 11 at 17:26-29 (same); JTX 22 at 11:15-18 (same); Pls' FoF ¶ 166. And they describe using rifaximin with or without lactulose. JTX 19 at 16:62-17:3 ("This method includes: administering rifaximin to a subject daily that is being treated with lactulose, and tapering lactulose consumption…. In one embodiment, the *baseline use of lactulose is no use*.") (emphasis added); JTX 11 at 16:62-17:3 (same); JTX 22 at 10:49-57 (same); Pls' FoF ¶ 166. The specifications include an example of a rifaximin trial in which "[l]actulose use was optional." Pls' FoF ¶ 167.

Norwich's position seems to be that the specifications lack data, which is the incorrect legal test. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010) (en banc). The '195 and '573 specifications have clinical trial data disclosing that rifaximin's efficacy did not depend on whether the subjects were rifaximin alone or with lactulose. Pls' FoF ¶ 167.

## II.    IBS-D PATENT VALIDITY

### A.    Priority Date and Level of Ordinary Skill in the Art

The priority date for the IBS-D Claims is February 26, 2008. Pls' FoF ¶ _. The definition of a POSA is not outcome determinative. Pls' FoF ¶ _.

### B.    Nonobviousness

#### 1.    Antibiotics Were Not Recommended to Treat IBS-D

"There [was] insufficient evidence to recommend antibiotics for the treatment of [IBS]" as of the priority date. PTX 693 at 1319; Pls' FoF ¶ 177. First, the only published randomized, double-blind clinical trial of rifaximin to treat IBS (Pimentel 2006) found that rifaximin (400 mg TID for 10 days) failed to improve IBS patients' abdominal pain and diarrhea (the symptoms integral to defining IBS-D). Pls' FoF ¶¶ 186-188. Second, the evidence for using antibiotics in IBS was

"controversial," because it was based on the theory that SIBO contributed to IBS, and so antibiotics (e.g., rifaximin) could treat IBS by eradicating SIBO. Pls' FoF ¶¶ 173-176. A POSA would have understood that "[a] sound rationale for antibiotic therapy ha[d] not been established because the issue of SIBO in IBS ha[d] not been resolved." PTX 692 at 1152; Pls' FoF ¶ 177. Third, a POSA would have recognized that "antibiotics could play a role in the pathogenesis of IBS" or "exacerbate symptoms." PTX 693 at 1320; PTX 664 at 1780. Fourth, there was "the possibility [that] repeated courses of antibiotics in this chronic relapsing condition may lead to the development of antibiotic resistance and opportunistic infections," like *C. difficile*. PTX 692 at 1142; PTX 1034 at 1484.

Hence, a POSA would have understood that physicians tried rifaximin off-label out of desperation, not because they expected it to work. Pls' FoF ¶ 192. Dr. Schoenfeld, Plaintiffs' expert, prescribed rifaximin to IBS-D patients in 2007, *see* Def's Br. at 17, but only about 10 times when his patients had run out of options and were miserable.[5] *Id.* So, a POSA would have hoped there would be a benefit, but off-label use was like an experiment. *Id.* Plaintiffs disagree that Weinstock, Jolley, Pimentel 2011, and Salix's marketing and prescription data (or the uses reported therein) are prior art. Pls' FoF ¶¶ 194, 195. Norwich has not proven that the uses were public or even if they were, that the uses meet the elements of the IBS-D Claims. *Id. Res. Found. of SUNY v. Mylan Pharm. Inc.*, 809 F. Supp. 2d 296, 323-24 (D. Del. 2011) (physician's off-label use of drug was not a public use because although corroborated, the use did not occur in public, there was no public access to the use, and the physician "had a confidentiality obligation to his patient not to disclose her name and treatment"), *aff'd in relevant part*, 531 F. App'x 1008 (Fed.

---

[5] Despite Norwich's repeated characterization of off-label use as widespread, Dr. Harary never testified that *he* used rifaximin off-label to treat IBS-D, and even today, his website tells patients that "[a]ntibiotics should not be used routinely to treat" IBS. Tr. 715:8-17, 721:16-722:15 (Harary).

Cir. 2013).[6] Even if the uses were prior art, they still must be considered in light of the prior art as a whole. *In re Langer*, 465 F.2d at 899. Thus, even assuming a POSA knew about off-label use (at a minimum via retrospective chart reviews like Yang and Barrett), a POSA would have recognized that experts summarizing IBS-D literature also would have been aware of those uses, but still found "insufficient evidence to recommend" it. Pls' FoF ¶¶ 177, 205. *Sanofi*, 204 F. Supp. 3d at 694 (POSA would not rely on post-hoc analysis for reasonable expectation of success where "the historic uncertainty in the field regarding the efficacy of AAD treatments generally and the lack of consistent clinical trial results are factors that would cause a POSA to take a more exacting look than usual at a post-hoc analysis").

## 2. Norwich's Prior Art Combinations

Norwich improperly isolated the claimed subject matter into "separate pieces" and then "stitch[ed] together an obviousness finding from discrete portions of prior art references without considering the references as a whole." *In re Enhanced Security Res., LLC*, 739 F.3d 1347, 1355 (Fed. Cir. 2014). Even assuming a POSA would have been motivated to combine the RFIB2001 Protocol with Pimentel 2006, Cuoco, or Barrett, Norwich "failed to prove that a relevant artisan would have made the particular combination that [Norwich] proposed." *See St. Jude Medical*, 977 F.3d at 1242. Norwich retained the tablet size and length from the RFIB2001 Protocol (but not the daily dose or frequency); it retained the frequency from Pimentel 2006 (but not the daily dose or length); it retained the frequency and length from Cuoco (but not the daily dose); and it retained

---

[6] None of the cases Norwich cites held that a treatment method that was not, but *could* have been public, is prior art. *UCB, Inc. v. Watson Labs., Inc.*, 927 F.3d 1272, 1289-91 (Fed. Cir. 2019) (polymorph was publicly used as it was the active ingredient in patch worn by patient and that was different from case where samples sent to third party were not, but could have been, used publicly); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1305-06 (Fed. Cir. 2006) (system promoted through seminars and distribution of instruction sheet was public use); *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1320-21 (Fed. Cir. 2002) (prototype demonstration was public use).

19

the frequency from Barrett (but not the daily dose or length). This is classic hindsight.

**Pimentel 2006**. Dr. Harary testified that rifaximin significantly improved global IBS symptoms, but he ignored that rifaximin failed to improve abdominal pain and diarrhea. Pls' FoF ¶ 186. *In re Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965) (impermissible "to pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to [a POSA]"). Dr. Harary did not consider the criticisms of Pimentel, *infra* pp. 25, 27, including that Pimentel 2006's limitations made its "findings inconclusive and raise[d] questions about the clinical significance of the results." PTX 457 at 627.

**Cuoco**. A POSA would not have been able to draw reasonable conclusions from Cuoco's retrospective chart review as to whether rifaximin would treat IBS-D because it was based on the controversial hypothesis that SIBO contributed to IBS. Pls' FoF ¶¶ 189, 173-177. Its methodology was poor – over half of patients were lost to follow-up. Pls' FoF ¶ 189. The authors retrospectively applied symptom scores, resulting in bias. Pls' FoF ¶ 190. And even then, a POSA would have had trouble figuring out how many patients' IBS-like symptoms got better or worse. *Id.*

**Barrett**. A POSA would not have been able to draw reasonable conclusions from Barrett as to whether rifaximin would treat IBS-D. Pls' FoF ¶ 192. Barrett reports a retrospective chart review of 8 IBS patients administered a probiotic and rifaximin 400 mg TID for one to five months. *Id*. It concludes with a hypothesis: "further studies on the potential benefits of this nonsystemic antibiotic for IBS [were] warranted." JTX 71 at S480.

**RFIB2001 Protocol**. It was undisputed that the RFIB2001 Protocol does not disclose results, and that the RFIB2001 dosage regimens were different than the claimed dosage regimen. Pls' FoF ¶¶ 181-182. And it was unrebutted that a POSA would not have reasonably expected

RFIB2001 would be successful simply because the trial had begun. Pls' FoF ¶ 181. The RFIB2001

Press Release – derived from the inventors' work and published in September 2007 – is not in any

of Norwich's prior art combinations, nor is it prior art. Pls' FoF ¶ 183. *Invitrogen Corp. v. Biocrest*

*Mfg., L.P.*, 424 F.3d 1374, 1380-81 (Fed. Cir. 2005) (inventor's own work or disclosure derived

from his work cannot be used to invalidate patents protecting his own later inventive activities).

Yet Norwich prominently features the press release in its obviousness argument. *See* Def's Br. at

19, 21, 26, 28. But this was to Norwich's detriment: the results were limited to a few sentences

about one aspect of the trial, and that one aspect cuts against any motivation to increase the

rifaximin dose. Pls' FoF ¶ 198. Again unrebutted, a POSA would not have reasonably expected a

future phase 3 trial would be successful since many IBS-D drugs that looked successful in phase

2 failed in phase 3. Pls' FoF ¶ 185.

### 3.    No Motivation to Combine the Prior Art

A POSA would not have been motivated to use rifaximin to improve IBS-D treatment

because rifaximin had not been shown to treat IBS-D in the first place: (i) the RFIB2001 Protocol

did not disclose results; (ii) Pimentel 2006 taught that rifaximin 400 mg TID for 10 days was no

better than placebo in improving abdominal pain and diarrhea in IBS patients; (iii) Cuoco was

based on the hypothesis that SIBO contributes to IBS, and its results were biased and confusing;

and (iv) Barrett concluded that more research was needed. Pls' FoF ¶ 196. *See DePuy Spine v.*

*Medtronic*, 567 F.3d 1314, 1326 (Fed. Cir. 2009) ("An inference of nonobviousness is especially

strong where the prior art's teachings undermine the very reason being proffered as to why a

[POSA] would have combined the known elements.").

Even if off-label use provided a general motivation to try rifaximin for IBS-D, that is not

sufficient motivation to combine the prior art to do what is specifically claimed. *See Medichem*,

437 F.3d at 1165 (POSA must be motivated to do more than "pursue a general approach that

seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it.") (cleaned up).

A POSA would have had reasons *not* to treat IBS-D with rifaximin, because it could: (i) contribute to or worsen IBS symptoms; (ii) cause *C. difficile* colitis; and (iii) cause superinfections with wide-spread use. Pls' FoF ¶ 196. *See Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1066 (Fed. Cir. 2020) (patent not obvious where "a POSA would be deterred from pursuing the claimed combination by concerns of" achieving "the opposite effect from that needed to treat" the claimed condition), *cert. denied*, 141 S. Ct. 2623 (2021).

### (a)    No Motivation to Adjust the Rifaximin Dosage Regimen

A POSA would not have been motivated to adjust the rifaximin dosage regimen to improve IBS-D treatment. As an initial matter, the motivation in Norwich's Brief (*adjust* the dosage regimen) is broader than the one its expert asserted at trial (*increase* the dosage regimen). *Compare* Def's Br. at 21-22 *with* Tr. 662:16-663:9, 668:9-25 (Harary). Notwithstanding that arguments in briefing cannot replace trial evidence, *In re Schulze*, 346 F.2d 600, 602 (C.C.P.A. 1965), a motivation to "adjust" the dosage regimen only enlarges the number and complexity of alternatives that Dr. Harary discounted. *See Ortho-McNeil Pharm.,* 520 F.3d at 1364.

**Tablet size.** Dr. Harary subverted his own testimony that a POSA would have wanted to increase the tablet size (from 200 to 550 mg) so as to reduce the pill burden (from two tablets to one). Tr. 674:10-16 ("Yeah, I don't think going from two pills to one would make a big difference …"), 730:4-18 (agreeing "a POSA could choose whatever rifaximin dosage they wanted to") (Harary). A POSA would not look to improve compliance when compliance with a two-tablet, three-times-a-day dosage regimen had been excellent. Pls' FoF ¶ 202; Tr. 728:14-20 (Harary). *See Arctic Cat Inc. v. Polaris Indus., Inc.*, 795 F. App'x 827, 833 (Fed. Cir. 2019) ("Although a challenger to a patent is not required to prove there was a known problem with the prior art, the

Board did not misapply the law by requiring [the challenger] to prove the facts that it alleged.")
(cleaned up). And the inventors' reason for developing a 550 mg tablet is legally irrelevant. *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012). *Contra* Def's Br. at 23.

**Length.** Dr. Harary landed on 14 days, despite testifying that a POSA would have wanted to increase the length of rifaximin administration, Tr. 662:23-24, 668:4-7, 668:19-21, and would have been aware of lengths ranging from 7 days to five months, Tr. 664:5-15, 653:21-654:8, 639:3-8. He gave no explanation for why a POSA's motivation to increase the length would land him at the bottom end of the lengths he asserts were disclosed.

**Frequency.** Norwich's argument that TID dosing would have been obvious is that rifaximin must be "administered to a patient via some finite number of administrations," and the options were dosing once, twice, or three times a day. Def's Br. at 24. As for why TID specifically, Norwich argued that a POSA would have wanted to maintain an effective concentration of rifaximin in the small intestine to control bacteria, *id.*, but a POSA would not have reasonably believed that controlling bacteria in the small intestine would treat IBS-D, Pls' FoF ¶¶ 174-177.

**Dose**. Dr. Harary landed on 1650 mg daily, despite testifying that a POSA would have wanted to increase the dose, Tr. 662:16-663:9; 668:9-25, and that a POSA would have been aware of doses ranging from 100 to 2400 mg daily, Tr. 715:5-7, 670:5-18; *see* Def's Br. at 22 (citing (i) Viscomi's range of 100 to 1800 mg that was not specific to IBS, Pls' FoF ¶ 197; (ii) Lin 2006's regimen (400 mg TID for 10 days) that Pimentel 2006 found was *ineffective* to treat abdominal pain and diarrhea in IBS patients, and a range of 1200 mg to 1800 mg daily for an entirely different condition, *id.*; and (iii) "prior uses" of 800 to 2400 mg daily, disclosed after the priority date, Pls' FoF ¶ 194). Dr. Harary gave no explanation for why a motivation to increase the dose would land the POSA well under the highest dose Dr. Harary asserted was disclosed.

23

Complicating dose selection, there was no known dose-response relationship between rifaximin and IBS-D symptom improvement. Pls' FoF ¶¶ 197-198. Norwich cites Pimentel 2006's statement that "[r]ecent data suggest that the optimal dosage of rifaximin [for IBS] may, in fact, be higher than that used in our study" (1200 mg), but its only support for that statement was Lauritano. Pls' FoF ¶ 199. Lauritano did not study rifaximin's effects in IBS or even on GI symptoms; nor did Lauritano study a higher dose than 1200 mg. *Id.* Similarly, Scarpellini and Di Stefano did not study rifaximin's effects on symptoms. Pls' FoF ¶ 200. Rather, Lauritano, Scarpellini, and Di Stefano looked at breath test normalization, which was not reliable "to assess for eradication of SIBO after treatment with antibiotics," much less IBS-D symptom improvement. PTX 1064 at 2507; Pls' FoF ¶ 175.

The overlapping range, burden-shifting framework does not apply. *Contra* Def's Br. at 22-24. "Antibiotic dose and duration of therapy ha[d] not been established;" there was no "workable range" within which to identify an optimal dose; and the range Norwich relies on (100 to 2400 mg) is large. PTX 692 at 1142; Pls' FoF ¶¶ 197-198. *See Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015) (questioning whether burden-shifting framework would apply where "the disclosed ranges are so broad as to encompass a very large number of possible distinct compositions.") (cleaned up). Further, "[a] presumption of obviousness attaches only when *the* range or value of a particular variable is *the* difference between the claimed invention and the prior art." *Pharmacyclics LLC v. Alvogen Pine Brook LLC*, 556 F. Supp. 3d 377, 408 (D. Del. 2021) (cleaned up) (emphasis in original). Like in *Pharmacyclics*, "there are many differences between the claimed invention and [the prior art], including the applicable disease, route of administration, and number of administrations per day." *Id.*

But even assuming the burden-shifting framework applies, a POSA would not have

reasonably believed that adjusting the dose influences IBS symptoms. *See E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1006 (Fed. Cir. 2018) ("[A] change to a parameter may be patentable if the parameter was not recognized as result-effective.") (cleaned up). And though it is not Plaintiffs' burden to persuade the Court that 1650 mg is "critical," that is exactly what the evidence shows: 1650 mg daily succeeded when other doses did not. Pls' FoF ¶ 186 (1200 mg daily failed to improve abdominal pain and diarrhea), Pls' FoF ¶ 184 (POSA would have inferred from the RFIB2001 Press Release that 1100 mg might work, but that 2200 mg did not).

### (b)     No Motivation to Use Rifaximin to Treat IBS-D in Patients 65 Years of Age and Older

A POSA would not have been motivated to combine Pimentel 2006 or Barrett with the RFIB2001 Protocol to treat IBS-D at all (including patients 65 years of age or older). Pimentel 2006 disclosed that rifaximin failed to improve abdominal pain and diarrhea in IBS patients aged 18 to 65 years of age. Pls' FoF ¶ 186. RFIB2001 permitted patients 18 years of age or older to enroll but disclosed no results for any age group. Pls' FoF ¶ 181. And Barrett was a retrospective review of only 8 patients and concluded that further study on rifaximin's "potential" benefit was warranted. Pls' FoF ¶ 218.

### (c)     Attorney Argument Does Not Cure Dr. Harary's Failure to Consider the Prior Art as a Whole

Dr. Harary avoided information that undercut (even directly contradicted) his analysis, and Norwich's counsel cannot cure that mistake in post-trial briefing. *See Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005); *Ferring Pharms. Inc. v. Par Pharm., Inc.*, 267 F. Supp. 3d 501, 505-06 (D. Del. 2017) ("In post-trial briefing, however, Defendant's attorneys call out specific passages from these treatises that allegedly provide support for [its expert's] opinion. This post hoc attorney argument is inappropriate."), *aff'd*, 726 F. App'x 821 (Fed. Cir. 2018).

The RFIB2001 Protocol, Pimentel 2006, and Yang were built on the hypothesis that SIBO contributed to IBS, and that rifaximin could treat IBS by eradicating SIBO; but Riordan, Parisi, Robson, Jones, and Walters criticized that hypothesis. Pls' FoF ¶¶ 175-176. And that hypothesis was the heart of Dr. Harary's obviousness analysis.[7] *See* Tr. 662:16-663:9 ("there are a lot of studies showing that – what we want to do, basically is get a better clinical result" – those studies being Lauritano and Scarpellini, which studied "small intestinal bacterial overgrowth"), 668:15-25 ("anything we can do to improve delivery of the drug to the small intestine and more effectively eradicate SIBO would be more likely to be beneficial to the patient"), 672:4-23 ("the more frequent you give the dose, the more likely you are to replenish the amount of antibiotic in the small intestine … you're more likely to have effective levels of the bacteria with more frequent dosing"), 675:14-676:9 ("same logic as before") (Harary).

Norwich makes much of the fact that Quigley and Vanner do not cite Yang or the RFIB2001 Protocol, but it was not up to Quigley and Vanner to consider the prior art as a whole. That is Norwich's burden. Still, a POSA would not have doubted Vanner's conclusion just because he did not cite Yang because Vanner *did* consider Pimentel 2006. Tr. 780:11-24 (Schoenfeld). Pimentel 2006 was a randomized, double-blind, placebo-controlled trial, at the higher end of reliability, whereas Yang was a retrospective chart review, at the low end of reliability due to multiple types and sources of bias. Pls' FoF ¶¶ 172, 193. *See, e.g.*, *Cephalon*, 456 F. Supp. 3d at 607-08 (D. Del. 2020) (crediting more recent reference that taught away from claimed combination

---

[7] Dr. Harary had trouble detangling Dr. Pimentel's IBS work from its SIBO underpinning. Contrary to his testimony and Norwich's summary thereof, Dr. Pimentel's Book does not disclose that rifaximin and neomycin's safety and efficacy "make them ideal choices for *treating IBS*," Tr. 624:18-21 (Harary) (emphasis added), Def's FoF ¶ 99. It states rifaximin and neomycin's safety and efficacy "make them ideal choices for *treating intestinal bacterial overgrowth*." PTX 752 at 73 (emphasis added). A POSA would not have mixed up the two. Tr. 791:18-792:5 (Schoenfeld).

over earlier reference that suggested combination but applied less reliable methodology), *aff'd*, 856 F. App'x 309 (Fed. Cir. 2021). Finally, Norwich cannot credibly assert that everyone knew about off-label use but that Drs. Drossman and Quigley did not when discussing rifaximin's role in IBS. *See* Def's Br. at 25. As Norwich concedes, Vanner considered off-label use in the USA and elsewhere. *Id.* But after "rigorously examin[ing] the validity of the [breath test] for diagnosing SIBO in IBS and the supporting evidence that SIBO underlies IBS, and explor[ing] the findings from clinical trials examining the effects of antibiotics on IBS" Vanner still found insufficient evidence to recommend antibiotics – just 24 days before the priority date. PTX 693 at 1315, 1319.

Norwich's response to Drossman's editorial on Pimentel 2006 reads as if it were Plaintiffs' burden to come forward with evidence showing nonobviousness. Def's Br. at 26-27 (Drossman did not "discourage the use of rifaximin to treat IBS-D" and "did not state that rifaximin was not effective for treating IBS-D"). *See Honeywell*, 865 F.3d at 1355-56 (it is not the patentee's burden to "persuasively show that [a POSA] would have expected *failure*") (emphasis in original). The "perceived shortcomings," as Norwich put it, were identified by a (if not *the*) leading expert in IBS. Pls' FoF ¶ 188. Thus, "[a] POSA would have relied on Pimentel 2006 for what it disclosed," Def's Br. at 27, but Dr. Harary failed to do that when he ignored rifaximin's failure to improve IBS pain and diarrhea. *In re Wesslau*, 353 F.2d at 241.

Finally, antibiotic resistance is relevant to motivation, *contra* Def's Br. at 25, because Norwich made it relevant by broadly arguing that a POSA would have been motivated to use rifaximin to treat IBS-D. *See infra* p. 26 (transcript cites to Dr. Harary's motivations to combine). *See Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1368 (Fed. Cir. 2016) (unclaimed feature not relevant to reasonable expectation of success, but relevant to motivation). Norwich is incorrect in arguing that the prior art resistance quotes were not rifaximin-specific. Dr.

Pimentel's book stated that "[i]n some cases of IBS, the antibiotics mentioned in Chapter 6 that are a core feature of the Cedars-Sinai protocol for IBS may not work. Usually, the reason is that the bacteria have developed a resistance to these drugs." PTX 752 at 98. The antibiotics in Chapter 6 were neomycin and rifaximin. *Id.* at 90; Tr. 806:4-13 (Schoenfeld). Rifaximin is the only antibiotic Quigley mentions, and is one of just two antibiotics Vanner mentions by name. PTX 693 at 1315; PTX 692 at 1142. And Dr. Harary ignored the FDA advisory committee's resistance concerns at a meeting entirely about rifaximin's use to treat IBS-D. Pls' Op. Br. at 18.

Finally, the lens through which Salix viewed the SIBO/IBS hypothesis is irrelevant to patentability; Plaintiffs' "trial narrative" properly focused on the POSA. *Contra* Def's Br. at 26. *See* 35 U.S.C. § 103; *Neptune Generics*, 921 F.3d at 1377 (patentee's views on prior art references were not relevant to obviousness). Likewise, Dr. Schoenfeld's February 2008 view of Dr. Pimentel's study is irrelevant because he was (and still is) a person of *extraordinary* skill.

### 4.    No Reasonable Expectation of Success

Rifaximin failed to improve IBS abdominal pain and diarrhea compared to a placebo, Pls' FoF ¶ 186, and "[t]here can be little better evidence negating a reasonable expectation of success than reports of failure." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1081 (Fed. Cir. 2012). The hypothesis that rifaximin might be beneficial in IBS was built on a house of cards – even Dr. Pimentel admitted he was a "lone voice in the wilderness" in proposing that SIBO contributed to IBS. Tr. 596:16-597:8 (Pimentel); *see also* PTX 752 at 1-2, 5 (Pimentel Book: "most physicians continue to have a poor understanding about IBS"; and "physicians and patients alike may get lost trying to understand the quagmire of opinions and research findings"); Pls' FoF ¶¶ 204-206. This poor understanding would have mattered to a POSA's expectations about rifaximin for IBS-D because "further major therapeutic advances in the field seem[ed] unlikely to occur until the specific biologic basis for symptoms [was] identified

better." PTX 696 at 2636. *See Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051, 1061-62 (Fed. Cir. 2019) (affirming this Court's finding that a POSA would not have reasonably expected success when the "the molecular biology of [the claimed disease] was not fully understood" as of the priority date).

Off-label use of the 200 mg rifaximin tablet would not have provided a POSA with a reasonable expectation that 1650 mg daily of rifaximin (administered 550 mg TID) for 14 days would work as claimed. Pls' FoF ¶ 236. To start, the fact that there were off-label uses is not evidence those uses were successful. Tr. 797:11-17 (Schoenfeld). At most, off-label uses were a hope that rifaximin might treat IBS in miserable patients who were out of options. Pls' FoF ¶ 236. *See, e.g.*, *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1384-85 (Fed. Cir. 2019). Nor would off-label use upset the generally-accepted wisdom in the literature *not* to treat IBS with antibiotics. *See Sanofi*, 204 F. Supp. 3d at 691-93; Pls' FoF ¶ 205. This is especially so, since Norwich relies on post-filing evidence of off-label use in its reasonable expectation of success analysis, and none of Norwich's cases suggest it can use nonprior art for this purpose. *See* Def's Br. at 27-28 (citing NFoF ¶¶ 113 and 174 (which itself cites ¶¶ 109 and 113)).

It is not enough for Norwich to argue that a POSA would have reasonably expected rifaximin to be effective to treat IBS-D because "[t]he reasonable-expectation-of-success analysis must be tied to the scope of the claimed invention." *Teva Pharms. USA, Inc.*, 18 F.4th at 1381. None of Norwich's cited facts are tied specifically to the claimed regimen: 1650 mg daily (550 mg TID) for 14 days. *See* Def's Br. at 27-28; *see* Tr. 808:22-809:4 (Schoenfeld).

Finally, there was no known therapeutic range for rifaximin in IBS-D: "Antibiotic dose and duration of therapy [had] not been established. All studies to date [had] used different doses and antibiotic regimens; the optimal approach need[ed] to be established in a prospective, placebo-

controlled, dose-ranging study." PTX 692 at 1142; Pls' FoF ¶ 208. "It is not sufficient to merely assert an 'obvious-to-try theory,' especially where, … the relevant art is littered with a history of inconsistent trial results." *Sanofi*, 204 F. Supp. 35 at 696; *see also Pharmacyclics*, 556 F. Supp. 3d at 404 (rejecting argument that POSA would have arrived at dosage via a "routine" dosing study starting from prior art disclosure of a dosage range). Thus, a POSA could not have used "routine optimization" to arrive at the claimed rifaximin dosage regimen, because it was not known whether rifaximin worked in the first place, or if dose was a result-effective variable. Pls' FoF ¶ 208.

Thus, a POSA would not have reasonably expected that rifaximin 550 mg TID for 14 days would work as claimed, given that as of February 2008, "[t]here was insufficient evidence to recommend antibiotics for the treatment of [IBS]." PTX 693 at 1319, 1320 ("[I]t is difficult to recommend antibiotic treatment for IBS at this time."); Pls' FoF ¶ 203. *See Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 958 (Fed. Cir. 1997) ("[P]roceeding against accepted wisdom is evidence of unobviousness.") (citation omitted).

### C.    Adequate Written Description

Norwich failed to prove that claim 2 of the '569 patent lacks adequate written description. The theme of Norwich's written description defense is that the specification's disclosures are "prophetic," "had not yet [been] studied," and "do[] not report data." Def's Br. at 30-31; *see also* Tr. 686:18-22 (Harary) ("Q. And to your knowledge, *is there any data* presented in the patent relating to the administration of 550 milligrams 3 times a day for 14 days? A. No, *so, in essence there's no support* for that claim of 12 weeks of durability of response ….") (emphasis added). But the '569 patent is not required to support claim 2 with "either examples or an actual reduction to practice." *Ariad Pharms.*, 598 F.3d at 1352.

Norwich asserts that the disclosure of a 14-day 550 mg TID dosage regimen to achieve a durability of response is "generic" and "is not tied to [1] any medical condition or [2] dosing

30

regimen." Def's Br. at 30-31. Neither is correct. First, the '569 patent makes clear it is about IBS-D, Tr. 812:14-813:8 (Schoenfeld), and so a POSA would understand that "durability of response" in the '569 patent is tied to IBS-D, not just "any medical condition." *See In re Wright*, 866 F.2d 422, 425 (Fed. Cir. 1989) (for written description "the specification as a whole must be considered"). Second, a POSA would recognize the connection between the dosage regimen in column 5 that "results in *a durability of response*" and "*duration of response, may be, ...*" in column 11. *See* Tr. 813:9-814:20 (Schoenfeld); JTX 9 at 5:49-56, 11:44-57. This one-step connection is not the "amalgam of disclosures" "never linked together" that was insufficient in *Flash-Control, LLC v. Intel Corp.*, No. 2020-2141, 2021 WL 2944592, at *3, 4 (Fed. Cir. July 14, 2021) (unpublished). *Contra* Def's Br. at 31.

Norwich is also incorrect that the specification fails "to describe the specific 'durability of response' that is claimed." Def's Br. at 30. A durability of response of "12 weeks" is disclosed in: "[t]he duration of response, may be, for example, 2 days, 7 days, two weeks, 3 weeks, 4 weeks, *12 weeks*, between about 1 week and about 24 weeks or longer." JTX 9, 11:44-57 (emphasis added). *See Snitzer v. Etzel*, 465 F.2d 899, 902 (C.C.P.A. 1972) ("[T]here would seem to be little doubt that the literal description of a species provides the requisite legal foundation for claiming that species").[8] *Contra* Def's Br. at 31 and Tr. 688:4-9 (Harary). And Dr. Harary was incorrect that the specification fails to say what the Figure 3, 12-week post-treatment phase entails. *See* Tr. 686:8-17 (Harary). The specification discloses that "FIG. 3 shows a proposed study design for treatment with rifaximin *to show durability of response*." JTX 9 at 6:10-12 (emphasis added).

---

[8] This is not a situation in which the specification identifies a broad genus but claims a species. *See Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 21 F.4th 1362, 1370 (Fed. Cir. 2022) ("'Blaze marks' are not necessary where the claimed species is expressly described in the specification, as the 0.5 mg daily dosage is here.").

### D.      Definiteness

Norwich failed to prove that claim 2 of the '569 patent is indefinite. How other courts have decided whether other claim terms are indefinite does not control the inquiry here; definiteness is a case-by-case assessment of "reasonableness." *See Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377-78 (Fed. Cir. 2015) (*Nautilis III*) (Supreme Court's "reasonable certainty standard" requires analysis of specification and POSA's knowledge in the relevant art area); *see also Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377-81 (Fed. Cir. 2017) (refusing to rashly apply *Datamize's* "vagaries of any one person's opinions" statement to hold "visually negligible" indefinite; "whether a claim is indefinite must be judged in light of the specification and prosecution history of the patent in which it appears") (cleaned up).

"In the face of an allegation of indefiniteness, general principles of claim construction apply," *Nautilus III*, 783 F.3d at 1377, and here, "adequate relief" and "durability of response" are terms with customary meanings to a POSA. Pls' FoF ¶¶ 213-214. In IBS-D, there is no biomarker to determine successful treatment (e.g., like a blood test or CT scan). Tr. 507:24-508:7 (Schoenfeld). Rather, a POSA would recognize that patient-reported "adequate relief" was (and still is) used to determine IBS-D treatment success, and "the certainty necessary for definiteness is only that which is reasonable under the unique circumstances of the case and relevant industry or scientific discipline." *Evonik Degussa GmbH v. Materia, Inc.*, 274 F. Supp. 3d 241, 245 (D. Del. 2017). That "adequate relief" is patient-dependent does not mean it is indefinite. *H. Lundbeck A/S v. Apotex Inc.*, No. 18-88-LPS, 2020 WL 777210, at *3 (D. Del. Feb. 18, 2020). And a Wisconsin district court's opinion that a "you'll know it when you see it approach" was not compatible with the definiteness requirement does not control here, nor is it the test set forth in *Nautilus*. *Contra* Def's Br. at 29.

Even a "purely subjective" claim phrase is not *per se* indefinite, as Norwich's own case

law makes clear. *See, e.g., Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014) (court must look to the written description for guidance on "purely subjective" claim phrase). The '569 patent teaches an objective method for "adequate relief:" a "yes" response from a patient asked if they have had adequate relief. Pls' FoF ¶ 213. It explains that patients with physicians' help can consider symptom reduction to determine adequate relief. *Id. See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1376 (Fed. Cir. 2017) ("[A] claim is not indefinite if a [POSA] would know how to utilize a standard measurement method … to make the necessary measurement.").

Ostensibly as evidence that "adequate relief" lacks objectivity, Norwich offers one example: a 30% improvement from baseline in an IBS-D patient's abdominal pain may or may not be "adequate relief." Def's Br. at 29. A "30% improvement from baseline in … abdominal pain" was part one of a two-part endpoint Salix used to determine adequate relief in phase 3 trials; a patient had to have both abdominal pain *and* stool consistency improvement. Pls' FoF ¶ 213; JTX 74, § 14.3. Thus, a "30% improvement from baseline in … abdominal pain" "may or may not be 'adequate relief of symptoms'" only because abdominal pain was just half of adequate relief. *Id.* In any event, Norwich's example raises an infringement dispute, not an indefiniteness issue. *Presidio*, 875 F.3d at 1377 (application of claimed method to an individual case is a dispute "about whether there is infringement, not [a] dispute[] about whether the patent claims are indefinite").

Finally, Norwich asserts there is uncertainty on how to measure the "durability of response." Durability of response varies from patient-to-patient because it is a patient-reported outcome, Pls' FoF ¶ 214, but "[t]he test for indefiniteness is not whether infringement of the claim must be determined on a case-by-case basis." *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 39 (Fed. Cir. 2020). Thus, patient-to-patient variation is not the method-driven difference that *Dow* and

*Teva* found problematic. *Contra* Def's Br. at 29-30. The specification offers objective criteria to determine if a patient has had about 12 weeks of adequate relief (i.e., a yes/no question), even if two patients have different opinions on what length is adequate to them. Pls' FoF ¶¶ 214-215.

## III.   POLYMORPH PATENT VALIDITY

### A.   Priority Date and Level of Skill in the Art

The priority date for the Polymorph Claims is November 7, 2003. Pls' FoF ¶ 216. Although offering different definitions of a POSA, both experts agree that their validity analyses would not change under either definition. Tr. 860:7-861:8 (Zaworotko); Tr. 936:21-937:13 (Myerson).

### B.   No Anticipation

Norwich failed to prove claim 4 of the '199 patent is anticipated. The rifaximin *compound* had been known since the 1980s, but the fact that it is polymorphic was unknown publicly until the priority date. Pls' FoF ¶ 218. The inventors unexpectedly discovered the existence of rifaximin polymorphs, including rifaximin β, and that the key to synthesizing a specific crystalline form was controlling the temperature and length of time of the crystallization, and the drying parameters. Pls' FoF ¶ 229.

Norwich's anticipation defense is based on inherency because Norwich and its expert acknowledge that each and every element of claim 4 is not expressly disclosed in Cannata.[9] Pls' FoF ¶ 219. But Norwich has no direct evidence that any of Cannata's examples anticipate. Indeed, Norwich's expert, Dr. Zaworotko, did not try to recreate any example in Cannata. Pls' FoF ¶ 220.

Without direct evidence, Norwich must look outside Cannata to the Viscomi Declaration, Viscomi 2008, Braga, 2012, and Bacchi 2008, which are dated well after the priority date. Pls. FoF ¶ 221.  Norwich uses these references not to shed light on what Cannata would have meant to a

---

[9] Cannata was considered during prosecution of the '199 patent. *Infra* note 12.

POSA, but to impermissibly fill Cannata's gaps. *See Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 726 F.2d 724, 726-27 (Fed. Cir. 1984). However, the post-dated references do not – indeed cannot – show that Cannata inherently results in rifaximin β with the claimed XRPD peaks and water content as an intermediate or final product *every time* those examples are practiced. *See Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047-48 (Fed. Cir. 1995) (affirming no inherency where testing showed the prior art could yield crystals of the claimed polymorph or a different polymorph); *In re Armodafinil Pat. Litig. Inc.*, 939 F. Supp. 2d 456, 465 (D. Del. 2013).

Norwich failed to show that rifaximin β necessarily results when following the Cannata processes. It is undisputed that the batches of rifaximin tested in the Viscomi Declaration[10] did not yield rifaximin β every time.  Pls' FoF ¶ 222. In fact, the batches contained a *different* polymorph or *mixtures* of different polymorphs. *Id.* That rifaximin β *may* result or *sometimes* results from following Cannata is insufficient. *Endo Pharms. Sols., Inc. v. Custopharm Inc.*, 894 F.3d 1374, 1381 (Fed. Cir. 2018); *In re Armodafinil*, 939 F. Supp. 2d at 465.

Moreover, Dr. Zaworotko's reliance on post-filing Viscomi 2008 and Braga 2012, which disclose processes for preparing rifaximin that closely follow those in the '199 patent, Pls' FoF ¶ 223, to argue that rifaximin β forms as an intermediate in the Cannata examples is misplaced. Viscomi 2008 and Braga 2012 disclose processes for preparing rifaximin that significantly differ in the reactives, reaction steps, washing/filtering steps and crystallization steps compared to those in Cannata. Tr. 950:14-23 (Myerson); Pls' FoF ¶¶ 223-226. "Experiments that do not follow the prior art procedure alleged to inherently anticipate cannot show inherent anticipation." *Merck & Cie v. Watson Lab'ys, Inc.*, 125 F. Supp. 3d 503, 513 (D. Del. 2015) (cleaned up), *rev'd on other*

---

[10] Plaintiffs submitted the Viscomi Declaration to the Patent Office in 2006 in connection with a related patent application to overcome a rejection of the claims as anticipated by Cannata and Marchi. Tr. 879:5-11 (Zaworotko); Tr. 947:13-948:1 (Myerson); JTX 80, at ¶ 4.

*grounds*, 822 F.3d 1347 (Fed. Cir. 2016). Dr. Zaworotko ignores evidence that differences in each step of a chemical synthesis—including the reaction, washing/filtering, drying, and crystallization steps—can impact the impurity profile and influence the outcome of the crystallization. Pls' FoF ¶¶ 227-228, 232, 236. Varying parameters within these steps (e.g., solvent, solvent composition, temperature, cooling rates, evaporation rates) can affect what crystalline form (if any) results. *Id.* The inventors discovered the key to synthesizing a specific crystalline form each and every time is controlling the temperature of the crystallization, the length of time of crystallization, and the drying parameters. *Supra* p. 34. Some or all of these details are absent from each of Cannata's Examples 1, 6, 7 and 9. Tr. 948:15-952:2 (Myerson); *see In re Armodafinil*, 939 F. Supp. 2d at 477-78 (prior art process lacked the crystallization conditions necessary to inevitably make the claimed polymorph). Cannata's lack of detail and missing information—XRPD profile and water content—make it impossible to predict the outcome of its examples, including whether any intermediate or final product had a water content of at least 5%. *See* Pls' FoF ¶¶ 220, 227. Thus, without recreating the examples, there is no evidence that rifaximin β necessarily would have formed as an intermediate or final product following Cannata. *Contra* Def's Br. at 34.

hEven if Viscomi 2008 and Cannata followed the same processes for preparing rifaximin (they do not), Dr. Zaworotko is incorrect that Viscomi 2008's Figure 4 shows that rifaximin β "has to be the precursor for any of the other crystal forms with lower water content," Tr. 921:24-922:6 (Zaworotko), because he completely ignores that rifaximin γ, which has a lower water content than rifaximin β, Tr. 876:5-10 (Zaworotko), can form without first going through rifaximin β. *See* JTX 65 at 1079 (Figure 4); Def's Br. at 32 (same). Thus, even under Norwich's flawed theory, Figure 4 proves that rifaximin β is not a "necessary and inevitable consequence" of practicing the examples in Cannata. *Contra* Def's Br. at 34 (citing *Glaxo Grp.*, 2004 WL 1875017 at *19).

The *Schering* and *Atlas Powder* line of cases Norwich cites are inapposite here, *contra* Def's Br. at 33, as Norwich failed to present any testing evidence showing that rifaximin β necessarily resulted as either a final product or intermediate when following Cannata. More analogous are *Eibel* and *Tilghman* where there was no conclusive evidence that the prior art produced the claimed invention. *See Eibel Process Co. v. Minn. & Ont. Paper Co*., 261 U.S. 45, 66 (1923) ("no evidence that any pitch of the wire, used before Eibel, had brought about [the claimed] result"); *Tilghman v. Proctor*, 102 U.S. 707, 711-12 (1880) (no conclusive evidence that a particular fatty acid resulted from following the prior art process and, therefore, that the claimed process occurred in the prior art); *see also Pittsburgh Iron & Steel Foundries Co. v. Seaman-Sleeth Co.*, 248 F. 705, 709 (3d Cir. 1917) (no evidence that the claimed alloy was produced by following the prior art process).

Last, Norwich's assertion that Bacchi 2008 discloses the same process as Cannata's Examples 1 and 7 is flawed.[11] First, unlike Bacchi 2008, Examples 1 and 7 say nothing about using evaporation, much less slow evaporation, during the crystallization step. Pls' FoF ¶ 231; Tr. 918:12-919:5 (Zaworotko) (conceding on cross that there was no mention of slow evaporation in Example 1). Crystallizing using a solvent composition at a fixed ratio, e.g., 7:3 ethanol to water like in Cannata's Examples 1 and 7, "eliminates the possibility of doing evaporation slow or fast" because doing so would alter the ratio. Pls' FoF ¶ 232. Thus, a POSA would have believed that Cannata was likely using a combination of cooling and antisolvent. *Id.*. Second, Bacchi 2008 does not disclose what ratio of ethanol to water was used in the crystallization; the components of a solvent including the ratio of its components "change[] the properties of the solvent[]," influencing

---

[11] Norwich's evidence is limited to comparing Bacchi 2008 to Examples 1 and 7 of Cannata.  *See* Tr. 882:14-883:10 (Zaworotko).

what polymorphs can form. *Id.*; *supra* p. 36; *In re Armodafinil*, 939 F. Supp. 2d at 477-78 (solvent, cooling rate, and concentration can affect the outcome of a crystallization). Norwich provided no evidence showing that Bacchi 2008 prepared rifaximin β using a 7:3 ethanol to water solvent. *See* Tr. 953:2-24 (Myerson).

### C.   Nonobviousness

Norwich failed to prove that the Polymorph Claims are obvious. First, no reference discloses rifaximin β, how to make it, or a composition comprising it.[12] Pls' FoF ¶ 233. Thus, Norwich's argument hinges on a general motivation to search for and characterize new polymorphs, which is insufficient motivation to discover the specifically claimed form β. *See Medichem*, 437 F.3d at 1165); *see also In re Armodafinil*, 939 F. Supp. 2d at 500 ("Form I would not have been obvious because there was no more than a general motivation to find new crystal forms of armodafinil with nothing directed to the unknown Form I itself."). The inquiry is not whether a POSA would have been motivated to develop *a* rifaximin polymorph, but whether he would have been motivated to develop the *claimed* rifaximin polymorph: rifaximin β. *Pharmacyclics*, 556 F. Supp. 3d at 412. And as none of Norwich's references disclose rifaximin β or its claimed features, Pls' FoF ¶¶ 218-219, 233-235, 237, a POSA would not have been motivated to develop rifaximin β. *See Pharmacyclics*, 556 F. Supp. 3d at 412 (no reference would have motivated a POSA to develop crystalline ibrutinib with the claimed 2-Theta peaks).

Second, there would have been no reasonable expectation of success in arriving at the claimed rifaximin β.  It is undisputed that prior to November 7, 2003, rifaximin's polymorphism – and thus, rifaximin β and that it exists as a hydrate – were unknown publicly. Pls' FoF ¶ 218; *see* 915:17-916:2 (Zaworotko). Because it was not possible to predict the existence of the rifaximin β

---

[12] Norwich's primary prior art references, Cannata and Marchi, were considered by the patent examiner during prosecution of the '199 and '206 patents. Tr. 945:7-17, 954:21-25 (Myerson).

with a particular set of diffraction peaks and water content in advance of discovering it and characterizing it, a POSA would not have had a reasonable expectation of success of finding something he does not know exists. Pls' FoF ¶¶ 238-239. "Predictability is a touchstone of obviousness," *Grunenthal GMBH v. Alkem Lab'ys Ltd.*, 919 F.3d 1333, 1344 (Fed. Cir. 2019) (cleaned up), and the experts agreed that polymorphism is an unpredictable field. Pls' FoF ¶ 238. In fact, Dr. Zaworotko wrote in a 2010 scientific paper that "although crystallization has been widely studied scientifically since at least the early 19th century, this does not mean that crystallization is predictable or even controllable." PTX 704 at 394; *see also* PTX 717 at 16802 (echoing a similar sentiment in 2005). And in 2016, Dr. Zaworotko wrote the existence of hydrates[13] "still remains largely unpredictable and represents a challenge in crystal engineering," PTX 980 at 431, a statement he still agrees with today. Tr. 914:2-915:8 (Zaworotko). Numerous courts, including this one, have recognized the unpredictably of polymorphism. E.g., *Pharmacyclics,* 556 F. Supp. 3d at 412; *In re Armodafinil*, 939 F. Supp. 2d at 491-92 (quoting a 2001 paper by Dr. Zaworotko); *Merck & Cie*, 125 F. Supp. 3d at 514.

Norwich argues that a POSA could have used routine experimentation to obtain and characterize rifaximin β, relying on Dr. Zaworotko's opinion that the *only* crystallization methods a POSA would have considered in November 2003 to screen for polymorphs were slow evaporation, cooling, and slurrying and that there was only a single way to perform each method. *See* Tr. 864:8-13 (Zaworotko). But there were numerous other screening methods available to a POSA, each of which could have been used alone or in combination. Pls' FoF ¶ 236. And within each of these methods, a POSA could have varied parameters, that could affect the resulting polymorphic form. *Supra* pp. 36, 37-38. None of Norwich's references describe a particular

---

[13] Rifaximin is now known to exist as a hydrate. Tr. 913:10-23 (Zaworotko).

crystalline form or tell a POSA how to make a particular crystalline form of rifaximin. So the POSA would have been left trial and error experiments to seeing what he would get. Tr. 956:17-21 (Myerson); Pls' FoF ¶ 238. That trial-and-error approach is inconsistent with a reasonable expectation of success. *In re Deuel*, 51 F.3d 1552, 1559 (Fed. Cir. 1995) ("A general incentive does not make obvious a particular result, nor does the existence of techniques by which those efforts can be carried out."); *Merck & Cie*, 125 F. Supp. 3d at 514; *In re Armodafinil*, 939 F. Supp. 2d at 502.

As none of Norwich's references disclose rifaximin β or its claimed features, *supra* p. 38, Norwich's argument – that a POSA would have been motivated to screen the "as-synthesized" rifaximin in Cannata for polymorphs based on rifaximin's recognized antibacterial activity, or to conduct humidity experiments on rifaximin based on a POSA's recognition that the crystallization solvents used in Cannata included water, which would lead to hydrate formation (and would have detected rifaximin β in doing so) (*see* Def's Br. at 35) – is based on hindsight knowledge of the inventor's discovery and synthesis of rifaximin β. *See Ortho-McNeil*, 520 F.3d at 1364 (defendant's expert "simply retraced the path of the inventor with hindsight, discount[ing] the number and complexity of the alternatives"); *In re Cyclobenzaprine*, 676 F.3d at 1070-71.

Lastly, rifampicin polymorphism would not have provided additional motivation to look for, or a reasonable expectation of finding, the claimed rifaximin β. *Contra* Def's Br. at 36. As Dr. Myerson testified, structurally similar compounds "behave in a completely different manner when it comes to polymorphism." PTX 418 at 2; Pls' FoF ¶¶ 237, 239. "It remains impossible to know, based on molecular structure alone, whether a compound will be polymorphic …." PTX 418 at 2; Pls' FoF ¶¶ 237, 239.

### D.   Adequate Written Description

Norwich failed to prove that the Polymorph Claims are invalid for lack of written

description of rifaximin β having XRPD peaks "at about 5.4°, 9.0°, and 20.9° 2θ." Each and every claim limitation is described in a single embodiment in the '199 and '206 patents, including rifaximin in polymorphic form β characterized by XRPD peaks at about 5.4°, 9.0°, and 20.9° 2θ. JTX 2 at 5:64-6:3 ("The polymorph called rifaximin β is characterized by … a powder X-ray diffractogram (reported in FIG. 2) which shows peaks at the values of the diffraction angles 2θ of **5.4°**; 6.4°; 7.0°; 7.8°; **9.0°**; 10.4°; 13.1°; 14.4°; 17.1°; 17.90°; 18.30°; **20.9°**.") (emphasis added); JTX 3 at 5:64-6:3 (same); Pls' FoF ¶ 241. A POSA would need nothing more to understand that the inventors were in possession of the claimed subject matter as of November 7, 2003. Tr. 962:21-963:1 (Myerson); *see Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1190-91 (Fed. Cir. 2014) ("The critical inquiry is whether the patentee has provided a description that in a definite way identifies the claimed invention in sufficient detail that a person of ordinary skill would understand that the inventor was in possession of it at the time of filing.") (cleaned up).

Norwich mischaracterizes and exaggerates the scope of the Polymorph Claims as encompassing "an undescribed genus of crystalline forms" and "any crystalline form having three XRPD peaks." Def's Br. at 37. The claims are limited on their face to a *specific* polymorphic form: rifaximin β. *See* JTX 2, at claim 4; JTX 3, at claim 36; Tr. 961:13-962:20 (Myerson).

Claiming a polymorphic form using at least 3 XRPD peaks is the "normal practice at the USPTO … for polymorphic forms claimed." JTX 28, at XIFAX_NOR_0002208; Tr. 965:2-17 (Myerson). It is undisputed that a POSA would understand that a subset of peaks can be used to identify a polymorphic form of a compound. Pls' FoF ¶ 242; *see also* PTX 707 at 15:36-39 (Dr. Zaworotko's own patent stating: "For PXRD data herein, each composition of the present invention[, a new crystalline form of a known compound,] may be characterized by any one, any two, any three, any four, any five, any six, any seven, or any eight or more the 2θ angle peaks.").

Norwich's written description argument rests on the notion that by describing a rifaximin β embodiment that has 12 peaks (which include the 3 claimed peaks), the '199 and '206 patents allegedly fail to describe the purported "genus" of rifaximin having 3 peaks.  Even accepting Norwich's "genus"/"species" characterization, the facts and law support Plaintiffs. "A sufficient description of a genus … requires the disclosure of either a representative number of species falling within the scope of the genus or *structural features common to the members of the genus* so that one of skill in the art can visualize or recognize the members of the genus." *Ajinomoto Co. v. Int'l Trade Comm'n*, 932 F.3d 1342, 1358 (Fed. Cir. 2019) (cleaned up, emphasis added).  The experts agree that each peak in an XRPD diffractogram is a structural feature of that polymorphic form, Pls' FoF ¶ 241, so rifaximin β will always have peaks at certain 2θ locations—including at about 5.4°, 9.0°, and 20.9° 2θ—regardless of whether the peaks are explicitly identified (including as a specific subset).  *See Yeda Rsch. & Dev. Co., Ltd. v. Abbott GMBH & Co. KG*, 837 F.3d 1341, 1345 (Fed. Cir. 2016); *Allergan,* 796 F.3d at 1309 (a specification serves as adequate written description of an invention's undisclosed yet inherent properties).  Norwich offered no evidence that any member of the purported rifaximin β "genus" will lack XRPD peaks at about 5.4°, 9.0°, and 20.9° 2θ.  In fact, Dr. Zaworotko testified that the 12 rifaximin β peaks identified in Viscomi 2008—the same 12 recited in the '199 and '206 patents for rifaximin β—are characteristic of the rifaximin β form. Tr. 884:25-885:11 (Zaworotko). Thus, XRPD peaks at about 5.4°, 9.0°, and 20.9° 2θ are inherent structural features common to the rifaximin β "genus" such that every member will have these peaks.

To the extent rifaximin β is considered a "genus," Norwich failed to provide evidence that the claimed subset of rifaximin β peaks would have been insufficient as of the priority date to distinguish the rifaximin β "genus" from the other known rifaximin forms, i.e., rifaximin α and γ.

*See Pfizer Inc. v. Teva Pharms. U.S.A., Inc.*, 882 F. Supp. 2d 643, 702 (D. Del. 2012) (written description for chemical compounds requires only that the application "details relevant identifying characteristics such that the compound can be distinguished from other compounds") (cleaned up), *aff'd*, 555 F. App'x 961 (Fed. Cir. 2014) (same); *Yeda*, 837 F.3d at 1345-46 (application provided sufficient written description where no known protein other than the claimed protein had the disclosed and claimed characteristics). XRPD peaks at about 5.4°, 9.0°, and 20.9° 2θ – structural features common to the rifaximin β "genus" – were sufficient as of November 7, 2003 to distinguish rifaximin β from the other known rifaximin polymorphs.  Pls' FoF ¶ 242.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs*

_____

Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
kjacobs@morrisnichols.com
cclark@morrisnichols.com
*Attorneys for Plaintiffs*

OF COUNSEL:

Scott K. Reed
Steven C. Kline
Shannon K. Clark
Daniel A. Apgar
Alexis M. McJoynt
Damien N. Dombrowski
VENABLE LLP
1290 Avenue of the Americas
New York, NY  10104
(212) 218-2100

Becky E. Steephenson
VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, NY 10020
(212) 307-5598

June 2, 2022

43

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 2, 2022, upon the following in the manner indicated:

Karen E. Keller                                            *VIA ELECTRONIC MAIL*
Nathan R. Hoeschen
SHAW KELLER LLP
I.M. Pei Building
1105 N. Market St., 12th Floor
Wilmington, DE  19801
*Attorneys for Defendant*

Matthew J. Becker                                        *VIA ELECTRONIC MAIL*
Stacie L. Ropka
Matthew S. Murphy
Chad A. Landmon
Rebecca L. Clegg
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT  06103
*Attorneys for Defendant*

Aziz Burgy                                               *VIA ELECTRONIC MAIL*
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC  20036
*Attorneys for Defendant*

Richardo S. Camposanto                                   *VIA ELECTRONIC MAIL*
AXINN, VELTROP & HARKRIDER LLP
560 Mission Street
San Francisco, CA  94105
*Attorneys for Defendant*

*/s/ Karen Jacobs*
Karen Jacobs (#2881)