IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SALIX PHARMACEUTICALS, LTD.,  )
SALIX PHARMACEUTICALS, INC.,  )
BAUSCH HEALTH IRELAND LTD., and  )  **Redacted - Public Version**
ALFASIGMA S.P.A.,  )
   )
       Plaintiffs,  )
   )
   v.  )  C.A. No. 20-430-RGA
   )
NORWICH PHARMACEUTICALS, INC.,  )
   )
       Defendant.  )

## LETTER TO THE HONORABLE RICHARD G. ANDREWS
## FROM EMILY S. DIBENEDETTO

OF COUNSEL:
Matthew J. Becker
Stacie L. Ropka
Matthew S. Murphy
Chad A. Landmon
Rebecca L. Clegg
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8100

Aziz Burgy
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
(202) 721-5417

Richardo S. Camposanto
AXINN, VELTROP & HARKRIDER LLP
560 Mission Street
San Francisco, CA 94105
(415) 490-2000

Dated: August 19, 2022

Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Defendant*

Dear Judge Andrews:

We write on behalf of Defendant Norwich Pharmaceuticals, Inc. ("Norwich") to respectfully request an order authorizing Norwich to redact-in-part two sentences from the parties' August 3, 2022 Joint Letter Regarding Proposed Form of Judgment (D.I. 190) ("Joint Letter"). Norwich's proposal (Ex. A) seeks to maintain the confidentiality of non-public correspondence regarding the regulatory status of Norwich's ANDA, and thereby preclude Norwich's competitors (including personnel of Plaintiffs not covered by the Court's Protective Order) from having access to and using the information to undercut Norwich's business interests. In contrast, Plaintiffs' August 15, 2022 letter (D.I. 197) proposes a redaction that discloses Norwich's confidential regulatory correspondence and allows competitors to approximate an approval timeline for Norwich's ANDA. The Joint Letter was directed to a narrow dispute over the form of judgment, but Plaintiffs cited Norwich's confidential information in their request for a status conference for eliciting post-trial discovery about Norwich's ANDA. The Court should not allow a gratuitous disclosure of Norwich's confidential information when such information had no relation to the Court's decision regarding the form of judgment.

## I.     LAW

"Although there is a 'presumptive right of public access to pretrial motions of a *nondiscovery nature*, whether preliminary or dispositive,' the right is 'not absolute.'" *Cipla Ltd. v. Boehringer Ingelheim Pharms. Inc. et al.*, C.A. No. 22-300-UNA, D.I. 9 at 1-2 (D. Del. Mar. 7, 2022) (Andrews, J.) (Ex. B) (quoting *In re Avandia Marketing*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *In re Cendant Corp.*, 260 F.3d 183, 192–93 (3d Cir. 2001) and *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 344 (3d Cir. 1986)). A movant overcomes this presumption by showing that "the interest in secrecy outweighs the presumption." *In re Avandia Marketing*, 924 F.3d at 672. This burden is more easily satisfied when a party seeks to redact only a portion of a record. *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994). Accordingly, the material sought to be redacted must be "the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Marketing,* 924 F.3d at 672 (quoting *Miller*, 16 F.3d at 551). "[C]ourts may deny access to judicial records, for example, where they are sources of business information that might harm a litigants competitive standing." *Littlejohn v. Bic Corp.*, 851 F.2d 673, 677–78 (3d Cir. 1988); *In re Avandia Marketing,* 924 F.3d at 679. Courts may also deny access to judicial records if the records contain trade secrets, confidential research, development, or commercial information. *Helsinn Healthcare S.A. v. Dr. Reddy's Labs., Ltd.*, CV144274SRCCLW, 2017 WL 11475270, at *2 (D.N.J. Nov. 8, 2017) (citing *Leucadia, Inc. v. Applied Extrusion Techs Inc.*, 998 F.2d 157, 166 (3d Cir. 1993)). Courts apply a "good cause" standard to justify redacting judicial records, which requires a "balancing process, in which courts weigh the harm of disclosing information against the importance of disclosure to the public." *Mosaid Techs. Inc. v. LSI Corp.*, 878 F. Supp. 2d 503, 507–08 (D. Del. 2012). Good cause exists where the information contains, for example, details of, discussion of, and/or reference to confidential information regarding the movant's ANDA and regulatory strategy, and the movant demonstrates that competitors could use the information to undercut the movant's business interests. *Cipla*, at 2 (citing *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 415 n.3 (3d Cir. 2013)); *Delaware Display Grp. LLC v. LG Elecs. Inc.*, 221 F. Supp. 495 (D. Del. 2016).

## II.     THE SERIOUS AND DEFINED HARM TO NORWICH
##          OUTWEIGHS THE PUBLIC'S INTEREST IN THE INFORMATION.

Any public interest in understanding the basis of the parties' dispute is outweighed by the likely damage to Norwich's interests in maintaining the confidentiality of its information and avoiding competitive harm. As discussed below and in the August 18, 2022 Declaration of Dr. Jyoti Sachdeva[1] (Ex. C), the disclosure of the correspondence cited in the Joint Letter will inflict a serious and defined injury to Norwich. The cited correspondence, including its date and contents, comprises Norwich's non-public ANDA information. Ex. C at ¶¶ 5-6. The information it conveys is not yet stale due to the passage of time. *Id.* at ¶ 7. Norwich's competitors, with knowledge of that correspondence, may ascertain ██████████████████████ and reasonably estimate a date range for its approval, or tentative approval. *Id.* at ¶¶ 8-9 (citing Ex. G at 3; Ex. H at 5). Indeed, the deadlines for both responding to such correspondence and the review cycles for submissions made in response to the same are published in regulatory guidance documents that are well known to the industry. *Id.* Thus, even knowledge of the date and general subject of the cited correspondence would allow a competitor to glean specific information about Norwich's ANDA, and then adopt a course of action that may undercut Norwich's business interests or regulatory strategy. *Id.* at ¶¶ 9, 13.

The harm to Norwich by the disclosure of the correspondence cited in the Joint Letter is not speculative. On August 20, 2021, FDA indicated that it intended to modify product specific guidance to add certain *in vivo* bioequivalence requirements for rifaximin 550 mg tablets, which had been subject to a biowaiver. Ex. C at ¶ 10 (citing Ex. I). Plaintiffs appear to have instigated this potential shift by serially filing Citizen's Petitions with FDA, including one *after* Norwich submitted its ANDA. *Id.* at ¶ 11 (citing Ex. J at 1). Given the short gap of time between FDA's August 20, 2021 announcement and the date of the correspondence cited in the Joint Letter, a competitor could ascertain that ████████████████████████ ██████████████████████████. *Id.* at ¶ 10. Yet, even Plaintiffs agree in their proposal that ████████ ██████████████ and other items discussed in the Joint Letter should be redacted. D.I. 197, Ex. A at 2. Norwich has reasonable apprehension that Plaintiffs, or another competitor, would use this information, if made public, to advance their own business interests, or in further petitioning before FDA. Ex. C at ¶¶ 11-12. Plaintiffs have already pointed to the possible addition of *in vivo* bioequivalence requirements, and their other potential efforts to thwart generic competition, in public statements to allay investors' fears following the Court's July 28, 2022 Oral Order. *Id.* at ¶ 11 (citing Ex. K at 2).

Plaintiffs' proposal is not sufficient to avoid such harm. On its face, Plaintiffs' proposed redaction still discloses that Norwich's ANDA was not in a condition to be approved and that FDA requested additional information. D.I. 197, Ex. A at 2. Thus, it provides non-public information to Norwich's competitors. In addition, it identifies a date for the correspondence that, as discussed, could be used to estimate a timeline of the status of Norwich's ANDA. Ex. C at ¶ 9. Three generic competitors have also submitted ANDAs for rifaximin 550 mg, settled the underlying patent litigation, and reportedly having the right to enter the market with their ANDA products, or an authorized generic, if and when Norwich launches its product. *Id.* at ¶ 12 (citing Ex. K at 2). One competitor has received tentative approval. Ex. D. Thus, disclosing information that concerns the

---

[1] Dr. Sachdeva is Executive Director, Regulatory Affairs in the U.S. for Alvogen, Norwich's affiliate and regulatory agent, and has been deposed in this matter regarding Norwich's ANDA.

timing of approval, or tentative approval, of Norwich's ANDA would advantage these other competitors in formulating their business or regulatory strategies, and disadvantage Norwich. Ex. C at ¶ 13.  For example, Plaintiffs have already identified on the pursuit of additional rifaximin formulations as a potential strategy for avoiding a loss of exclusivity on their existing product.  Ex. E.

### III.  PLAINTIFFS GRAUITOUSLY CITED THE INFORMATION FOR THE PURPOSE OF OBTAINING DISCOVERY ABOUT NORWICH'S ANDA.

The Court's July 28, 2022 Oral Order asked the parties to submit a proposed judgment in accord with the Court's intended findings.  The parties submitted the Joint Letter to address a dispute over the form of judgment.  Plaintiffs' citation to and discussion of the correspondence in the Joint Letter, however, did not relate to any dispute about the form of judgment.  Rather, it pertained only to Plaintiffs' request for a status conference aimed at eliciting post-trial discovery about Norwich's ANDA.  *See Leucadia*., 998 F.2d 157 (common law right of access did not attach to discovery motions); *see also Genentech, Inc. v. Amgen, Inc*., 1:17-cv-01407-CFC-SRF, D.I. 694 at 15 (D. Del. Sept. 2, 2020) (Smolla, S.M.) ("The core learning of *Leucadia* is that the common-law right of access does not attach to [discovery] motions [ ] because this would have the effect of converting material that is normally not a 'judicial record' into material that is.") (Ex. F at 7). Thus, Plaintiffs' tangential request for a status conference is unrelated to the public's interest in understanding the basis of the parties' dispute over judgment form and the Court's resolution of the same.

Plaintiffs could have used alternate language (e.g., "Norwich last updated its production of ANDA documents in October 2021") in the Joint Letter that made their request, preserved the confidentiality of Norwich's information, and avoided the current dispute.  Plaintiffs chose not to do so.  Instead, they created a record that disclosed Norwich's confidential information, and now seek to disclose this competitively-sensitive information to the public.  The common law right of access to a judicial record should not encourage one party to build an unnecessary record with another party's non-public information to achieve an end, or business interest, having no relation to the underlying dispute or judicial record.

*      *      *

For the foregoing reasons, Norwich respectfully requests that the Court issue an order authorizing the redaction-in-part of two sentences in the Joint Letter, as set forth in D.I. 196, that cite to and discuss the confidential correspondence.

Respectfully submitted,

*/s/ Emily S. DiBenedetto*

Emily S. DiBenedetto (No. 6779)

cc:   Clerk of the Court (via CM/ECF)
       All Counsel of Record (via CM/ECF and e-mail)

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-430 (RGA) |
| | ) | |
| NORWICH PHARMACEUTICALS, INC., | ) | |
| | ) | ███████████████████ |
| Defendant. | ) | |
| | ) | |

**JOINT LETTER TO THE HONORABLE RICHARD G. ANDREWS**
**REGARDING PROPOSED FORM OF JUDGMENT**

## I.      PLAINTIFFS' POSITION

Plaintiffs' and Norwich's proposed judgments (Exhibits A and B, respectively) present a dispute concerning whether the Court should determine now if Norwich's ANDA would induce infringement in the future based on hypothetical changes Norwich may make to its ANDA (which is still under review and lacks tentative approval). Norwich's judgment would automatically allow the FDA to approve its ANDA if Norwich were to amend it to carve out the HE indication (i.e., a label that is different from the one litigated by the parties) without any further action by this Court, by limiting the relief under § 271(e)(4)(A) (setting the date of earliest ANDA approval) to only an "ANDA with proposed labeling containing the indication 'reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults.'" This is improper because under § 271(e)(4)(A), the date of approval is tied to the drug product, not an indication. § 271(e)(4)(A) ("[T]he court shall order the effective date of any approval of the drug … product involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed.").

In essence, Norwich asks the Court to render an advisory judgment, because it would constitute "an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937); *see also Sierra Applied Sci., Inc. v. Adv. Energy Indus., Inc.*, 363 F.3d 1361, 1374, 1379 (Fed. Cir. 2004) ("[T]he court must carefully calibrate its analysis" in a case involving different products; "[t]o do otherwise would risk issuing an advisory opinion on … a method using that product—based on an actual controversy involving another product."); *Canon, Inc. v. Green Project, Inc.*, 12 Civ. 00576 (RWS), at *4 (S.D.N.Y. Aug. 29, 2013) (slip op.) ("[D]istrict courts have denied motions that 'would amount to an impermissible advisory opinion,' [when defendant] inappropriately seeks a pre-approval of its future behavior, namely, selling its redesign.") (Exhibit C). Norwich's argument that these were not ANDA cases is a distinction without a difference as they all involve Article III jurisdiction. Norwich proposes that the Court decide, without discovery or trial, that Norwich would not infringe the Asserted HE Patents if at some future date it were to amend its ANDA to purportedly carve out the HE indication—in effect, pre-approval of a design-around based on facts that have not occurred, the exact nature of which are unknown, and which may never come to pass. *See Forest Lab'ys, LLC v. Sigmapharm Laby's, LLC*, 2019 WL 3574249, at *4 (D. Del. Aug. 6, 2019); *see also Allergan, Inc. v. Sandoz, Inc.*, 2013 WL 6253669, at *3 (E.D. Tex. Dec. 3, 2013), *aff'd* 587 F. App'x 657 (Fed. Cir. 2014) (per curium) (denying motion to modify judgment after Federal Circuit affirmed trial court's validity findings; "[Sandoz's] amendment purports to carve out an infringing element in an attempt to escape the judgment . . . [Sandoz] asserts[] the Court should deem this design-around to not infringe the [patent] and the present injunction should be modified to permit Sandoz to launch this new version of its product . . . . Sandoz fully litigated the merits of its invalidity case before this Court, and then, displeased with the outcome, [now seeks] to escape the consequences of this choice by shifting to a different course after the fact.") (cleaned up).

The Court's Oral Order and Plaintiffs' judgment apply to "Norwich's ANDA," period. "Norwich's ANDA" served as the act of infringement under § 271(e)(2)(A) giving rise to jurisdiction, not a particular indication. The parties litigated and the Court asked the parties to assume that it decided that "Norwich's ANDA" would induce infringement of the Asserted HE Patents. Necessarily, that is based on the proposed labeling that Norwich submitted with its current ANDA—a label that contains HE and IBS-D indications; HE and IBS-D dosages; HE and IBS-D clinical, safety, and pharmacokinetic data; etc. Although the Court's opinion presumably will set forth the bases for its

decision, *see* FRCP 52(a), the judgment should reflect the ultimate decision—that "Norwich's ANDA" would induce infringement of the Asserted HE Patents and under § 271(e)(4)(A), "the effective date of *any approval* of the *drug . . . product*" cannot be until the last of the Asserted HE Patents expire. The judgment should not summarize the Court's findings on what portions of Norwich's label (e.g., the indication "reduction in risk of overt [HE] recurrence in adults") would induce infringement, and thus, by extension, what would not induce infringement. *See* FRCP 54(a) ("A judgment should not include recitals of pleadings, a master's report, or a record of prior proceedings."). Norwich's recourse to the *Novartis v. West-Ward* judgment fails because all patents-in-suit were found not invalid, infringement was undisputed, and the judgment was not contested. Norwich concedes, and Plaintiffs agree, that this Court cannot enter judgment regarding a proposed "skinny" label. The parties never litigated the issue of what a future, hypothetical "skinny" label would look like, and whether it would infringe the Asserted HE Patents. Other than implying that it may carve out the HE indication (e.g., section 1.2 of its label), Norwich has not stated whether it would remove or revise other portions of the label, including sections Plaintiffs relied upon to prove infringement. Nor is there any way to know if the FDA will permit Norwich to revise or remove such language or would require other modifications. Thus, if Norwich were to carve out the HE indication (i.e., pursue a purported "skinny" label with the IBS-D indication), Plaintiffs would need further discovery on whether Norwich would still induce infringement of the Asserted HE Patents. As explained in *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320 (Fed. Cir. 2021) (*en banc*), a carve out is not an automatic exemption to inducement, and Plaintiffs would seek discovery similar to that relied on in *GSK* to prove inducement (e.g., Norwich's intent, marketing strategy, and marketing materials). *Id.* at 1337-38; *Forest*, 2019 WL 3574249, at *8 ("[I]t is neither fair to [plaintiff] nor an efficient use of judicial resources for me to guess as to how the parties will modify their arguments based on the [ANDA] amendments.").

But as it stands, there has been no change to the facts the parties litigated at trial. Norwich lacks tentative approval and thus far has declined Plaintiffs' request for updates as to the status of its ANDA. The last FDA correspondence Norwich produced was an October 18, 2021 Complete Response Letter, in which the FDA informed Norwich that it could not approve the ANDA in its present form and requested, among other things. ████████████████████ ████████████████████████ orwich has not disclosed whether it has responded to this letter, and if so, the status of the FDA's acceptance of Norwich's response. Not knowing when or whether Norwich's ANDA will receive tentative approval or what it will cover leaves the potential for emergency motion practice (i.e., a temporary restraining order and preliminary injunction) or need for an expedited appeal. Plaintiffs respectfully request a status conference to address these issues so that the parties and courts do not unnecessarily waste resources.

Finally, the parties dispute whether the judgment should include an injunction pursuant to § 271(e)(4)(B). That disagreement largely mirrors that over whether Norwich is entitled to an advisory opinion. Stripped of this dispute, once, as here, liability is established, the court has routinely entered injunctions that apply to the ANDA, "including any amendments or supplements thereto." *See, e.g., Onyx Therapeutics, Inc. v. Cipla Ltd.*, C.A. No. 16-998 (D. Del. May 15, 2020) (D.I. 549) (Exhibit D) (Exhibit G (presenting dispute over whether the ANDA defendant was "improperly attempting to 'carve out' of the judgment some unknown and unidentified future modification to the formulating of its proposed ANDA product.")). To the extent, however, there were any dispute, the parties can have further briefing on the *eBay* factors.

2

## I.   DEFENDANT'S POSITION

The Court directed the parties to submit a proposed final judgment that assumed the Court will find the asserted polymorph claims and IBS-D patent claims ("IBS-D claims") invalid. Norwich's proposal does this and would grant Salix the relief it is entitled to based on the only claims it prevailed on – the asserted HE patent claims ("HE claims"). Specifically, Norwich proposes a form of judgment (Exhibit B) that restricts the effective date of approval of Norwich's ANDA only if the proposed labeling contains the HE indication, and does not enjoin Norwich from selling its ANDA Product because Salix has failed to create any record justifying injunctive relief. This proposal would leave Norwich the option of seeking to amend its ANDA, which has not been tentatively approved, to carve out the HE indication pursuant to 21 U.S.C. § 355(j)(2)(A)(viii). Salix's proposal, on the other hand, would prevent FDA from approving, and Norwich from marketing, Norwich's ANDA Product with *any* proposed labeling until *2029*. Neither the Court's presumptive rulings nor the record in this case entitle Salix to this additional relief.

### A.   The Approval Date of Norwich's ANDA Should Only Be Restricted If the ANDA Labeling Contains the HE indication.

Norwich proposes that the "effective date . . . of any final approval by FDA of Norwich's ANDA *with proposed labeling containing [the HE indication]* shall be a date not earlier than the latest expiration of the Asserted HE Patent Claims . . . ." This acknowledges that the product has been approved for two distinct indications and that this Court's July 28, 2022 Oral Order (D.I. 189) (the "Order") found only that the asserted HE claims were valid and infringed.

Rifaximin 550 mg tablets are indicated for (1) "treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults" and (2) "reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults." These indications, however, are not related. Each indication is directed to a different condition and set of patients, and each requires a different dose and dosing regimen. Indeed, each party had different experts having different expertise address disputed issues of infringement concerning the asserted IBS-D and HE patent claims. In addition, the patent use codes submitted by Salix and listed in FDA's Orange Book for the asserted HE patents (e.g., "reduction in risk of overt [HE] recurrence" and "reduction in subject's risk of experiencing a breakthrough overt [HE] episode") are not directed to treating IBS-D.

The Order stated that the asserted IBS-D claims, and the asserted polymorph claims, would be found invalid as obvious. Thus, the IBS-D and polymorph patents cannot restrict Norwich from marketing its ANDA product, and were not infringed by the submission of Norwich's ANDA. Moreover, Salix did not allege or offer evidence at trial that the IBS-D indication would induce infringement of the asserted HE claims. Accordingly, any relief granted to Salix should be based on the presence of the HE indication in the proposed ANDA labeling because that is what has been adjudicated to induce infringement of the asserted HE claims.

Contrary to Salix's argument that a judgment may only address "Norwich's ANDA" as a whole, this Court is not foreclosed from assessing relief on an indication-by-indication basis. For example, in *Novartis Pharms. Corp. et al. v. West-Ward Pharmaceuticals Int'l. Ltd.*, C.A. 15-474, D.I. 103 (D. Del. 2017) (Exhibit E), the court entered judgment restricting the approval date of the disputed ANDA according to each indication. There, the patentee showed that the different patents

covering the two indications were valid and infringed.  Here, different patents cover the HE and IBS-D indications, and Norwich has prevailed on the IBS-D claims.

Salix's assertion that Norwich's proposed judgment seeks an advisory opinion is erroneous.  In fact, the opposite is true.  Norwich's proposed judgment is based on only what has been adjudicated by this Court – that the HE indication in Norwich's label induces infringement of the HE patents and that the HE patents are valid.  In contrast, by ordering that FDA delay the effective date of approval of Norwich's ANDA regardless of whether the ANDA contains an indication directed to HE, Salix seeks a judgment that deems any label proposed in Norwich's ANDA infringing.  Yet, Salix is not entitled to such broad or speculative relief because that issue exceeds the scope of jurisdiction of this Court.  This is especially true where the law permits ANDA applicants to carve out an indication from the drug label.  21 U.S.C. § 355(j)(2)(A)(viii).  If Norwich were to carve out the HE indication from its proposed ANDA labeling, then the predicate for delaying the approval of Norwich's ANDA until after the expiration of the asserted HE patent claims under Section 271(e) would no longer exist.  Norwich does not ask this Court to enter judgment regarding, or "pre-approve," a proposed "skinny" label for only the IBS-D indication.  It asks this Court to reject any proposed judgment that presupposes labeling excluding the HE indication would infringe the asserted HE patent claims, or precludes Norwich's ability to seek a skinny label. Notably, Salix did not assert any HE patent in *Salix Pharms. Ltd. et al., Inc. v. Sandoz, Inc*., C.A. No. 19-18566, D.I. 15 (D.N.J. Dec. 16, 2019) (Exhibit F), where another ANDA filer sought approval of the product for only the IBS-D indication.

Salix's case law regarding "advisory opinions" is inapposite.  *Aetna*, *Sierra*, or *Canon* do not address an ANDA case or facts remotely congruent with the present dispute.  In *Allergan*, the drug had one indication, a stipulation of infringement of the patent covering that indication was entered before trial, and the infringer later attempted a design-around by removing certain information from its proposed labeling *for the same indication*.  In *Forest Laboratories*, the case involved a product claim and the infringer sought to change its product specification after trial.  Here, the dispute is driven by the drug having two distinct indications, and not a product change.

### B. Plaintiffs Have Not Met Their Burden to Obtain Injunctive Relief.

The Court's finding that Norwich would induce infringement of the asserted HE claims does not mandate injunctive relief.  *Bayer Pharma AG v. Watson Labs., Inc*., C.A. No. 12-1726-LPS, 2016 WL 7468172, at *4 (D. Del. Dec. 28, 2016) (denying injunctive relief).  To obtain an injunction, Salix must satisfy a four-factor test that is well-known to this Court.  *Id*.  Salix has not created any record demonstrating irreparable harm or the inadequacy of available legal remedies. In fact, Salix presented no evidence to the Court whatsoever of the commercial sales of its branded product, nor of its significance to Salix.  Contrary to Salix's assertion, irreparable harm is not "presumptive," and whether courts "routinely enter[ ] injunctions under § 271(e)" is irrelevant.  Salix's reliance on *Onyx Therapeutics* is misplaced because the entry of an injunction was not contested and the patents covered a composition and not a method of use.  In addition, Norwich's ANDA with proposed labeling for the HE indication could not be approved under either party's proposed judgment before the expiration of the asserted HE claims.  *See Alcon, Inc. v. Teva Pharms. USA, Inc*., C.A. No. 06-234-SLR, 2010 WL 3081327, at *3 (D. Del. Aug. 5, 2010) (Section 271(e)(4)(A) provided a legal remedy).  Thus, an injunction is not warranted.

4

Respectfully,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Cameron P. Clark
_____
Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
kjacobs@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Plaintiffs Salix Pharmaceuticals,
Ltd., Salix Pharmaceuticals, Inc., Bausch
Health Ireland Ltd., and Alfasigma S.p.A.*

August 3, 2022

SHAW KELLER LLP

/s/ Nathan R. Hoeschen
_____
Karen E. Keller (#4489)
Nathan R. Hoeschen (#6232)
1105 North Market Street, 12th Floor
Wilmington, DE  19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Defendant Norwich
Pharmaceuticals, Inc.*

# Exhibit B

**IN THE UNITED SATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CIPLA LTD., | |
| Plaintiff, | |
| v. | Civil Action No. <u>22-300-UNA</u> |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC., BOEHRINGER INGELHEIM INTERNATIONAL GMBH, AND BOEHRINGER INGELHEIM PHARMA GMBH & CO. KG, | |
| Defendants. | |

## <u>ORDER GRANTING MOTION TO SEAL</u>

**THIS MATTER** having come before the Court by way of motion by Plaintiff Cipla Ltd. ("Plaintiff" or "Cipla") seeking an order pursuant to Local Rule of Civil Practice and Procedure of the United States District Court for the District of Delaware 5.1.3 sealing portions of Cipla's Complaint for Declaratory Judgment of Noninfringement ("Complaint") and Exhibits B–D and H under seal.  For good cause appearing, the Court hereby finds:

1.      Although there is a "presumptive right of public access to pretrial motions of a nondiscovery nature, whether preliminary or dispositive," *In re Avandia Marketing*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *In re Cendant Corp.*, 260 F.3d 183, 192–93 (3d Cir. 2001)), the right is "not absolute," *id.* (quoting *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 344 (3d Cir. 1986)); *see also Littlejohn v. Bic Corp.*, 851 F.2d 673, 677–78 (3d Cir. 1988). The movant overcomes the presumption of access if it shows "that the interest in secrecy outweighs the presumption. *In re Avandia Marketing*, 924 F.3d at 672 (quoting *Bank of Am.*, 800 F.2d at 344). The material needs to be "the kind of information that courts will protect and that

disclosure will work a clearly defined and serious injury to the party seeking closure.'" *Id.* (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994)).

2.      A court applies a "good cause" standard to justify sealing or redacting judicial records, which requires a "balancing process, in which courts weigh the harm of disclosing information against the importance of disclosure to the public." *Mosaid Techs. Inc. v. LSI Corp.*, 878 F. Supp. 2d 503, 507–08 (D. Del. 2012).

3.      Cipla has requested the Court seal details of, discussion of, and/or reference to communications with the U.S. Food and Drug Administration ("FDA") relating to Cipla's Abbreviated New Drug Application ("ANDA") for Cipla's Nintedanib capsules, 100 mg and 150 mg ("Cipla's proposed ANDA product") and confidential communications with Defendants Boehringer Ingelheim Pharmaceuticals Inc. ("Boehringer, Inc."), Boehringer Ingelheim International GmbH  ("Boehringer GmbH"), and Boehringer Ingelheim Pharma GmbH & Co. KG ("Boehringer Pharma") (collectively, "Defendants" or "Boehringer") relating to Cipla's ANDA and Cipla's proposed ANDA product.

4.      The Court finds good cause to seal portions of the Complaint that contain details of, discussion of, and/or reference to confidential information regarding Cipla's ANDA and Cipla's proposed ANDA product.

5.      The Court finds that disclosure of this type of information would cause a clearly defined and serious injury to Cipla because future competitors could use the details of Cipla's proposed ANDA product and regulatory strategy as a roadmap for their own potential products that could undercut Cipla's business interests. *See, e.g.*, *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 415 n.3 (3d Cir. 2013) (finding good cause to seal documents "to protect the parties' confidential proprietary business and competitive interests").

6. Accordingly, the Court finds that good cause exists to seal the documents at issue under the considerations set forth in *In re Avandia Marketing*, 924 F.3d 662, 672 (3d Cir. 2019) and Local Rule of Civil Practice and Procedure of the United States District Court for the District of Delaware 5.1.3.

For the reasons set forth above, as well as good cause shown:

**IT IS**, on this ___7___ day of ___March___, 2022,

1. **ORDERED** that Cipla's Motion to File Under Seal is **GRANTED** and the portions identified in Cipla's Motion to File Under Seal shall remain under seal; and further

2. Cipla shall file redacted versions of its Complaint within seven (7) days of filing the sealed documents, which will redact only the confidential information identified by Cipla in support of its Motion to Seal.

**SO ORDERED.**

/s/ Richard G. Andrews

U.S. District Court Judge

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 20-430 (RGA) |
| v. | ) ) ) | **DECLARATION OF JYOTI SACHDEVA** |
| NORWICH PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) | |

I, Jyoti Sachdeva, Ph.D., declare as follows:

1.      I submit this Declaration on behalf of Norwich Pharmaceuticals, Inc. ("Norwich") in support of Norwich's request to redact information concerning non-public correspondence about Norwich's Abbreviated New Drug Application No. 214369 (the "ANDA") cited in the August 3, 2022 Joint Letter to the Honorable Richard G. Andrews Regarding Proposed Form of Judgment (D.I. 190) ("Joint Letter").

2.      Norwich is an affiliate of a group of companies known as "Alvogen," and Alvogen is the regulatory agent for Norwich's ANDA.

3.      I am the Executive Director, Regulatory Affairs in the United States for Alvogen, and have knowledge of Norwich's ANDA and related correspondence to or from Norwich and the U.S. Food and Drug Administration ("FDA") concerning Norwich's ANDA.  I was previously deposed in this matter.

4.      I have personal knowledge of the facts set forth in this Declaration or believe such facts to be true based on personal knowledge, information provided by knowledgeable persons who work with me, and review of records kept in the ordinary course of business.

5.      I have reviewed-in-relevant-part and understand that the Joint Letter cites a Complete Response Letter that Norwich received from FDA on October 8, 2021 in regards to the ANDA (the "October 2021 CRL Letter").

6.      The October 2021 CRL Letter has not been disclosed publicly and reflects sensitive proprietary information regarding Norwich's ANDA and its regulatory status.

7.      Given that Norwich received the October 2021 CRL Letter less than one year ago, neither the letter nor the information it contains is stale due the mere passage of time.

8.      Persons having knowledge of the regulation and approval of generic pharmaceutical drugs will understand that (i) a complete response letter requires an applicant to

1

submit a response that addresses FDA's concerns or provides additional information, and (ii) the response must generally be submitted within one year of receipt of the complete response letter, absent an extension.  *See generally Failure to Respond to an ANDA Complete Response Letter Within the Regulatory Timeframe* (Jul. 2022), *available at* https://www.fda.gov/media/160166/download.

9.      The disclosure of the fact that Norwich received the October 2021 CRL Letter would permit industry participants having familiarity with FDA's regulatory process to estimate a timeline for FDA's decision-making regarding Norwich's ANDA.  For example, FDA will review a response to a CRL letter containing an amendment to an ANDA in three to ten months depending on whether the amendment is classified as minor or major.  *See* GDUFA Reauthorization Performance Goals And Program Enhancements Fiscal Years 2018-2022, at 5 (May 12, 2016), *available at* https://www.fda.gov/media/101052/download.  Thus, knowledge of the date and general subject of a complete response letter would convey competitively sensitive information to potential competitors, which include the company that markets the brand drug and other ANDA filers.

10.      On August 20, 2021, FDA announced its intent to modify the product specific guidance for rifaximin 550 mg tablets to "add" certain in vivo bioequivalence requirements for ANDA filers.  *See Planned Revised PSGs for Complex Generic Drug Products* (updated August 2, 2022), *available at* https://www.fda.gov/drugs/guidances-drugs/upcoming-product-specific-guidances-complex-generic-drug-product-development.  Given the short gap of time between FDA's announcement and the October 2021 CRL Letter, a person familiar with the regulatory process could reasonably determine that ███████████████████████████████████ ███████████████ This information would be of significant value to competitors seeking to gauge

2

the approval timeline for Norwich's rifaximin 550 mg tablets and allow them to develop their

own commercial and regulatory strategies, which would disadvantage Norwich.

11.     I am aware that Bausch Health filed a Citizen Petition in January 2021 regarding

the bioequivalence requirements for rifaximin 550 mg tablets.  *See* Docket No. FDA-2021-P-

0096, *available at* https://www.regulations.gov/docket/FDA-2021-P-0096/.  In addition, I am

aware that Bausch Health issued a press release on July 28, 2022 stating that "The FDA has

stated that they plan to make a major revision to the rifaximin product specific guidance to add

an *in vivo* bioequivalency study."  Bausch Health, *Bausch Health Provides Update Following*

*Oral Order in XIFAXAN® Patent Litigation* (Jul. 28, 2022), *available at*

https://www.bauschhealth.com/news-room/news-releases/news-details/202207281545pr_news_

uspr_____ny30520.  Given the foregoing, Norwich has serious concerns that the disclosure of

non-public information relating to the status of its ANDA may be used by Bausch Health, or

another competitor, in an attempt to disadvantage, if not delay, Norwich's efforts to obtain

tentative or final FDA approval for its rifaximin 550 mg tablets.

12.     Based on the same press release, I am also aware that Teva Pharmaceuticals, Sun

Pharmaceuticals, and Sandoz have filed ANDAs for rifaximin 550 mg tablets and reportedly

have the ability to market their product if and when Norwich launches its product.  Thus, the

disclosure of the October 2021 CRL Letter would convey competitively sensitive information to

other generic companies who may be preparing their own business or regulatory strategies, and

disadvantage Norwich.

13.     If the existence of and a general description on the contents of the October 2021

CRL Letter were to become available to the public or Norwich's competitors, Norwich would

suffer serious commercial injury.  Public disclosure of Norwich's sensitive business information

would give competitors an unfair advantage in a highly competitive marketplace, potentially causing Norwich significant competitive harm.

I declare under penalty of perjury and under the laws of the State of New Jersey that the foregoing is true and correct.  Executed this 19 day of August, 2022 at 44, Whippany Road, Morristown, New Jersey.

_____

Jyoti Sachdeva, Ph.D.

Exhibit D

**Drug Databases (https://www.fda.gov/Drugs/InformationOnDrugs/default.htm)**

# Drugs@FDA: FDA-Approved Drugs

**Home (index.cfm)** | **Previous Page**

**Abbreviated New Drug Application (ANDA):** 213713
**Company:** SANDOZ INC

✉ EMAIL (MAILTO:?SUBJECT=DRUGS@FDA: FDA APPROVED DRUG PRODUCTS&BODY=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/DAF/INDEX.CFM?
EVENT=OVERVIEW.PROCESS%26VARAPPLNO=213713)



## Products on ANDA 213713 ⌄

| CSV | Excel | Print |

| Drug Name | Active Ingredients | Strength | Dosage Form/Route | Marketing Status | TE Code | RLD | RS |
|---|---|---|---|---|---|---|---|
| RIFAXIMIN | RIFAXIMIN | UNKNOWN | UNKNOWN | None (Tentative Approval) | None | No | No |

Showing 1 to 1 of 1 entries

## Approval Date(s) and History, Letters, Labels, Reviews for ANDA 213713 ⌃

### Original Approvals or Tentative Approvals

| CSV | Excel | Print |

| Action Date | Submission | Action Type | Submission Classification | Review Priority; Orphan Status | Letters, Reviews, Labels, Patient Package Insert | Notes |
|---|---|---|---|---|---|---|
| 12/29/2020 | ORIG-1 | Tentative Approval | | STANDARD | | Label is not available on this site. |

Showing 1 to 1 of 1 entries

# Exhibit E

EX-99.1 3 bhc8-k542021ex991.htm EX-99.1

**Exhibit 99.1**

**Explanatory Note**

On August 6, 2020, we announced that we intend to separate our eye-health business into an independent publicly traded entity ("Bausch + Lomb") from the remainder of Bausch Health Companies Inc. (the "Separation"). See "Separation of the Bausch + Lomb Eye-Health Business" below for further details of the proposed Separation.

In connection with the planned Separation of its eye-health business into an independent publicly traded entity from the remainder of Bausch Health Companies Inc., the Company has begun managing its operations in a manner consistent with the organizational structure of the two separate entities as proposed by the Separation. As a result, during the first quarter of 2021, the Company's Chief Executive Officer ("CEO"), who is the Company's Chief Operating Decision Maker, commenced managing the business differently through changes in its operating and reportable segments, which necessitated a realignment of the Company's historical segment structure. This realignment is consistent with how the Company's CEO currently: (i) assesses operating performance on a regular basis, (ii) makes resource allocation decisions and (iii) designates responsibilities of his direct reports. Pursuant to these changes, effective in the first quarter of 2021, the Company operates in the following reportable segments: (i) Bausch + Lomb, (ii) Salix, (iii) International Rx, (iv) Ortho Dermatologics and (v) Diversified Products. In addition, as part of this realignment of segment structure, certain products historically included in certain segments are now included in their new respective segments based on the organizational structure of the two separate entities as proposed by the Separation. All segment revenues and profits for the periods presented have been recast to conform to the 2021 reporting segment reporting structure.

"Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations with Retrospective Segment Changes of the 2020 Form 10-K" set forth in this Exhibit 99.1 has been revised from the "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" included in Part II to the Company's Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Form 10-K") to reflect retrospective application of the new reporting structure and recast our historical results to conform to the new segment presentation. "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations with Retrospective Segment Changes of the 2020 Form 10-K" set forth below has not been revised to reflect events or developments subsequent to February 24, 2021, the date that we filed the 2020 Form 10-K. For a discussion of events and developments subsequent to the filing date of the 2020 Form 10-K, please refer to the reports and other information the Company has filed with the Securities and Exchange Commission and with the Canadian Securities Administration on SEDAR at www.sedar.com since that date, including the Company's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2021 filed on May 4, 2021.

**Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations with Retrospective Segment Changes of the 2020 Form 10-K**

**INTRODUCTION**

*This "Management's Discussion and Analysis of Financial Condition and Results of Operations" has been updated through February 24, 2021 and for the subsequent retrospective reflection of the segment change and should be read in conjunction with the audited Consolidated Financial Statements and the related notes thereto included elsewhere in this Annual Report on Form 10-K. The matters discussed in "Management's Discussion and Analysis of Financial Condition and Results of Operations" contain certain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, and that may be forward-looking information within the meaning*

New York to address the expected global demand for our Bausch + Lomb ULTRA® contact lens and our Lynchburg facility in Virginia to be our main point of distribution for medical devices in the U.S. During late 2018, we began investing in additional expansion projects at the Waterford and Rochester facilities in order to address the expected global demand for our SiHy Daily disposable contact lenses, which we launched in the U.S. in August 2020, under the branded name Bausch + Lomb INFUSE™ SiHy Daily Disposable contact lens.

We believe our recent product launches, licensing arrangements and the investments in our Waterford, Rochester and Lynchburg facilities demonstrate the growth potential we see in our Bausch + Lomb products and our eye-health business and that these investments will position us to further extend our market share in the eye-health market.

*Leveraging our Salix Infrastructure* - We strongly believe in our GI product portfolio and we have implemented initiatives, including increasing our marketing presence and identifying additional opportunities outside our existing GI portfolio, to further capitalize on the value of the infrastructure we built around these products to extend our market share.

In the first quarter of 2017, we hired approximately 250 trained and experienced sales force representatives and managers to create, bolster and sustain deep relationships with primary care physicians ("PCP"). With approximately 70% of IBS-D patients initially presenting symptoms to a PCP, we continue to believe that the dedicated PCP sales force is better positioned to reach more patients in need of IBS-D treatment.

This initiative provided us with positive results, as we experienced consistent growth in demand for our GI products throughout 2017 through 2020, which was evident by our growth in Salix revenues of 22% when comparing 2020 to 2017. These results encouraged us to seek out ways to bring out further value through leveraging our existing sales force and, in the later portion of 2018 and in 2019, we identified and executed on certain opportunities which we describe below.

*Strategic Acquisition* - As previously discussed, in March 2019, we completed the acquisition of certain assets of Synergy, whereby we acquired the worldwide rights to the Trulance® product, a once-daily tablet for adults with chronic idiopathic constipation, or CIC and irritable bowel syndrome with constipation, or IBS-C. We believe that the Trulance® product complements our existing Salix products and allows us to effectively leverage our existing GI sales force.

*Licensing Arrangements* - As previously discussed, in April 2019, we entered into two licensing agreements. The first is for certain intellectual property relating to an investigational compound targeting the pituitary adenylate cyclase receptor 1 in NAFLD, NASH and other GI and liver diseases. The second is to develop and commercialize MT-1303 (amiselimod), a late-stage oral compound that targets the sphingosine 1-phosphate receptor that plays a role in autoimmune diseases, such as inflammatory bowel disease and ulcerative colitis. These licenses present unique developmental opportunities to address unmet needs of individuals suffering with certain GI and liver diseases and if developed and approved by the FDA, will allow us to further utilize our existing sales force and infrastructure to extend our market share in the future and create value.

*Investment in Next Generation Formulations* - Revenues from our Xifaxan® product increased approximately 2%, 22% and 22% in 2020, 2019 and 2018, respectively. In order to extend growth in Xifaxan®, we continue to directly invest in next generation formulations of Xifaxan® and rifaximin, the principal semi-synthetic antibiotic used in our Xifaxan® product. In addition to one R&D program in progress, we have three other R&D programs planned for next generation formulations of Xifaxan® (rifaximin) which address new indications.

We believe that the acquisition and licensing opportunities discussed above will be accretive to our business by providing us access to products and investigational compounds that are a natural pairing to our Xifaxan® business, allowing us to effectively leverage our existing infrastructure and sales force.

# Exhibit F

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| _____ | ) | |
| GENENTECH, INC. and CITY OF HOPE, | ) ) | |
| | ) | |
| _Plaintiffs_, | ) | Civ. No. 17-1407- CFC, Consol. |
| | ) | |
| v. | ) | |
| | ) | |
| AMGEN, INC. | ) | |
| | ) | |
| _Defendant._ | ) | |
| _____ | ) | |
| GENENTECH, INC. and CITY OF HOPE, | ) ) | |
| | ) | |
| _Plaintiffs_, | ) | Civ. No. 18-924-CFC |
| | ) | |
| v. | ) | |
| | ) | |
| AMGEN, INC. | ) | |
| | ) | |
| _Defendant._ | ) | |
| _____ | ) | |

# REPORT AND RECOMMENDATION OF SPECIAL MASTER

Rodney A. Smolla, Special Master

District Court Judge Colm Connolly assigned these consolidated matters to the Special Master in a Memorandum Order entered on March 30, 2020. The District Court's order broadly instructed the Special Master to determine whether the sealed

redacted filings of the parties comply with the legal principles that govern the sealing of documents filed in federal judicial proceedings as established by the Supreme Court of the United States, the United States Court of Appeals for the Third Circuit, and the Federal Rules of Civil Procedure.

This Report and Recommendation: (1) describes the process through which the duties of the Special Master were completed; (2) briefly summarizes the applicable legal principles governing sealing; (3) recites the legal positions on the issues taken by the parties and explains the Special Master's approval and endorsement of their positions; and (4) concludes with a recommended order detailing the mechanics of how the parties should comply with this Report and Recommendation, to ensure that all material that should be unsealed is unsealed, and all that should remain sealed remains sealed.[1]

A separate Sealed Appendix is filed contemporaneously with this Report and Recommendation.  That Sealed Appendix contains a document-by-document review, in which the nature of every retained sealing or partial redaction is described, and the legal basis justifying continued sealing or redaction is succinctly explained.

---

[1] The recitation of law in this Report and Recommendation has been kept short. The Court is well-familiar with the controlling principles.  The parties, through the initial guidance provided by the Special Master, and as evidenced in their thorough subsequent briefing, are as well.  There is no disagreement as to the guiding legal principles.

## I.  The Process

The Parties and the Special Master agreed on a process for streamlining the review ordered by Judge Connolly and mandated by Third Circuit precedent.  It may well serve as a useful model for future similar undertakings.  The Special Master issued an Interim Order providing legal guidance to the parties regarding the nature of material that should not be sealed, and the nature of material that could justifiably be sealed, and the nature of the factual showing required to justify sealing.  The Parties then engaged in their own self-review of all previously sealed material, engaging in a self-critique in which material previously filed under seal was voluntarily designated for unsealing.  As to filings that, in whole or in part, should in either Party's view remain sealed, the Parties submitted to the Special Master the proffered legal and factual justifications.  This process undoubtedly saved a great deal of time and expense.  Even so, between them the Parties still submitted several hundred principal documents or attached exhibits for which continued sealing was urged, in whole or in part.  As to those documents, the Special Master considered the Parties' legal submissions and the Parties' application of law to fact as to each document.   As required by Third Circuit precedent, each specific sealing and redaction was reviewed by the Special Master.

## II. The Applicable Legal Principles

### A.    The Three Tiers of Review

Three discrete bodies of law govern the principles pertaining to confidentiality, sealing, and redactions of documents in federal court litigation. They apply in ascending orders of scrutiny.

First, there are principles governing the issuance of protective orders in federal litigation. These principles emanate from Rule 26(c) of the Federal Rules of Civil Procedure, and the attendant gloss courts have applied to the application of Rule 26(c). *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 783-92 (3d Cir. 1994).

Second, federal courts recognize a common-law right of access to judicial records. "The existence of a common law right of access to judicial proceedings and to inspect judicial records is beyond dispute." *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059, 1066 (3d Cir. 1984). There is a "presumption in favor of access to 'public records and documents, including judicial records and documents.'" *Bank of America National Trust & Savings Association v. Hotel Rittenhouse Associates*, 800 F.2d at 343, *quoting Nixon v. Warner Communications, Inc*., 435 U.S. 589, 597 (1978).

Third, "the public and the press have a First Amendment right of access to civil trials." *In re Avandia Marketing Sales Practices & Product Liability Litigation*, 924 F.3d 662, 673 (3d Cir. 2019), *citing Publicker*, 733 F.2d at 1070. "[T]he First

Amendment, independent of the common law, protects the public's right of access to the records of civil proceedings." *Republic of Philippines v. Westinghouse Electric Corporation*, 949 F.2d 653, 659 (3d Cir. 1991), *citing Publicker*, 733 F.2d at 1070. "The First Amendment right of access requires a much higher showing than the common law right to access before a judicial proceeding can be sealed." *In re Cendant Corp.*, 260 F.3d 183, 198 n. 13 (3d Cir. 2001). Any restriction on the First Amendment right of public access is "'evaluated under strict scrutiny.'" *Avandia*, 924 F.3d at 673, *quoting PG Publishing Company v. Aichele*, 705 F.3d 91, 104 (3d Cir. 2013).

Of these three, it is the middle tier, the common-law access right, that is principally in play in this Report and Recommendation.

### B.    The Common-Law Right of Access

### 1.  The *Avandia* Guidance

While not purporting to articulate exhaustively what substantive showings will justify sealing or redacting a judicial record and what showings will not, the Third Circuit's landmark ruling in *Avandia* did provide substantial guidance. *Avandia* confirmed the long-standing truism that the presumption of public access is "'not absolute.'" *Avandia*, 924 F.3d at 672, *quoting Bank of America*, 800 F.2d at 344. The presumption of public access *may* be overcome.

The critical divide is the distinction between material containing palpable trade secrets or proprietary business practices that will produce present commercial and competitive harm, on the one hand, and vague, conclusory assertions of commercial or competitive harm, or assertions that in fact appear grounded in reputational interests and embarrassment, on the other. A party's "'vague assertions that the transcript contains secretive business information, and that disclosure would render [it] at a tactical disadvantage' [are] insufficient to overcome that strong presumption." *Avandia*, 924 F.3d at 676, *quoting LEAP Sys., Inc. v. MoneyTrax, Inc.*, 638 F.3d 216, 221-22 (3d Cir. 2011). The touchstone is the persuasive demonstration of specific, concrete, particularized of harm.

### 2. The *Publicker* Categories

The Third Circuit's 1984 opinion in *Publicker*, decided some 25 years prior to *Avandia*, endures as one of the most important substantive guides to what material may justifiably remain sealed. In a paragraph describing situations in which sealing could be justified, the Third Circuit postulated three categories: one involving "the content of the information at issue," a second "the relationship of the parties," and the third "the nature of the controversy." *Publicker*, at 733 F.2d at 1073.

The Third Circuit then offered examples. For "the content of the information," it used as an example "safeguarding a trade secret." *Id.* For the "relationship of the parties," it posited a suit by a client to prevent a lawyer from

disclosing confidential information protected by the attorney-client privilege.  *Id.*
The Third Circuit then gave as an example of "the nature of the controversy," a
passage which reads in its entirety: "A similar situation would be presented where
there is a binding contractual obligation not to disclose certain information which to
the court seems innocuous but newsworthy; in that situation unbridled disclosure of
the nature of the controversy would deprive the litigant of his right to enforce a legal
obligation." *Id.* at 1073-74.

### 3.  The Carve-Out for Discovery Motions

In *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157 (3d
Cir. 1993), the Third Circuit held that the common-law right of access did *not* attach
to discovery motions.   In excluding "discovery motions," *Leucadia* relied heavily
on the fundamental principle that underlying discovery material *itself* is not a judicial
record.  There is no common law right of access to "raw discovery."  *Id*. at 157.  If
in the course of discovery, disputes arise, parties may file "discovery motions"
seeking the intervention of a court to resolve the disputes.  Those motions may
require attachment of "raw discovery" materials, such as excerpts from depositions
or interrogatory answers.  The core learning of *Leucadia* is that the common-law
right of access does not attach to such motions, or their exhibits containing raw
discovery, because this would have the effect of converting material that is normally
not a "judicial record" into material that is.  The key passage in *Leucadia* thus

explained that "a holding that discovery motions and supporting materials are subject to a presumptive right of access would make raw discovery, ordinarily inaccessible to the public, accessible merely because it had to be included in motions precipitated by inadequate discovery responses or overly aggressive discovery demands." *Id*. at 157.

### 4. The Procedural Requirements

*Avandia* contemplates a rigorous process of judicial review.  The right of access must not be demoted to "a mere formality."  *Avandia*, 924 F.3d at 676.  To ensure that proper weight is given to "the public's strong interest in the openness of judicial records," a District Court must engage in "a document-by-document review."  *Id*.  Casual, superficial review does not suffice.  "Again, the strong presumption of openness inherent in the common law right of access 'disallows the routine and perfunctory closing of judicial records.'" *Id.*, *citing In re Cendant Corp.*, 260 F.3d at 193-94.

The substantive and procedural standards that must be met to overcome the presumption of access are onerous by definition and design. The party seeking to seal judicial records must satisfy "a heavy burden."  *Miller v. Indiana Hospital*, 16 F.3d 549, 551 (3d Cir. 1994).  The party seeking to have a record sealed "must show that 'the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking

closure.'" *Avandia*, 924 F.3d at 677-78, *quoting Miller*, 16 F.3d at 55.  In granting a sealing order, a "District Court should articulate 'the compelling[,] countervailing interests to be protected," make "specific findings on the record concerning the effects of disclosure, and provide[ ] an opportunity for interested third parties to be heard.'" *Avandia*, 924 F.3d at 677-78, *quoting In re Cendant Corp.*, 260 F.3d at 194. "'In delineating the injury to be prevented, specificity is essential.'" *Id.* Generalized incantations that secrecy is required to prevent competitive or commercial harm are not enough to carry the movant's burden. "'Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient.'" *Id.*

The factfinding required by district courts must be careful and meticulous in order to vindicate the rights of the public and the integrity of the judicial process itself, notwithstanding the private interests or preferences of the litigants, even when they are in agreement.  "'[C]areful factfinding and balancing of competing interests is required before the strong presumption of openness can be overcome by the secrecy interests of private litigants.'" *Avandia*, 924 F.3d at 677-78, *quoting Leucadia,* 998 F.2d at 167.

The Third Circuit's *Avandia* opinion mandates a "document-by-document" review of the claimed propriety of sealing.  "[I]t must be clear from the record that the district court engaged in a particularized, deliberate assessment of the standard as it applies to each disputed document." *Id*.

### III. The Submissions of the Parties

### A.  Genentech's Legal Arguments

Genentech grounds its claims for continued sealing or redaction of certain designated materials on its need to retain the confidentiality of proprietary trade secrets or other competitively sensitive information.  Such material is at the core of that type of material that is routinely treated as overcoming the common-law presumption of access.  The revelation of trade secrets, or of other competitively sensitive information that may not meet the formal definition of "trade secret," but nonetheless is shown to be of the nature that would work palpable competitive harm on a party, is precisely the type of material most likely to successfully rebut the presumption favoring access.  As the Supreme Court observed in *Nixon v. Warner Communications*, "courts have refused to permit their files to serve as … sources of business information that might harm a litigant's competitive standing." *Nixon*, 435 U.S. at 598.  So too, the Third Circuit has recognized that "[d]ocuments containing trade secrets or other confidential business information may be protected from disclosure." *Leucadia*, 998 F.2d at 166.  Thus "[d]espite the presumption, courts may deny access to judicial records, for example, where they are sources of business information that might harm a litigants competitive standing." *Littlejohn v. Bic Corp.*, 851 F.2d 673, 678 (3d Cir. 1988), *citing Nixon*, 435 U.S. at 598.

### B. Amgen's Legal Arguments

Amgen groups its proffered retained sealings and redactions into four categories:

(1)    Sensitive and proprietary manufacturing and trade secret information;

(2)    Sensitive and confidential material reflecting commercial and regulatory intelligence, planning and/or strategy;

(3)    Sensitive and proprietary legal information, including privileged material produced in response to the Court's waiver orders; and

(4)    Sensitive and confidential pre-litigation material reflecting the parties' substantive exchanges during the non-public pretrial exchanges under the Biologics Price Competition and Innovation Act ("BPCIA"), 42 U.S.C. § 262.

Sealing of material is legally justified under all four of these categories.

The first two categories identified by Amgen are essentially alternative phrasings to the same principles relied upon by Genentech.  They fall well within the confines of the types of material that the Third Circuit has identified as appropriate for sealing under the standards of *Publicker*, *Avandia*, and related cases.

As to the third category, confidential legal information is the sort of relationship-based exception to the common-law access rule specifically described in *Publicker*.

And the final category, confidential exchanges arising from the BPCIA

process, is an extraneously imposed confidentiality obligation—imposed by Congress, after all—carrying even greater weight than *Publicker*'s recognition that contractual obligations may justify sealing or redaction. The BPCIA is a process prescribed by Congress to streamline biosimilar product litigation through negotiations directed at identifying patents to litigate or license.  The Act by its terms treats these exchanges as confidential. 42 U.S.C. § 262(l)(1)(C) ("No person that receives confidential information . . . shall disclose any confidential information to any other person or entity, including the reference product sponsor, without the prior written consent of the [biosimilar] applicant.").

On top of these four substantive justifications, much of the material designated for continued sealing or redaction by both parties falls squarely within the carve-out for discovery motions and accompanying attachments recognized in *Leucadia*.

### C. Factual Documentation

Both Genentech and Amgen provided comprehensive and persuasive factual explanation and documentation as to why the material each identified as appropriate for sealing does in fact meet the criteria summarized above.  Both parties submitted numerous, lengthy, and detailed factual declarations by highly placed and expert employees within their respective companies.  Those substantial declarations explained generally, and with reference to specific documents in the record, the

factual predicate for continued sealing.  The positions and qualifications of those declarants, as well as the substance of their presentations, are discussed as germane in the Sealed Appendix.

In generic terms, without broaching reference to specific redacted or sealed material, the submissions of the parties were in alignment in describing the intensely competitive scientific and business arena in which they compete.  Both have persuasively established the justification for sealing various docket entries and accompanying exhibits.  The proffered justifications include, among others, trade secrets, proprietary scientific research, highly sensitive manufacturing information, the confidential terms of settlement and license agreements, business intelligence, regulatory strategies, and confidential legal information.

The parties have documented how the information contained in their proposed sealings and redactions, if disclosed, would visit upon them present commercial and competitive harm.  In revealing sensitive and confidential business information to their competitors, they would be supplying those competitors with information regarding their knowledge, operations, capabilities, and strategies.

In some instances, the prospect of harm is linear and direct.  Competitors in the highly-competitive biologics marketplace could use Amgen's or Genentech's own research to the competitors' competitive advantage to more effectively develop and manufacture products.

In other instances, the harm is less linear and direct, but still entirely real. Both parties, as many in the industry, are constantly involved in litigation. Revelation of the terms of settlement agreements, which are among the documents for which continued sealing is often sought, could place the parties at a demonstrable disadvantage in navigating and negotiating other litigation contests with competitors in the same pharmaceutical space.

The parties have established that in the highly competitive pharmaceutical industry environment, even seemingly minor pieces of information about a pharmaceutical company can be valuable to its competitors. So too, both parties have demonstrated that they go to extraordinary lengths to safeguard the integrity of their confidential information, both through the firewalls they impose to protect the information from outsiders, and the closely guarded "need to know" protocols they impose internally on their own employees.

One size does not fit all in describing the specific nature of the proposed redactions.  In some instances the material reflects commercial intelligence—research and strategic analysis of factors such as anticipated market share and penetration, sales volume, or pricing and discount strategy.  These competitive assessments include inward-facing judgments on the parties' own capacities as well as outward-facing judgments on the capacities of others. The proffered redactions also include information on the approaches of the parties to interfacing with

14

government regulators in their highly regulated industry.   The parties each expend substantial resources in conceptualizing how best to secure regulatory approval of their products.  Public revelation of those strategies could undercut the effectiveness of those efforts, or provide competitors with value information they could exploit to their own advantage.

In sum, the parties have engaged in appropriate self-restraint and self-scrutiny in placing into the public domain much of the material previously filed under seal. Having carefully scrutinized the sealings and redactions they seek to maintain, the Special Master approves and recommends continued sealing and redaction, as detailed more specifically in the accompanying Sealed Appendix.

## IV. Recommended Order

This litigation has been expansive, and the mechanics of executing the operational directives of this Report and Recommendation are fraught with the potential for inadvertent error.  The guiding principles are simple enough:

(1) Any document previously sealed that is now to be unsealed in its entirety should be unsealed.

(2) Any document previously sealed in its entirety that is now to continue to be sealed in its entirety should remain sealed.

(3)  Any document previously sealed in its entirety, or redacted in part, which is now to retain some justifiable redactions, but narrowed from the prior entire

sealing or redacted sealing, should be re-filed in its new form, with only the approved narrowed redactions continued.

To implement these principles, the Parties have already conferred with the Clerk of the Court.  As a result of that consultation, this Report and Recommendation recommends to the Court that the Parties be ordered to meet and confer and file a joint submission to the Clerk of Court, in the form of an Appendix (as opposed to document-by-document re-filings), with a courtesy copy to the Special Master, that will: (1) identify those filings that were previously sealed in whole or in part that should now be entirely unsealed; (2) identify those documents previously sealed that are now to be continued to be sealed in their entirety; and (3) compile in the one Appendix filing new versions of all documents previously filed entirely under seal or with redactions, in their new form, with the redactions narrowed as approved by the Special Master as listed in the Sealed Appendix, with the appropriate previously sealed or redacted material now public, and the continued and approved material redacted.

Exhibit G

# Failure to Respond to an ANDA Complete Response Letter Within the Regulatory Timeframe

## Guidance for Industry

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**July 2022**
**Generic Drugs**

# Failure to Respond to an ANDA Complete Response Letter Within the Regulatory Timeframe

## Guidance for Industry

*Additional copies are available from:*

*Office of Communications, Division of Drug Information*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10001 New Hampshire Ave., Hillandale Bldg., 4th Floor*
*Silver Spring, MD 20993-0002*
*Phone: 855-543-3784 or 301-796-3400; Fax: 301-431-6353*
*Email: druginfo@fda.hhs.gov*
*https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*
*or*
*Office of Communication, Outreach, and Development*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*10903 New Hampshire Ave., Bldg. 71, Room 3128*
*Silver Spring, MD  20993-0002*
*Phone: 800-835-4709 or 240-402-8010; Email: ocod@fda.hhs.gov*
*https://www.fda.gov/vaccines-blood-biologics/guidance-compliance-regulatory-information-biologics/biologics-guidances*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**
**July 2022**
**Generic Drugs**

*Contains Nonbinding Recommendations*

## A.  Failure to Respond to a CRL Within 1 Year

If an applicant fails to submit to FDA all materials needed to fully address all deficiencies identified in the CRL within 1 year after issuance of the CRL (or take either of the other two actions prescribed by regulation and that are described above), FDA may consider this failure to be a request by the applicant to withdraw the ANDA.[9]  FDA will notify the applicant in writing and the applicant will have 30 days from the date of that notification to (1) explain why the ANDA should not be withdrawn and (2) request an extension of time to address all deficiencies identified in the CRL.[10]  To best facilitate FDA's consideration of the reasonableness of the request under 21 CFR 314.110(c), we recommend that the applicant provide the information described in section III.C of this guidance, and FDA will evaluate that request for an extension of time by considering, among other relevant information, the factors identified in section III.D of this guidance.  If the applicant does not respond to the notification within 30 days, FDA will deem the ANDA withdrawn and will notify the applicant of the withdrawal in writing.[11]

## B.  Failure to Respond to a CRL Within the Extended Time Period Granted by FDA

If FDA grants the applicant's request for an extension to respond to a CRL but the applicant fails to submit an amendment which addresses all the deficiencies identified in the CRL within the extended time period granted by FDA or to request an additional extension, FDA may consider this failure to be a request by the applicant to withdraw the ANDA.[12]  FDA will notify the applicant in writing and the applicant will have 30 days from the date of that notification to (1) explain why the ANDA should not be withdrawn and (2) request another extension of time to address all deficiencies identified in the CRL.[13]  To best facilitate FDA's consideration of the reasonableness of the request under 21 CFR 314.110(c), we recommend that the applicant provide the information described in section III.C of this guidance.  If the applicant does not respond to the notification within 30 days, FDA will deem the ANDA withdrawn and notify the applicant of the withdrawal in writing.[14]

## C.  Submission of a Request for an Extension to Respond to a CRL

Applicants should submit a request for an extension to respond to a CRL via an amendment to their ANDA.  We recommend that a request address the following issues:

- A justification or reason as to why the applicant needs additional time to respond to the CRL.  The justification should include:

---

[9] 21 CFR 314.110(b)-(c).

[10] 21 CFR 314.110(c)(2).

[11] Ibid.

[12] 21 CFR 314.110(c)(1).

[13] 21 CFR 314.110(c)(2).

[14] Ibid.

# Exhibit H

GDUFA REAUTHORIZATION PERFORMANCE GOALS AND PROGRAM
ENHANCEMENTS FISCAL YEARS 2018-2022

I.   SUBMISSION REVIEW PERFORMANCE GOALS

    A.   Original ANDAs and ANDA Amendments

    B.   PASs and PAS Amendments

    C.   Unsolicited ANDA and PAS Amendments

    D.   DMFs

    E.   Controlled Correspondence

    F.   GDUFA I Bridging

II.  ORIGINAL ANDA REVIEW PROGRAM ENHANCEMENTS

    A.   ANDA Receipt

    B.   ANDA Review Transparency and Communications Enhancements

    C.   Review Classification Changes During the Review Cycle

    D.   ANDA Approval and Tentative Approval

    E.   Dispute Resolution

    F.   Other ANDA Review Program Aspirations

III. PRE-ANDA PROGRAM AND SUBSEQUENT MID-REVIEW-CYCLE MEETINGS
     FOR COMPLEX PRODUCTS

    A.   Rationale for Pre-ANDA Program, Guidance on Enhanced Pathway for Complex
       Products

    B.   Controlled Correspondence

    C.   Product-Specific Guidance

    D.   Product Development Meetings

    E.   Pre-Submission Meetings

    F.   Inactive Ingredient Database Enhancements

1

submits a Pre-Submission Facility Correspondence 2 months prior to the date of amendment submission and the Pre-Submission Facility Correspondence is found to be complete and accurate and remains unChanged.

    c.   Review and act on priority major ANDA amendments within 10 months of amendment submission if (i) preapproval inspection is required and (ii) the applicant does not submit a Pre-Submission Facility Correspondence 2 months prior to amendment submission, or facility information Changes or is found to be incomplete or inaccurate.

5.   Review and act on 90 percent of standard and priority minor ANDA amendments within 3 months of the date of amendment submission.

**Table for Section I(A)(1) and (2): Original ANDAs**

| Submission Type | Goal |
|---|---|
| Standard Original ANDAs | 90% within 10 months of submission date. |
| Priority Original ANDAs | 90% within 8 months of submission date if applicant meets requirements under I(A)(2)(a). |
|  | 90% within 10 months of submission date if applicant does not meet requirements as described under I(A)(2)(b). |

**Table for Section I(A)(3) – (5): ANDA Amendments**

| Submission Type | Goal |
|---|---|
| Standard Major ANDA Amendments | 90% within 8 months of submission date if preapproval inspection not required. |
|  | 90% within 10 months of submission date if preapproval inspection required. |
| Priority Major ANDA Amendments | 90% within 6 months of submission date if preapproval inspection not required. |
|  | 90% within 8 months of submission date if preapproval inspection required and applicant meets requirements under I(A)(4)(b). |
|  | 90% within 10 months of submission date if preapproval inspection required and applicant does not meet requirements as described under I(A)(4)(c). |
| Standard and Priority Minor ANDA Amendments | 90% within 3 months of submission date. |

# Exhibit I

# Upcoming Product-Specific Guidances for Complex Generic Drug Product Development

## Introduction

This web page provides information related to upcoming new and revised product-specific guidances (PSGs) to support the development and approval of safe and effective complex generic drug products.

## What is a complex generic drug product?

As described in the GDUFA II Commitment Letter (/media/101052/download), a complex generic drug product generally means the following—

- A product with:
  - a complex active ingredient(s) (e.g., peptides, polymeric compounds, complex mixtures of APIs, naturally sourced ingredients)
  - a complex formulation (e.g., liposomes, colloids)
  - a complex route of delivery (e.g., locally acting drugs such as dermatological products and complex ophthalmological products and otic dosage forms that are formulated as suspensions, emulsions or gels)
  - a complex dosage form (e.g., transdermals, metered dose inhalers, extended release injectables)
- Complex drug-device combination products (e.g., auto injectors, metered dose inhalers); and
- Other products where complexity or uncertainty concerning the approval pathway or possible alternative approaches would benefit from early scientific engagement.

## How often does FDA publish new and revised PSGs?

| Active Ingredient(s) | Route of Administration | Dosage Form | RLD or RS Application Number |
|---|---|---|---|
| TIRBANIBULIN | TOPICAL | OINTMENT | 213189 |
| TOBRAMYCIN | INHALATION | POWDER | 201688 |
| TRIAMCINOLONE ACETONIDE | INJECTION | SUSPENSION | 211950 |
| TRIAMCINOLONE ACETONIDE | INTRA-ARTICULAR | FOR SUSPENSION, EXTENDED RELEASE | 208845 |
| VARENICLINE TARTRATE | NASAL | SOLUTION | 213978 |
| VILTOLARSEN | INTRAVENOUS | SOLUTION | 212154 |
| VOSORITIDE | SUBCUTANEOUS | POWDER | 214938 |
| ZANAMIVIR | INHALATION | POWDER | 021036 |

## Planned Revised PSGs for Complex Generic Drug Products
## Updated August 2, 2022

| Active Ingredient(s) | Route of Administration | Dosage Form | RLD or RS Application Number | Planned Revision Category (Brief Reason) |
|---|---|---|---|---|
| ACYCLOVIR | BUCCAL | TABLET | 203791 | Editorial Revision: Update language<br><br>Minor Revision: Clarify in vivo study |

| Active Ingredient(s) | Route of Administration | Dosage Form | RLD or RS Application Number | Planned Revision Category (Brief Reason) |
|---|---|---|---|---|
| PALIPERIDONE PALMITATE | INTRAMUSCULAR | SUSPENSION, EXTENDED RELEASE | 022264 | Minor Revision: Clarify in vivo study design |
| PENCICLOVIR | TOPICAL | CREAM | 020629 | Editorial Revision: Harmonize the language for BE recommendations across similar PSGs in alignment with the general guidances; Reorganize information on physicochemical and structural characterization studies<br><br>Minor Revision: Add links or references to general guidance; Expand the eligibility for an in vitro-based BE option |
| PIMECROLIMUS | TOPICAL | CREAM | 021302 | Editorial Revision: Harmonize the language for BE recommendations across similar PSGs in alignment with the general guidances; Reorganize information on physicochemical and structural characterization studies<br><br>Minor Revision: Add links or references to general guidance |
| PODOFILOX | TOPICAL | GEL | 020529 | Minor Revision: Add an in vitro BE option as an alternative BE approach; Add links or references to general guidance |
| PROGESTERONE | VAGINAL | GEL | 020701 | Editorial Revision: Update the language<br><br>Minor Revision: Add an in vitro BE option as an alternative BE approach; Clarify in vivo study design; Add recommendations for device comparisons; Comply with CDISC |
| RIFAXIMIN | ORAL | TABLET | 021361 | Major Revision: Add in vivo BE study |

# Exhibit J

# BakerHostetler

Baker&Hostetler LLP

Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304

T 202.861.1500
F 202.861.1783
www.bakerlaw.com

Lance L. Shea
direct dial: 202.861.1648
lshea@bakerlaw.com

December 28, 2020

Division of Dockets Management
Food and Drug Administration
Department of Health and Human Services
5630 Fishers Lane, rm. 1061
Rockville, MD 20852

**Re: Salix Pharmaceuticals, Inc. Citizen Petition**

To Whom It May Concern:

On behalf of Salix Pharmaceuticals, Inc. ("Salix"), we submit the attached citizen petition requesting that the Commissioner of the United States Food and Drug Administration refrain from approving any abbreviated new drug application submitted under section 505(j) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(j), referencing any strength of Xifaxan® as the reference listed drug, unless such approval is in full accordance with the actions requested in the petition.

This petition is a new filing, separate and distinct from Salix's citizen petitions assigned docket FDA-2008-P-0300-0001 (filed on May 15, 2008) and FDA-2016-P-3418-0001 (filed on Oct. 17, 2016).

This petition is being submitted under section 505 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355, and in accordance with 21 C.F.R. § 10.30. In order to protect confidential trade secret information addressed by 21 C.F.R. § 20.61, this redacted version of the petition is being filed along with publicly available references, initially. Once FDA acknowledges receipt of the petition and provides a docket number, Salix will submit a non-redacted, confidential version of the petition and a full set of references.

Should you have any questions regarding this petition, please do not hesitate to contact the undersigned.

Sincerely,

Lance L. Shea
Partner

## CITIZEN PETITION

The undersigned submits this petition under section 505 of the Federal Food, Drug, and Cosmetic Act to request the Commissioner of Food and Drugs to refrain from approving any abbreviated new drug application submitted under section 505(j) of the Federal Food, Drug, and Cosmetic Act referencing any strength of Xifaxan® as the reference listed drug, unless such approval is in full accordance with the actions requested herein.

Salix Pharmaceuticals, Inc.

December 28, 2020

## TABLE OF CONTENTS

I.     **Actions Requested** ........................................................................ 1

II.    **Executive Summary** ..................................................................... 2

III.   **Statement of Legal Grounds** ...................................................... 5

      A.    **To be approved under FDCA Section 505(j), a Proposed Generic must be proven therapeutically equivalent to Xifaxan** .................. 5

      B.    **The bioequivalence requirement must be met for approval of Proposed Generics.** ........................................................... 6

      C.    **The pharmaceutical equivalence (active ingredient sameness) requirement must be met for approval of Proposed Generics.** ... 10

IV.   **Statement of Technical Grounds** ............................................... 12

      A.    **No methodology exists to reliably measure or estimate the rate at, or extent to which dissolved rifaximin from a Proposed Generic will become available at topical sites of action.** ............................. 12

      B.    Redacted ..... 12

      C.    Redacted

             .................................................... 16

      D.    Redacted
             ................. 18

      E.    Redacted

             .................................................... 19

           1.    Redacted
                ................... 19

           2.    Redacted

                .................................................... 20

           3.    Redacted
                        21

           4.    Redacted

Redacted .................. 21

5.          Redacted ............ 25

F.    **The recommendations made by the Draft Guidance on Rifaximin will not ensure that any Proposed Generic is bioequivalent to Xifaxan.** ......................................... 25

    1.    **The recommendations made by the Draft Guidance on Rifaximin.** ......................................... 25

    2.    **The Recommended PK Studies must be revised.** ............... 27

        a)    **The Recommended PK Studies cannot provide meaningful evidence about the rate at, or extent to which dissolved rifaximin from a Proposed Generic will become available at topical sites of action.** ...... 27

        b)          Redacted .......................................................... 28

    3.    **The Recommended IVD Methods must be revised.** ........... 32

        a)          Redacted ........ 32

        b)    **No current IVD methodology has been demonstrated to simulate *in vivo* dissolution conditions in the GI tract.** ........................................ 32

            (1)    **The Recommended IVD Methods have not been demonstrated to simulate *in vivo* dissolution conditions in the GI tract.** ........ 32

            (2)          Redacted ............................ 33

        c)          Redacted .............. 33

**(1)** Redacted .............. **33**

**(2)** Redacted ....................................................... **34**

**(3)** Redacted ....................................................... **34**

**(4)** Redacted ....................................................... **36**

**d)** Redacted ................................. **38**

**(1)** Redacted ....................................................... **38**

**(2)** Redacted .......... **38**

**(3)** Redacted . .... **39**

**(4)** Redacted ....................................................... **39**

**(5)** Redacted ................... **40**

**(6)** Redacted ............ **41**

**e)**              Redacted

.................................................. **44**

       **(1)**         Redacted

............................. **44**

       **(2)**         Redacted

.................................. **44**

       **(3)**         Redacted

.............. **46**

**4.**      The Recommended CEBE Studies must be revised.......... **47**

     **a)**       **Alone, the Recommended CEBE Studies will not provide evidence sufficient for approval of a Proposed Generic. .................................................... 47**

       **(1)**        **CEBE studies do not measure bioequivalence directly. ............................. 47**

       **(2)**        **CEBE studies are the least sensitive methodology for estimating the rate at, and extent to which dissolved rifaximin from a Proposed Generic will become available at Xifaxan's topical sites of action. ................ 47**

       **(3)**        Redacted

.............................. **49**

**(a)**       Redacted    ...................... **51**

**(b)**       Redacted    ............... **52**

**(c)**       Redacted
            .............................................. **53**

**b)**      **The biowaiver of a CEBE study for Xifaxan 200 Tablets offered by the Draft Guidance on Rifaximin cannot be allowed** Redacted

          .............................................. **54**

**G.**    **The Draft Guidance on Rifaximin must ensure that Proposed Generics provide Xifaxan's full therapeutic effect strength for each indication, especially the HE indication: a CEBE study for the HE indication is necessary for approval of a Proposed Generic.** .................................................. **54**

    **1.**    **Therapeutic effect strength for each Xifaxan indication must be ensured.** ....................................... **55**

    **2.**    **A CEBE study for the HE indication is necessary for Proposed Generics that do not have the Xifaxan Polymorph Profile, as well as those that contain excipients that are not Q1/Q2 equivalent to those in Xifaxan.** .......... **56**

**H.**    **If the GI lumen is over- or under-dosed with rifaximin by a Proposed Generic, the risk of antibiotic resistance will be increased.** ...................................................... **58**

**V.**    **Conclusion: The Draft Guidance on Rifaximin must be revised as requested by this petition.** ............................................ **60**

**VI.**    **Environmental Impact** ......................................................... **61**

**VII.**    **Economic Impact** .............................................................. **61**

**VIII.**    **Certification** ..................................................................... **61**

# LIST OF TABLES

Table 1:                                    Redacted

Table 2:          Option 1 Testing

Table 3:          Option 2 Testing

Table 4:                                  Redacted

Table 5:                                  Redacted

Table 6:                                Redacted

Table 7:                                  Redacted

Table 8:                              Redacted

Table 9:                             Redacted

Table 10:                              Redacted

Table 11:         Hypothetical Range of Bioequivalence Assessments in CEBE
                  Studies: Travelers' Diarrhea

Table 12:         Hypothetical Range of Bioequivalence Assessments in CEBE
                  Studies: Hepatic Encephalopathy

Table 13:         Hypothetical Range of Bioequivalence Assessments in CEBE
                  Studies: Irritable Bowel Syndrome with Diarrhea

## **LIST OF FIGURES**

Figure 1:      Redacted

Figure 2:       Redacted

Figure 3:       Redacted

Figure 4:       Redacted

Figure 5:       Redacted

Figure 6:      Redacted

Figure 7:       Redacted

Figure 8:       Redacted

Figure 9:       Redacted

Figure 10:      Redacted

Figure 11:      Redacted

Figure 12:       Redacted

Figure 13:      Redacted

Figure 14:                         Redacted


Figure 15:                          Redacted


Figure 16:                          Redacted


Figure 17:                         Redacted


Figure 18:        Graphical Overview of Bioequivalence Assessment Scenarios in
                  CEBE Studies.

Figure 19:                          Redacted

# Exhibit K


(https://www.bauschhealth.com/)

# NEWS ROOM
# News Releases

## Bausch Health Provides Update Following Oral Order in XIFAXAN® Patent Litigation

JULY 28, 2022

**-- Company to Appeal Expected Court Decision on Certain XIFAXAN® Patents –**

LAVAL, Quebec, July 28, 2022 /PRNewswire/ -- Bausch Health Companies Inc. (NYSE/TSX: BHC), and its gastroenterology business Salix Pharmaceuticals, today announced the U.S. District Court of Delaware issued an Oral Order in the matter of *Salix Pharmaceuticals, Ltd. et al v. Norwich Pharmaceuticals, Inc.* regarding the infringement and validity of certain U.S. Patents protecting the composition and use of XIFAXAN® (rifaximin) 550 mg tablets for the treatment of irritable bowel syndrome with diarrhea (IBS-D) and reduction in risk of overt hepatic encephalopathy (HE) recurrence.

The Oral Order indicates that the Court will find certain U.S. Patents protecting the use of XIFAXAN® (rifaximin) 550 mg tablets for the reduction in risk of HE recurrence valid and infringed and U.S. Patents protecting the composition, and use of XIFAXAN® for treating IBS-D invalid. While the Court has not yet entered any final judgement, absent Norwich's removal of the HE indication and data from their Abbreviated New Drug Application

(ANDA), it is expected that the Court will enjoin Norwich's pending ANDA until expiration of the XIFAXAN® HE Patents in 2029. The Company intends to vigorously oppose any attempt by Norwich to remove the HE safety data from its ANDA in an effort to avoid the XIFAXAN® HE Patents.

The FDA has stated that they plan to make a major revision to the rifaximin product specific guidance to add an *in vivo* bioequivalency study. Until an approval of a revised ANDA is granted by the FDA and the expected injunction modified by the Court, Norwich is not permitted to launch a generic equivalent of XIFAXAN®.

When the Court enters a final order, Bausch Health will consider all available options to vigorously defend the intellectual property protecting XIFAXAN® and will appeal the Court's decision to the U.S. Court of Appeals for the Federal Circuit.

"We are disappointed with today's development. We strongly disagree with any conclusion that our patents are not valid and intend to file an appeal to any such order," Thomas J. Appio, CEO, Bausch Health, said. "As a leader in gastrointestinal health, protecting our intellectual property is essential to our ability to continue to develop innovative therapies. We intend to vigorously pursue all available options to challenge any final ruling, while also continuing to drive growth and innovation for our XIFAXAN® franchise."

Bausch Health has previously entered into settlement agreements with Teva, Sun Pharmaceuticals, and Sandoz to permit a generic rifaximin product entry in 2028 or upon an earlier approval and launch of a generic rifaximin product. Until, and if, Norwich secures FDA approval for its generic rifaximin product and subsequently launches a generic rifaximin product, Teva, Sun Pharmaceuticals, and Sandoz will not be permitted to launch a generic version of XIFAXAN® tablets before 2028.

The Company intends to file an appeal immediately after any final order is issued, assuming it is consistent with the Oral Order.

## About XIFAXAN

XIFAXAN® (rifaximin) 550 mg tablets are indicated for the reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults and for the treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.